[No. S041459. Aug. 5, 1997.]

AMERICAN ACADEMY OF PEDIATRICS et al., Plaintiffs and
Respondents, v.
DANIEL E. LUNGREN, as Attorney General, etc., et al., Defendants and
Appellants.

312

COUNSEL

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General,

Stephanie Wald and Ralph M. Johnson, Deputy Attorneys General, for Defendants and Appellants.

Larry P. Arnn, Edward J. Erler, Ernest O. Vincent, Samuel B. Casey, Frank J. Fisher, Anne J. Kindt, William P. Clark, Alister McAlister, Clarke D. Forsythe, Paul Benjamin Linton, Reed & Brown, Stephen W. Reed and Michael J. Coppess as Amici Curiae on behalf of Defendants and Appellants.

Abigail English, Margaret C. Crosby, Ann Brick Carol Sobel, Morrison & Foerster, Linda E. Shostak, David G. Robertson Annette P. Carnegie and Lori A. Schechter for Plaintiffs and Respondents.

Louise H. Renne, City Attorney (San Francisco), Paula Jesson, Deputy City Attorney, Dawn M. Schock, Mary Ann Soden, Mark I. Schickman, Amitai Schwartz, Jone Lemos Jackson, Renee Nordstrand, Jean A. Martin, Jenny E. Skoble, Catherine A. Porter, Janine Reagan, Elizabeth Mohr, Elizabeth E. Bader, Gilbert Gaynor, Geraldine Jaffe, Robert F. Kane, Joseph R. Grodin, Farella, Braun & Martell, Ann G. Daniels, Jill A. Thompson, Claudia A. Lewis, Steel, Clarence & Buckley, Nanci Clarence, Martin Guggenheim, McCutchen, Doyle & Enersen, McCutchen, Doyle, Brown & Enersen, Leslie G. Landau, Brandt Andersson, Beth H. Parker, Hope A. Schmeltzer, Shashikala Bhat, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Ethan P. Schulman, Lewis D'Amato, Brisbois & Bisgaard and Paula F. Henry as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

GEORGE, C. J.—In this case we must determine the validity, under the California Constitution, of a statutory provision that requires a pregnant minor (whether just short of her 18th birthday, or several years younger) to secure parental consent or judicial authorization before she may obtain an abortion. The trial court, after a lengthy court trial, concluded that the statute was unconstitutional, and the Court of Appeal unanimously agreed with that ruling and affirmed the judgment.

As in past cases involving the controversial subject of abortion, we emphasize at the outset that the morality of abortion is not at issue in this case. "The morality of abortion is not a legal or constitutional issue; it is a matter of philosophy, of ethics, and of theology. It is a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles." (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29

Cal.3d 252, 284 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].) Our decision in this case does not turn upon the personal views of any justice with regard to that moral issue.

Nor is the desirability of parental involvement in a minor's decision whether to obtain an abortion or instead to give birth to a child in question here. No one would doubt the value to a pregnant minor of wise and caring parental guidance and support as she confronts a decision that will affect the rest of her life, assuming such support is available and the minor is willing to seek it. The statute at issue, however, applies not only to a pregnant minor who is willing to seek parental advice and consent, but rather has its most significant impact in those instances in which a pregnant minor is too frightened or too embarrassed to disclose her condition to a parent (or to a court).

The question before us is not whether, as a matter of policy, the challenged statute is wise or beneficial, but instead whether it is constitutional. We determine the validity of the legislative measure by applying the relevant legal principles embodied in the California Constitution, the preeminent expression of California law enacted by the people.

For the reasons explained hereafter, we conclude that both the trial court and the Court of Appeal correctly determined that the statute at issue violates the right of privacy guaranteed by article I, section 1, of the California Constitution. Accordingly, we shall affirm the judgment rendered by the Court of Appeal.[1]

I

The statutory provision in question—Assembly Bill No. 2274, 1987-1988 Regular Session (hereafter Assembly Bill 2274)—was enacted in 1987, but it has never been enforced because its application has been stayed by the lower courts pending determination of its validity. This measure constitutes just one part of a comprehensive statutory scheme governing the conditions and circumstances under which medical, surgical, and hospital care may be provided to minors in California. To place the challenged legislation in proper perspective, we review the history and evolution of the related California statutory provisions in this area.

At common law, minors generally were considered to lack the legal capacity to give valid consent to medical treatment or services, and consequently a parent, guardian, or other legally authorized person generally was

---

[1]It bears emphasis that *all* of the lower court judges who have considered the validity of the statute in question have found that the statute violates the right of privacy guaranteed by the California Constitution.

required to provide the requisite consent. In the absence of an emergency, a physician who provided medical care to a minor without such parental or other legally authorized consent could be sued for battery. (See generally, IJA-ABA Joint Com. on Juvenile Justice Standards, Standards Relating to Rights of Minors (1984) std. 4.1, com., p. 51.) As with other common law rules relating to the legal "disability" of minority, the purpose of the general common law rule regarding medical care was to protect the health and welfare of minors, safeguarding them from the potential overreaching of third parties or the improvidence of their own immature decisionmaking, and leaving decisions concerning the minor's medical care in the hands of his or her parents, who were presumed to be in the best position to protect the health of their child. (See, e.g., *Bonner* v. *Moran* (D.C. Cir. 1941) 126 F.2d 121, 122-123 [75 App.D.C. 156, 139 A.L.R. 1366].)

The requirement that medical care be provided to a minor only with the consent of the minor's parent or guardian remains the general rule, both in California and throughout the United States. (See, e.g., *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243-244 [104 Cal.Rptr. 505, 502 P.2d 1]; *Rainer* v. *Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 251, fn. 14 [95 Cal.Rptr. 901]; see generally, Annot. (1989) 67 A.L.R.4th 511, 516-517.) Over the past half-century, however, a number of significant statutory developments in California have modified the general rule relating to the provision of medical care to minors.

One development involves the Legislature's enactment of a number of discrete, so-called "medical emancipation" statutes, each of which has designated a general category of minors who—although not legally emancipated for all purposes—nonetheless are authorized to obtain medical, surgical, or hospital care in all contexts, without parental consent. In 1961, the Legislature enacted statutory provisions authorizing (1) any lawfully married minor, and (2) any minor on active duty with any of the United States armed services, to consent to all hospital, medical, and surgical care without parental approval. (Stats. 1961, ch. 1407, § 1, p. 3212 [enacting former Civ. Code, § 25.6]; Stats. 1961, ch. 1407, § 2, p. 3213 [enacting former Civ. Code, § 25.7].)[2] And in 1968, the Legislature adopted a somewhat broader medical emancipation statute, providing that "a minor 15 years of age or older who is living separate and apart from his parents or legal guardian, whether with or without the consent of a parent or guardian and regardless of

[2]In 1978, in adopting a new, comprehensive Emancipation of Minors Act, the Legislature provided that any person who has entered into a valid marriage or is on active duty with any of the armed forces of the United States is an emancipated minor for all purposes. (See Stats. 1978, ch. 1059, § 1, p. 3267, enacting former Civ. Code, § 62, subds. (a), (b), now Fam. Code, § 7002, subds. (a), (b).)

the duration of such separate residence, and who is managing his own financial affairs, regardless of the source of his income," may consent to any hospital, medical, or surgical care *without parental approval.* (Stats. 1968, ch. 371, § 1, p. 785 [enacting former Civ. Code, § 34.6, now Fam. Code, § 6922]; see *Carter* v. *Cangello* (1980) 105 Cal.App.3d 348 [164 Cal.Rptr. 361].)

In addition to this first category of what might be characterized as "*general* medical emancipation" statutes, California has adopted a considerable number of additional statutory provisions that fall within a second category of what might be termed "*limited* medical emancipation" statutes, i.e., statutes that authorize minors, without parental consent, to obtain medical care only *for specific, designated conditions,* without authorizing the minor to consent to medical care for other medical needs. These limited medical emancipation statutes identify circumstances in which a minor in need of medical care may be reluctant, for a variety of reasons, to inform his or her parents of the situation or condition that has created the minor's need for such care, and in which, because of such reluctance, there is a substantial risk that minors would fail to seek medical care—"to the detriment of themselves, their families, and society" (Wadlington, *Medical Decision Making for and by Children: Tensions Between Parent, State and Child* (1994) 1994 U.Ill.L.Rev. 311, 323-324)—were minors required to inform their parents and obtain parental consent before being allowed to receive medical care. (See generally, Wadlington, *Consent to Medical Care for Minors,* in Children's Competence to Consent (Melton et al. edits. 1983) pp. 61-64.)

Over the past 40 years, California has enacted a variety of such limited medical emancipation statutes. The initial statute falling within this category—the amended version of which is challenged in this case—was enacted in 1953 and authorized an unmarried pregnant minor, *without parental consent,* to obtain hospital, medical, and surgical care *related to pregnancy.* (Stats. 1953, ch. 1654, § 1, p. 3383, enacting former Civ. Code, § 34.5, now Fam. Code, § 6925.) (We shall review the specific language and evolution of this statute in more detail below.) In 1968, the Legislature adopted a similar provision authorizing any minor, 12 years of age or older, to obtain, without parental consent, medical care *related to* the diagnosis or treatment of *any infectious, contagious, or communicable disease, including a sexually transmitted disease.* (Stats. 1968, ch. 417, § 1, p. 859, enacting former Civ. Code, § 34.7, now Fam. Code, § 6926.) In 1977, an analogous provision was adopted authorizing any minor, 12 years of age or older, to obtain, without parental consent, medical care *related to the diagnosis and treatment of rape.* (Stats. 1977, ch. 354, § 1, p. 1325, enacting former Civ. Code, § 34.8, now Fam. Code, § 6927.) That same year, the Legislature adopted another statute

authorizing a minor (of any age) to obtain, without parental consent, medical care *relating to sexual assault.* (Stats. 1977, ch. 935, § 1, p. 2859, enacting former Civ. Code, § 34.9, now Fam. Code, § 6928.)[3] And in 1977 the Legislature also adopted a statute authorizing any minor, 12 years or older, without parental consent, to obtain medical care and counseling *relating to the diagnosis and treatment of a drug or alcohol related problem.* (Stats. 1977, ch. 979, § 1, p. 2953, enacting former Civ. Code, § 34.10, now Fam. Code, § 6929.)[4] Finally, in 1979, another, somewhat comparable statute was adopted by the Legislature, authorizing a minor, 12 years or older, to obtain, without parental consent, *mental health treatment or counseling on an outpatient basis.* (Stats. 1979, ch. 832, § 1, p. 2887, enacting former Civ. Code, § 25.9, now Fam. Code, § 6924.)

As this list demonstrates, over the past four decades the Legislature has recognized that, in a variety of specific contexts, the protection of the health of minors may best be served by permitting a minor to obtain medical care without parental consent. These statutes do not reflect a legislative determination that a minor who, for example, has been raped or has contracted a sexually transmitted disease would not benefit from the consultation and advice of a supportive parent. Indeed, as noted, a few of the statutes specifically call upon the treating physician or health care provider to notify and attempt to involve the minor's parents in the treatment process, so long as the circumstances suggest to the health care provider that such involvement will not be detrimental to the health or interests of the minor. (See *ante,* fns. 3, 4.) Nor do these statutes imply that a minor who, for example, has been sexually assaulted or has a drug or alcohol abuse problem is more mature or knowledgeable than other minors of similar age; a minor who may obtain medical care for such conditions still must obtain parental consent before she or he may obtain, for example, an appendectomy.

Instead, each of these statutory provisions embodies a legislative recognition that, particularly in matters concerning sexual conduct, minors frequently are reluctant, either because of embarrassment or fear, to inform their parents of medical conditions relating to such conduct, and consequently that there is a considerable risk that minors will postpone or avoid

---

[3]The provision authorizing a minor to consent to medical care relating to sexual assault contains a provision directing the professional who renders such medical treatment to attempt to contact the minor's parent or parents, but also provides that such contact need not be attempted if the professional believes that the parent committed the sexual assault.

[4]Although authorizing a minor to obtain medical care for drug and alcohol abuse problems without parental consent, the statute also provides that "[t]he treatment plan of a minor authorized by this section shall include the involvement of the minor's parent, parents, or legal guardian, if appropriate, as determined by the professional person or treatment facility treating the minor." (Stats. 1977, ch. 979, § 1, p. 2953.)

seeking needed medical care if they are required to obtain parental consent before receiving medical care for such conditions. To protect their health in these particular circumstances, the statutes authorize minors to receive medical care for these designated conditions without parental consent.

As already noted, the present case involves the constitutional validity of a legislative measure that amends the oldest of California's limited medical emancipation statutes, the one pertaining to a minor's access to medical care relating to pregnancy. We now proceed to review the history of that measure in some detail.

As originally enacted in 1953, former Civil Code section 34.5 provided in full: "Notwithstanding any other provision of the law, an unmarried, pregnant minor may give consent to the furnishing of hospital, medical and surgical care related to her pregnancy, and such consent shall not be subject to disaffirmance because of minority. The consent of the parent or parents of an unmarried, pregnant minor shall not be necessary in order to authorize hospital, medical and surgical care related to her pregnancy." (Stats. 1953, ch. 1654, § 1, p. 3383.) Under the terms of the statute, an unmarried pregnant minor was authorized to receive, without parental notification or consent, the full range of medical care related to her pregnancy that a pregnant adult could receive.

At the time former Civil Code section 34.5 was enacted in 1953, the applicable California statute narrowly limited the right of *any* pregnant woman to obtain an abortion, providing that a physician lawfully could perform an abortion only when such a procedure was "necessary to preserve" the life of the pregnant woman. (Former Pen. Code, § 274; see, e.g., *People* v. *Ballard* (1959) 167 Cal.App.2d 803, 814 [335 P.2d 204] [interpreting the scope of the statute].) Although no published decision addressed the question, it appears that at this time a pregnant minor, like a pregnant adult, lawfully could obtain an abortion only when the procedure was "necessary to preserve" the minor's life within the meaning of former Penal Code section 274. Under the terms of former Civil Code section 34.5, however, whenever such an abortion lawfully could be performed, a minor could obtain such medical and surgical care without parental involvement.

In 1967, the Legislature passed the Therapeutic Abortion Act (Stats. 1967, ch. 327, § 1, p. 1521, enacting former Health & Saf. Code, §§ 25950-25954). This act expanded the circumstances under which a woman lawfully could obtain an abortion, authorizing such a surgical procedure when (1) there was a substantial risk that continuation of the pregnancy would gravely impair the woman's physical or mental health, or (2) the pregnancy was the result

of rape or incest. (Under the Therapeutic Abortion Act, the determination whether a woman was eligible for an abortion was to be made by a committee composed of members of the medical staff of the hospital at which the abortion was to be performed.)

In *Ballard* v. *Anderson* (1971) 4 Cal.3d 873 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392], this court was presented with the question whether a pregnant minor, by virtue of former Civil Code section 34.5, was authorized to consent to the same medical and surgical procedures relating to her pregnancy to which a pregnant adult could consent under the Therapeutic Abortion Act. Finding nothing in the language of the act that would preclude a pregnant minor from consenting to an abortion under the conditions set forth in the act, the court in *Ballard* concluded that because an abortion constituted surgical care related to pregnancy within the meaning of former Civil Code section 34.5, under that provision a pregnant minor lawfully could consent to a therapeutic abortion. The court in *Ballard* declared: "There is no rational basis for discriminatorily singling out therapeutic abortion as the only type of pregnancy-related surgical care which requires parental consent." (4 Cal.3d at p. 883.)

Thus, the decision in *Ballard* confirmed that, under the then existing provisions of former Civil Code section 34.5, a pregnant minor could obtain, without parental consent, the full range of medical care relating to her pregnancy that a pregnant adult lawfully could obtain. Shortly after the *Ballard* decision, judicial decisions in this court and the United States Supreme Court (*People* v. *Barksdale* (1972) 8 Cal.3d 320, 332 [105 Cal.Rptr. 1, 503 P.2d 257]; *Roe* v. *Wade* (1973) 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147]; *Doe* v. *Bolton* (1973) 410 U.S. 179 [93 S.Ct. 739, 35 L.Ed.2d 201]), as well as the electorate's adoption of an explicit California constitutional right of privacy in November 1972, provided additional protection of a pregnant individual's right to choose whether to continue or terminate her pregnancy. Because the provisions of former Civil Code section 34.5 remained unchanged in all relevant respects,[5] California law continued to afford pregnant minors the right to obtain, without parental consent, the same, full range of medical and surgical care relating to pregnancy that a pregnant adult could obtain.

From its enactment in 1953 until its amendment in 1987, former Civil Code section 34.5 drew no distinction on the basis of whether or not a

---

[5]In 1975, former Civil Code section 34.5 was amended to authorize an unmarried minor to obtain, without parental consent, not only medical and surgical care relating to pregnancy, but care, other than sterilization, relating to "the prevention . . . of pregnancy," e.g., the prescription and furnishing of contraceptive drugs and devices. (Stats. 1975, ch. 820, § 1, p. 1873.)

pregnant minor chose to continue or to terminate her pregnancy. The statute provided simply that a minor could obtain medical and surgical care "relating to pregnancy" without parental consent, affording a pregnant minor unencumbered access to medical care relating to her pregnancy without regard to whether the minor chose to continue or to terminate her pregnancy.

In 1987, the Legislature enacted Assembly Bill 2274 (Stats. 1987, ch. 1237, §§ 1-7, pp. 4396-4399), which left unchanged the general language of former Civil Code section 34.5 ("[n]otwithstanding any other provision of law, an unemancipated minor may give consent to the furnishing of hospital, medical and surgical care related to the prevention or treatment of pregnancy . . . [and t]he consent of the parent or parents of such minor shall not be necessary in order to authorize the hospital, medical, and surgical care"), but added a concluding clause that declares the section shall not be construed "to authorize an unemancipated minor to receive an abortion without the consent of a parent or guardian other than as provided in Section 25958 of the Health and Safety Code."[6]

Former section 25958 of the Health and Safety Code (now § 123450), which was added by Assembly Bill 2274, in turn provides that (1) "[e]xcept in a medical emergency requiring immediate medical action, no abortion shall be performed upon an unemancipated minor unless she first has given her written consent to the abortion and also has obtained the written consent of one of her parents or legal guardian," and (2) "[i]f one or both of an unemancipated, pregnant minor's parents or her guardian refuse to consent to the performance of an abortion, or if the minor elects not to seek the[ir] consent . . . , an unemancipated pregnant minor may file a petition with the juvenile court[,] . . . set[ting] forth with specificity the minor's reasons for the request." Declaring that the minor's identity is to be treated as confidential in such a proceeding, Health and Safety Code former section 25958 goes on to provide that (1) if the court finds that the minor "is sufficiently mature and sufficiently informed to make the decision on her own regarding an abortion, and that the minor has, on that basis, consented thereto, the court shall grant the petition," and (2) if the court finds that the minor is not

---

[6]Former Civil Code section 34.5, as amended, read in full:
"Notwithstanding any other provision of law, an unemancipated minor may give consent to the furnishing of hospital, medical and surgical care related to the prevention or treatment of pregnancy, and that consent shall not be subject to disaffirmance because of minority. The consent of the parent or parents of such minor shall not be necessary in order to authorize the hospital, medical, and surgical care.
"This section shall not be construed to authorize a minor to be sterilized without the consent of his or her parent or guardian [or] to authorize an unemancipated minor to receive an abortion without the consent of a parent or guardian other than as provided in Section 25958 of the Health and Safety Code." (Stats. 1987, ch. 1237, § 2, p. 4396.)

sufficiently mature and informed, "the court shall then consider whether performance of the abortion would be in the best interest of the minor," and shall grant the petition if the court finds that the performance of an abortion would be in the minor's best interest and deny the petition if it finds that the performance of an abortion would not be in the minor's best interest. The section also includes a number of provisions intended to ensure that the so-called "judicial bypass" proceeding is held and decided expeditiously, and, if the trial court denies the petition, that the denial is subject to expedited appellate review. Finally, the section provides that any person who knowingly performs an abortion on a minor without complying with the section's provisions is guilty of a misdemeanor (punishable by a fine or incarceration).[7]

---

[7]Health and Safety Code section 25958, as added by Assembly Bill 2274 (Stats. 1987, ch. 1237, § 3, pp. 4396-4398) , reads in full:

"(a) Except in a medical emergency requiring immediate medical action, no abortion shall be performed upon an unemancipated minor unless she first has given her written consent to the abortion and also has obtained the written consent of one of her parents or legal guardian.

"(b) If one or both of an unemancipated, pregnant minor's parents or her guardian refuse to consent to the performance of an abortion, or if the minor elects not to seek the consent of one or both of her parents or her guardian, an unemancipated pregnant minor may file a petition with the juvenile court. If, pursuant to this subdivision, a minor seeks a petition, the court shall assist the minor or person designated by the minor in preparing the petition and notices required pursuant to this section. The petition shall set forth with specificity the minor's reasons for the request. The court shall ensure that the minor's identity is confidential. The minor may file the petition using only her initials or a pseudonym. An unemancipated pregnant minor may participate in the proceedings in juvenile court on her own behalf, and the court may appoint a guardian ad litem for her. The court shall, however, advise her that she has a right to court-appointed counsel upon request. The hearing shall be set within three days of the filing of the petition. A notice shall be given to the minor of the date, time, and place of the hearing on the petition.

"(c) At the hearing on a minor's petition brought pursuant to subdivision (b) for the authorization of an abortion, the court shall consider all evidence duly presented, and order either of the following:

"(1) If the court finds that the minor is sufficiently mature and sufficiently informed to make the decision on her own regarding an abortion, and that the minor has, on that basis, consented thereto, the court shall grant the petition.

"(2) If the court finds that the minor is not sufficiently mature and sufficiently informed to make the decision on her own regarding an abortion, the court shall then consider whether performance of the abortion would be in the best interest of the minor. In the event that the court finds that the performance of the abortion would be in the minor's best interest, the court shall grant the petition ordering the performance of the abortion without consent of, or notice to, the parents or guardian. In the event that the court finds that the performance of the abortion is not in the best interest of the minor, the court shall deny the petition.

"Judgment shall be entered within one court day of submission of the matter.

"(d) The minor may appeal the judgment of the juvenile court by filing a written notice of appeal at any time after the entry of the judgment. The Judicial Council shall prescribe, by rule, the practice and procedure on appeal and the time and manner in which any record on appeal shall be prepared and filed. These procedures shall require that the notice of the date, time, and place of hearing, which shall be set within five court days of the filing of notice of

Accordingly, as revised by Assembly Bill 2274, the applicable California statutes continue to authorize a pregnant minor to obtain medical care relating to her pregnancy without parental consent or judicial authorization so long as the minor chooses to continue her pregnancy, but provide that the minor may obtain a medically safe abortion only if she first obtains parental consent or judicial authorization.

II

Plaintiffs filed the present action challenging the constitutionality of Assembly Bill 2274 in November 1987, shortly after the statute was enacted and before it was scheduled to go into effect on January 1, 1988.[8] Plaintiffs contended that the statute violated the right of privacy secured by article I, section 1, of the California Constitution and denied them equal protection of the laws in violation of article I, section 7, of the California Constitution, and sought a preliminary injunction to enjoin its operation.

In December 1987, the superior court issued a preliminary injunction prohibiting state officials from enforcing the newly enacted legislation pending the resolution of plaintiffs' constitutional challenge. Defendants appealed from the order granting a preliminary injunction, and further proceedings with regard to the merits of the action were stayed pending that appeal. In October 1989, the Court of Appeal affirmed the trial court's order, concluding that in view of the substantiality of plaintiffs' constitutional challenge and the balance of relative hardships, the trial court did not err in granting the preliminary injunction. (*American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831 [263 Cal.Rptr. 46] (*American Pediatrics I*).) In reaching this conclusion, the Court of Appeal in *American Pediatrics I* determined that the provisions of Assembly Bill 2274 represented a significant infringement on a pregnant minor's intimate and fundamental constitutional right to choose whether or not to continue her pregnancy, and that to sustain the constitutionality of the provision "the burden at

appeal, shall be mailed to the parties by the clerk of the court. The appellate court shall ensure that the minor's identity is confidential. The minor may file the petition using only her initials or a pseudonym. Judgment on appeal shall be entered within one court day of submission of the matter.

"(e) No fees or costs incurred in connection with the procedures required by this section shall be chargeable to the minor or her parents, or either of them, or to her legal guardian.

"(f) It is a misdemeanor, punishable by a fine of not more than one thousand dollars ($1000), or by imprisonment in the county jail of up to 30 days, or both, for any person to knowingly perform an abortion on an unmarried or unemancipated minor without complying with the requirements of this section." (Stats. 1987, ch. 1237, § 3, pp. 4396-4398.)

[8]Plaintiffs in this action are the American Academy of Pediatrics, California District IX; the California Medical Association; the American College of Obstetricians and Gynecologists, District IX; Planned Parenthood of Alameda-San Francisco; and Dr. Philip Darney, a board-certified specialist in obstetrics and gynecology. Defendants are the Attorney General of the State of California and the district attorneys of each California county.

trial will be upon the People to prove they have a compelling interest in the regulation of unemancipated minors' consent to an abortion . . . [and] that this legislation is the least intrusive alternative available and is so narrowly drawn as to impinge upon the constitutionally protected area no more than is necessary to accomplish the state's legitimate goals." (214 Cal.App.3d at pp. 846-847.) The Court of Appeal in *American Pediatrics I* further held that, in view of this court's decision in *Committee to Defend Reproductive Rights* v. *Myers, supra*, 29 Cal.3d 252, "[t]he court at trial will have to determine if minors who have abortions have needs different from those of minors choosing to carry to term and, if not, whether legislation reasonably can be drafted which does not impermissibly discriminate between classes of minors." (214 Cal.App.3d at p. 848.) The matter then was returned to the superior court for further proceedings.

In October and November 1991, the case was tried to the superior court, sitting without a jury. At trial, 25 witnesses testified, and the deposition testimony of 6 other witnesses was admitted into evidence. The witnesses represented a broad spectrum of experts with training and experience in the fields of health care, adolescent development, and the application of judicial bypass procedures in other states. The testimony covered a wide range of subjects, including the relative medical and psychological risks posed to pregnant minors by abortion and childbirth, the general maturity of minors seeking abortion, the existing guidelines and practices with regard to the counseling provided to minors seeking abortion, and the general efficacy (or lack thereof) of the judicial bypass process in other jurisdictions.

At the conclusion of the trial, the court issued a lengthy opinion, reviewing the evidence that had been presented at trial and making extensive findings on the basis of the evidence presented. The trial court concluded that although the two interests upon which the state relied to support the legislation—namely, the protection of the physical, emotional, and psychological health of minors, and the furtherance of the parent-child relationship—constituted "compelling state interests" for purposes of the relevant constitutional analysis, the state had failed to prove that the challenged legislation would, in fact, further these interests. Indeed, the trial court found that the evidence at trial overwhelmingly established that the legislation would *not* advance these worthy objectives, but rather would be counterproductive and detrimental both to the health of pregnant minors and to the parent-child relationship. In addition, the trial court found that defendants had failed to justify the distinction drawn by the legislation between pregnant minors who choose to undergo abortions and pregnant minors who choose to carry to term, i.e., by requiring minors who seek to terminate their pregnancy to obtain parental consent or judicial authorization before they obtain medical

care, but permitting pregnant minors who choose to continue their pregnancy to obtain medical care without parental consent or judicial authorization.

On the basis of its factual findings and legal conclusions, the trial court concluded that Assembly Bill 2274 is unconstitutional, violating the right of privacy guaranteed by article I, section 1, of the California Constitution and denying the equal protection of the laws guaranteed by article I, section 7, of the California Constitution. The court issued a judgment permanently enjoining the statute's enforcement. Defendants appealed from the judgment.

While the appeal was pending in the Court of Appeal, our court decided the case of *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633], concluding that an athletic drug testing program, administered by a private organization, did not violate the state constitutional right of privacy. In the course of the decision in *Hill,* our court addressed a number of issues related generally to the proper scope and application of the state constitutional right of privacy. Although the trial court's decision in the present case preceded our decision in *Hill,* the Court of Appeal concluded that there was no need to remand this matter to the trial court for further proceedings in light of *Hill,*[9] and further concluded that, on the basis of the trial court record and the applicable privacy principles set forth and reaffirmed in *Hill,* the trial court correctly had concluded that Assembly Bill 2274 violates the state constitutional right of privacy. Accordingly, the Court of Appeal affirmed the trial court judgment, permanently enjoining the application of Assembly Bill 2274.[10]

We granted defendants' petition for review in order to consider the important issue presented by this case.

## III

In challenging the decisions of both the trial court and the Court of Appeal, defendants rely heavily upon the circumstance that the United States Supreme Court, in a series of decisions, has upheld the validity under the federal Constitution of abortion/parental consent laws—similar to that embodied in Assembly Bill 2274—that have been enacted in other states.[11] Indeed, it is quite clear that in drafting and enacting Assembly Bill 2274 in

---

[9]Neither plaintiffs nor defendants have challenged the Court of Appeal's conclusion that the present record provides an adequate basis upon which to decide the constitutional issue.

[10]Having concluded that the statute violated the state constitutional right of privacy, the Court of Appeal found no need to consider or resolve the state equal protection issue.

[11]The United States Supreme Court has addressed the validity of parental notice and consent provisions in abortion statutes in the following decisions: *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [96 S.Ct. 2831, 49 L.Ed.2d 788]; *Bellotti* v. *Baird*

1987, the California Legislature itself relied heavily upon the prior United States Supreme Court decisions in this area. Most of the express "legislative findings" set forth in section 1 of Assembly Bill 2274 are either verbatim quotations or close paraphrases of language from opinions of the United States Supreme Court,[12] and the judicial bypass provisions of Health and Safety Code former section 25958 clearly were drafted to comply with the requirements set forth in the applicable federal decisions. Defendants maintain that just as the United States Supreme Court has found such a statutory scheme permissible under the federal Constitution, we similarly should find the enactment permissible under the California Constitution.

■ As defendants acknowledge, however, it is well established that the California Constitution "is, and always has been, a document of independent force" (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099]), and that the rights embodied in and protected by the state Constitution are not invariably identical to the rights contained in the federal Constitution. (See generally, *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 351-355 [276 Cal.Rptr. 326, 801 P.2d 1077].) California cases long have recognized the independence of the California Constitution (see, e.g., *Gabrielli* v. *Knickerbocker* (1938) 12 Cal.2d 85, 89 [82 P.2d 391]), and article I, section 24, of the California Constitution expressly confirms that the rights "guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." Past cases make clear that

(1979) 443 U.S. 622 [99 S.Ct. 3035, 61 L.Ed.2d 797] (hereafter *Bellotti II*); *H. L.* v. *Matheson* (1981) 450 U.S. 398 [101 S.Ct. 1164, 67 L.Ed.2d 388]; *Planned Parenthood Assn.* v. *Ashcroft* (1983) 462 U.S. 476 [103 S.Ct. 2571, 76 L.Ed.2d 733]; *Akron* v. *Akron Center for Reproductive Health* (1983) 462 U.S. 416 [103 S.Ct. 2481, 76 L.Ed.2d 687] (hereafter *Akron I*); *Hodgson* v. *Minnesota* (1990) 497 U.S. 417 [110 S.Ct. 2926, 111 L.Ed.2d 344]; *Ohio* v. *Akron Center for Reproductive Health* (1990) 497 U.S. 502 [110 S.Ct. 2972, 111 L.Ed.2d 405]; *Planned Parenthood of Southeastern Pa.* v. *Casey* (1992) 505 U.S. 833 [112 S.Ct. 2791, 120 L.Ed.2d 674] (hereafter *Casey*); *Lambert* v. *Wicklund* (1997) 520 U.S. __ [117 S.Ct. 1169, 137 L.Ed.2d 464].

[12]Section 1 of Assembly Bill 2274 reads in full: "The Legislature finds as follows: (a) the medical, emotional, and psychological consequences of an abortion are serious and can be lasting, particularly when the patient is an immature minor; (b) the capacity to become pregnant and the capacity for exercising mature judgment concerning the wisdom of an abortion are not logically related; (c) minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences of their actions; (d) parents ordinarily possess information essential to a physician's exercise of his or her best medical judgment concerning a minor child; and (e) parents who are aware that their minor daughter has had an abortion may better ensure that she receives adequate medical attention subsequent to her abortion." (Stats. 1987, ch. 1237, § 1, p. 4396.)

The first four of these findings either directly quote or paraphrase language from two United States Supreme Court opinions. Findings (a), (b), and (d) correspond to language in *H. L.* v. *Matheson, supra,* 450 U.S. 398, 408, 411 [101 S.Ct. 1164, 1170-1171, 1172], and finding (c) corresponds to language in the lead opinion in *Bellotti II, supra,* 443 U.S. 622, 640 [99 S.Ct. 3035, 3046].

even when the terms of the California Constitution are textually identical to those of the federal Constitution, the proper interpretation of the state constitutional provision is not invariably identical to the federal courts' interpretation of the corresponding provision contained in the federal Constitution. (See, e.g., *Raven* v. *Deukmejian, supra,* 52 Cal.3d 336, 352-354; *People* v. *Brisendine, supra,* 13 Cal.3d 528, 548-551.)

■ Furthermore, with respect to the specific constitutional right at issue in this case—*the constitutional right of privacy*—there is a clear and substantial difference in the applicable language of the federal and state Constitutions. The federal Constitution contains no provision expressly setting forth or guaranteeing a constitutional right of "privacy"; the recent federal cases recognizing and protecting an individual's privacy interest in the area of reproductive rights have found such a right *implied* within the more general constitutional protection of "liberty" embodied in the Fifth and Fourteenth Amendments. (See, e.g., *Casey, supra,* 505 U.S. 833, 846-853 [112 S.Ct. 2791, 2804-2808].) The California Constitution, by contrast, contains in article I, section 1, an *explicit* guarantee of the right of "privacy."[13] This explicit reference to the right of privacy was added to the California Constitution in November 1972, when the electorate approved an initiative measure whose purpose was to provide explicit protection of the right of privacy in the state Constitution. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26-27; *id.,* rebuttal to argument against Prop. 11, p. 28.)

Finally, and most significantly, not only is the state constitutional right of privacy embodied in explicit constitutional language not present in the federal Constitution, but past California cases establish that, in many contexts, the scope and application of the state constitutional right of privacy is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts. (Compare *Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th 1, 15-20 [state constitutional right of privacy applies to private, as well as to state, action] with *Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 614 [109 S.Ct. 1402, 1411-1412, 103 L.Ed.2d 639] [federal privacy right applies only to governmental action]; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] [for purposes of determining validity of zoning ordinance, state privacy right protects right to reside with

---

[13]Article I, section 1, of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added.)

unrelated persons] with *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [94 S.Ct. 1536, 39 L.Ed.2d 797] [contra].)

 Indeed, a past decision of this court involving the same aspect of the right of privacy as that involved in the present case—namely, the right of a pregnant woman to choose whether to continue her pregnancy or to have an abortion—clearly demonstrates that the state Constitution has been interpreted to provide greater protection of a woman's right of choice than that provided by the federal Constitution as interpreted by the United States Supreme Court. In *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252 *(Myers)*, this court was faced with the question of the validity, under the California Constitution, of state Budget Act provisions that afforded full funding of medical expenses incurred by an indigent pregnant woman if she chose to continue her pregnancy and bear a child, but that, at the same time, generally denied public funding of medical expenses to an indigent women if she chose to have an abortion. In defending the constitutionality of the provisions challenged in *Myers*, the state relied upon a then recent decision of the United States Supreme Court that had upheld the validity, under the federal Constitution, of a similar funding scheme under which the federal government paid the medical expenses of an indigent pregnant woman if she chose to continue her pregnancy but did not pay for necessary medical expenses if the woman chose to have an abortion. (See *Harris* v. *McRae* (1980) 448 U.S. 297 [100 S.Ct. 2671, 65 L.Ed.2d 784]; see also *Maher* v. *Roe* (1977) 432 U.S. 464 [97 S.Ct. 2376, 53 L.Ed.2d 484] [upholding similar state regulation against federal constitutional challenge].) In *Myers*, this court concluded that the federal precedent was not controlling as to the validity of the challenged funding scheme under the state Constitution, and, applying state constitutional principles, went on to find that the unequal funding scheme violated the protection afforded a pregnant woman's right of privacy by the privacy provision of article I, section 1, of the California Constitution that had been adopted several years earlier.

In the more than 15 years that have elapsed since the *Myers* decision, California courts repeatedly and uniformly have recognized that "our state Constitution has been construed to provide California citizens with privacy protections encompassing procreative decisionmaking—*broader, indeed, than those recognized by the federal Constitution.*" (*Johnson* v. *Calvert* (1993) 5 Cal.4th 84, 100 [19 Cal.Rptr.2d 494, 851 P.2d 776], italics added [citing *Myers*]; see also *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128, 1136 [277 Cal.Rptr. 354] ["the state right of privacy has been held to be broader than the federal right," citing *Myers*]; *American Pediatrics I, supra,* 214 Cal.App.3d 831, 839 ["the California Constitution . . . expressly recognizes a right to privacy . . . which is broader than the federal right to privacy,"

citing *Myers*]; *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 241 [256 Cal.Rptr. 194] ["our state privacy guaranty is broader than the federal privacy right," citing *Myers*]; *Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 277 [226 Cal.Rptr. 361] ["[t]he California Supreme Court has declared the state constitutional right to be much broader than the privacy rights guaranteed by the federal Constitution," citing *Myers*]; accord, *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190, 1203 ["the right of procreative choice protected by Article I, § 1 has already been established as significantly broader than the comparable federal right," citing *Myers*].)

Because the applicable California authority establishes that the protection afforded by the California Constitution of a pregnant woman's right of choice is broader than the constitutional protection afforded by the federal Constitution as interpreted by the United States Supreme Court, the circumstance that the federal high court has concluded that abortion/parental consent statutes similar to Assembly Bill 2274 do not violate the federal Constitution, does not establish that Assembly Bill 2274 is compatible with the governing constitutional privacy principles established by the California Constitution. To decide that issue, it is necessary for us to evaluate Assembly Bill 2274 under applicable state constitutional principles.

IV

 In determining whether Assembly Bill 2274 violates the state constitutional right of privacy, we examine the challenged statute under the standards and principles set forth in this court's prior decisions interpreting and applying article I, section 1, of the California Constitution.

In *Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1 (*Hill*), a case involving a state constitutional challenge to a drug testing program imposed by a private organization (the National Collegiate Athletic Association (NCAA)) upon student athletes engaged in intercollegiate competition sponsored by the organization, our court conducted an exhaustive review of the history and past application of the state constitutional privacy clause, and attempted to clarify a number of issues concerning the proper application of this provision. Because of the breadth of the inquiry conducted in *Hill*, we believe that it is helpful to begin our analysis of the state constitutional privacy issue with a discussion of that decision.

 The initial issue addressed by the court in *Hill* was whether the state constitutional privacy clause properly should be interpreted to protect individuals only from invasions of privacy by governmental entities or other

"state actors," or instead also protects an individual's privacy from infringement or invasion by private persons or entities, such as the NCAA. After reviewing the background of the state constitutional provision, the court in *Hill* concluded that the state right of privacy, *unlike its federal counterpart*, is not limited to "state action," and applies to the actions of the NCAA at issue in *Hill*.[14]

■ Having found that the state constitutional privacy clause applies to the actions of the NCAA, the court in *Hill* turned to the question of the appropriate legal standard to be applied in determining whether the challenged drug testing program violated state constitutional privacy principles. The lower courts in *Hill* had ruled that the NCAA was required to prove both that its drug testing program was supported by a "compelling state interest" and that there were no less intrusive alternative means by which the interest served by the drug testing program could be achieved. After reviewing the history and background of the state constitutional privacy clause and prior California case law applying the provision, the court in *Hill* concluded that the lower courts had erred in suggesting "that every assertion of a privacy interest under article I, section 1, must be overcome by a 'compelling interest,' " or that a defendant invariably was required to demonstrate that the objective involved could not be met by less intrusive means. (7 Cal.4th at pp. 34-35.) Noting that although some prior California privacy decisions "use 'compelling interest' language[,] others appear to rely on balancing tests giving less intense scrutiny to nonprivacy interests," the court in *Hill* explained: "The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest. If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed." (7 Cal.4th at p. 34, fn. omitted.)

With respect to the particular privacy interests implicated by the athletic drug testing program at issue in *Hill*, the court ultimately determined that a general balancing test, rather than a compelling interest test, was applicable. (*Hill, supra*, 7 Cal.4th at pp. 43-44, 53-54.) On the other hand, as the above

---

[14]In the present case, of course, plaintiffs' state constitutional privacy challenge is directed at *a statutory measure enacted by the Legislature* that limits the circumstances under which a pregnant minor may obtain an abortion, and thus there is no question that even if "state action" were required to bring into play the state constitutional privacy clause, such a requirement would be satisfied here.

quotation indicates, the court recognized in *Hill* that when a challenged action or regulation directly invades "an interest fundamental to personal autonomy, . . . a 'compelling interest' must be present to overcome the vital privacy interest." (*Id.* at p. 34.) As we explain below, the statute at issue in the case now before us intrudes upon just such "an interest fundamental to personal autonomy," and we conclude that the statute thus is subject to scrutiny under the "compelling interest" test. (See, *post*, pp. 340-342.)

■ After clarifying that the "compelling interest" test does not apply to all intrusions upon privacy interests protected by the state constitutional right of privacy, the court in *Hill* went on to consider "the correct legal standard to be applied in assessing plaintiffs' claims for invasion of privacy" (7 Cal.4th at p. 35), setting forth three "elements" of a cause of action for violation of the state constitutional right of privacy and discussing the "defenses" that might be raised in opposition to such a claim. (*Id.* at pp. 35-39.) The court summarized its conclusions as follows: "[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id.* at pp. 39-40.) "A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests." (*Id.* at p. 40.)[15] The court further explained that "[t]he plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." (*Id.* at p. 40.)

■ As explained in the lead opinion in the recent decision in *Loder v. City of Glendale* (1997) 14 Cal.4th 846, 891 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (*Loder*): "The three 'elements' set forth in *Hill*—a legally protected privacy interest, reasonable expectation of privacy, and serious invasion of privacy—should not be interpreted as establishing significant *new* requirements or hurdles that a plaintiff must meet in order to demonstrate a

---

[15]In further explaining this point, the court in *Hill* observed: "The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law. [¶] Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." (7 Cal.4th at pp. 37-38.)

violation of the right to privacy under the state Constitution—hurdles that would modify substantially the traditional application of the state constitutional privacy provision (and diminish the protection provided by that provision), by authorizing, in a wide variety of circumstances, the rejection of constitutional challenges to conduct or policies that intrude upon privacy interests protected by the state constitutional privacy clause, without any consideration of the legitimacy or importance of a defendant's reasons for engaging in the allegedly intrusive conduct and without balancing the interests supporting the challenged practice against the severity of the intrusion imposed by the practice." (Lead opn. by George, C. J.)

Instead, "the three 'elements' set forth in *Hill* properly must be viewed simply as 'threshold elements' that may be utilized to screen out claims that do not involve a significant intrusion on a privacy interest protected by the state constitutional privacy provision. These elements do not eliminate the necessity for weighing and balancing the justification for the conduct in question against the intrusion on privacy resulting from the conduct in any case that raises a genuine, nontrivial invasion of a protected privacy interest. As we have noted, *Hill* was the first case in which our court addressed the question whether the state constitutional privacy clause applies to *private* as well as to governmental entities. Having concluded that that privacy clause applies to private entities and also that the legal concept of 'privacy' potentially has a very broad sweep, the court in *Hill* determined that it was appropriate to articulate several threshold elements that may permit courts to weed out claims that involve so insignificant or de minimis an intrusion on a constitutionally protected privacy interest as not even to require an explanation or justification by the defendant. *Hill* cannot properly be read, however, to have adopted a sweeping new rule under which a challenge to conduct that significantly affects a privacy interest protected by the state Constitution may be rejected without any consideration of either the legitimacy or strength of the defendant's justification for the conduct." (*Loder, supra,* 14 Cal.4th 846, 893-894, fn. omitted (lead opn. by George, C. J.).)

We proceed to analyze the validity of Assembly Bill 2274 under the broad general framework discussed in *Hill.*

V

We conclude initially that the state constitutional privacy claim advanced by plaintiffs in this case clearly satisfies the "threshold elements" set forth in *Hill* in order to screen out claims that do not involve a significant intrusion upon a privacy interest protected by the state constitutional privacy clause. Indeed, as we shall see, Assembly Bill 2274 intrudes significantly on a

privacy interest that past California decisions have identified as "clearly among the most intimate and fundamental of all constitutional rights." (*Myers, supra,* 29 Cal.3d 252, 275.)

## A

As the court noted in *Hill,* "[t]he first essential element of a state constitutional cause of action for invasion of privacy is the identification of a specific, legally protected privacy interest." (*Hill, supra,* 7 Cal.4th 1, 35.) Accordingly, we begin by determining whether Assembly Bill 2274 implicates a "protected privacy interest" that falls under the aegis of the state constitutional privacy clause.

■ As the court in *Hill* observed, "[l]egally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill, supra,* 7 Cal.4th 1, 35.) ■ Because we conclude that Assembly Bill 2274 significantly intrudes upon a fundamental autonomy privacy interest protected by the state privacy clause, and further conclude that defendants have failed to establish that the statute's intrusion on this autonomy privacy interest is necessary to serve the interests proffered in support of Assembly Bill 2274, we shall confine our analysis to the autonomy privacy interest, and need not determine whether Assembly Bill 2274's impact on any informational privacy interest is sufficient to satisfy the threshold elements of *Hill* and, if so, whether the proffered state interests are sufficient to justify any such intrusion on informational privacy.

■ Past California cases firmly and unequivocally establish that the interest in autonomy privacy protected by the California constitutional privacy clause includes a pregnant woman's right to choose whether or not to continue her pregnancy. (See, e.g., *People* v. *Belous* (1969) 71 Cal.2d 954, 963-964 [80 Cal.Rptr. 354, 458 P.2d 194]; *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, 879-881; *People* v. *Barksdale, supra,* 8 Cal.3d 320, 326-327; *Myers, supra,* 29 Cal.3d 252, 274-275.) As these decisions explain, the right to choose whether to continue or to terminate a pregnancy implicates a woman's fundamental interest in the preservation of her personal health (and in some instances the preservation of her life),[16] her interest in retaining

---

[16]"[T]he choice between childbirth and abortion in some instances involves potential risks to the life of the pregnant woman. Moreover, even when a life-threatening condition is not

personal control over the integrity of her own body,[17] and her interest in deciding for herself whether to parent a child. And our court also has made clear the profound importance of this constitutional right: "This right of personal choice is central to a woman's control not only of her own body, but also to the control of her social role and personal destiny. . . . *'The implications of an unwanted child for a woman's education, employment opportunities and associational opportunities (often including marriage opportunities) are of enormous proportion.'* [Citation.]" (*Myers, supra,* 29 Cal.3d at p. 275, italics added.) The right of choice may also implicate a woman's deepest philosophical, moral, and religious concerns, including her personal beliefs regarding the meaning of human existence and the beginning of human life. (Accord, *Casey, supra,* 505 U.S. 833, 851 [112 S.Ct. 2791, 2807] (lead opn.) ["[P]ersonal decisions relating to . . . procreation . . . involv[e] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy . . . [and] to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."].) In *Myers, supra,* 29 Cal.3d 252, 275, we declared that a pregnant woman's constitutional right of choice is "clearly among the most intimate and fundamental of all constitutional rights."

All of the fundamental autonomy privacy interests embodied in the constitutional right of choice clearly are implicated by the statute at issue in this case, because the statute prohibits a pregnant minor from obtaining the medical care necessary safely to terminate her pregnancy unless she first obtains either the consent of a parent or judicial authorization. There would be no question, of course, that a provision applicable to a pregnant *adult* would impinge upon a woman's constitutionally protected interest in autonomy privacy if it conditioned her right to obtain the medical care necessary safely to terminate her pregnancy upon the woman's obtaining the consent of another person (for example, a spouse, parent, or other relative), or obtaining a judicial order authorizing an abortion. Such a statute clearly would intrude upon the woman's right, as an individual, to retain personal control over the fundamental autonomy interests involved in the decision whether to continue

---

present, the constitutional choice directly involves the woman's fundamental interest in the preservation of her personal health." (*Myers, supra,* 29 Cal.3d at p. 274.)

[17] " 'If a man is the involuntary source of a child—if he is forbidden, for example, to practice contraception—the violation of his personality is profound; the decision that one wants to engage in sexual intercourse but does not want to parent another human being may reflect the deepest of personal convictions. But if a woman is forced to bear a child—not simply to provide an ovum but to carry the child to term—the invasion is incalculably greater . . . . [I]t is difficult to imagine a clearer case of bodily intrusion, even if the original conception was in some sense voluntary.' [Citation.]" (*Myers, supra,* 29 Cal.3d at p. 274.)

or to terminate her pregnancy. Defendants contend, however, that because Assembly Bill 2274 applies only to pregnant *minors*, and requires only parental consent (or judicial authorization), it should not be viewed as intruding upon a protected privacy interest for purposes of determining whether the initial "threshold element" of the *Hill* analysis is satisfied.

We do not agree. Although the circumstances that Assembly Bill 2274 applies to minors and involves parental consent certainly are relevant considerations in evaluating the adequacy of the justifications for the statute, in our view a statute that restricts a pregnant individual's ability to decide on her own whether to continue or to terminate her pregnancy unquestionably implicates a constitutionally protected privacy interest of a pregnant minor (as well as a pregnant adult) for purposes of the initial threshold element of *Hill.*

 To begin with, it is well established that, as a general matter, "minors as well as adults are 'persons' under the Constitution who are entitled to the protection" provided by our constitutional rights. (*In re Roger S.* (1977) 19 Cal.3d 921, 927 [141 Cal.Rptr. 298, 569 P.2d 1286]; see also *In re Scott K.* (1979) 24 Cal.3d 395 [155 Cal.Rptr. 671, 595 P.2d 105].) Furthermore, article I, section 1, of the California Constitution specifically declares that "[a]*ll people* are by nature free and independent and have inalienable rights[, including] enjoying and defending life and liberty, acquiring, possessing, and protecting property, . . . and *privacy*" (italics added). Significantly, the ballot argument accompanying the measure that added the privacy clause to article I, section 1, expressly confirms that the constitutional right of privacy afforded by this provision was intended to apply to "*every* Californian," including "every man, woman and *child* in this state." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen.. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26, 27, underlining omitted, italics added.) Accordingly, there can be no question but that minors, as well as adults, possess a constitutional right of privacy under the California Constitution.

Indeed, a few examples will make it clear that the constitutional right of privacy widely has been recognized as applying to minors as well as adults. As numerous decisions have pointed out (see, e.g., *White* v. *Davis* (1975) 13 Cal.3d 757, 774-775 [120 Cal.Rptr. 94, 533 P.2d 222]; *Hill, supra,* 7 Cal.4th 1, 21), the ballot argument supporting the privacy measure establishes that one principal objective of the privacy clause is to protect individuals from the unnecessary collection, and improper use, of personal information about them. Nothing in the language or history of the privacy provision suggests that minors, unlike adults, do not enjoy constitutional protection with regard

to the improper use of such information, and past cases have not drawn any distinction between the informational privacy rights of minors and adults.[18] Thus, if a governmental entity or business enterprise were to obtain private information concerning a minor for a particular purpose and then use or disclose the information for a different, unauthorized purpose, no one reasonably could maintain that the conduct would not implicate a constitutionally protected privacy interest simply because the privacy of a minor, rather than of an adult, was infringed. Similarly, if a group or an individual—perhaps motivated by an unusually strong ideological opposition to teenagers becoming mothers—were to compel a pregnant minor to undergo an abortion against her will, there would be no question but that the offending conduct, in addition to violating any number of penal statutes and tort doctrines, also would constitute a direct intrusion upon a constitutionally protected autonomy privacy interest of the minor. ▉ Thus, it is clear that the circumstance that Assembly Bill 2274 is directed to minors is not a valid basis for concluding that the statute does not impinge upon a protected privacy interest.[19]

The question whether a statute or rule intrudes upon a minor's state constitutional right of privacy admittedly becomes more complex when the only effect of the statute or rule is to condition the minor's exercise of his or her constitutional privacy right upon parental consent. As a general matter, parents during a child's minority have the legal right (and obligation) to act on behalf of their child to protect their child's rights and interests, and in most instances this general rule would apply to interests of the minor that are protected by the state constitutional right of privacy as well as to other rights

---

[18]In *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839], the Court of Appeal held that the defendant's alleged unauthorized disclosure and use of information that had been submitted to the school as part of an application for admission constituted a violation of the applicant's right of privacy under article I, section 1, of the California Constitution. Nothing in *Porten* suggests that the validity of the plaintiff's action depended upon whether the applicant was over or under 18 years of age when the misuse of information occurred. Similarly, a number of this court's decisions have discussed the applicability of article I, section 1, to students in a collegiate setting, and have not suggested that the application of the privacy provision to the circumstances of those cases turned on whether the plaintiffs were over or under the age of majority. (See, e.g., *White* v. *Davis, supra,* 13 Cal.3d 757; *Hill, supra,* 7 Cal.4th 1.)

[19]This is not to say that the constitutional privacy clause grants to minors all of the privacy rights that are enjoyed by adults. No case has suggested, for example, that the Legislature does not have greater latitude to regulate or proscribe voluntary sexual activity by or with a minor than it does with regard to voluntary sexual activity engaged in by an adult. (See, e.g., *Michael M.* v. *Superior Court* (1979) 25 Cal.3d 608, 611-613 [159 Cal.Rptr. 340, 601 P.2d 572]; *id.* at p. 624 (dis. opn. by Mosk, J.); Pen. Code, § 261.5.) The issue presented by this case, of course, does not concern any claim that a minor enjoys a constitutional right to engage in sexual activity, but rather concerns whether a minor who already has become pregnant has a constitutional right to determine whether she will continue or terminate her pregnancy.

and interests of the minor. Thus, for example, although past cases have established that the state constitutional right of privacy generally guarantees an individual's right to consent to, or to refuse to consent to, medical treatment or medication (see, e.g., *Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 733-738 [21 Cal.Rptr.2d 357, 855 P.2d 375]; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220]), we believe it is clear that, at least with respect to most medical treatment relating to a minor, the Legislature may grant a parent the authority to make medical decisions on behalf of his or her child. No one reasonably could suggest that a serious state constitutional privacy question would be presented, for example, whenever a parent, over a child's objection, requires the child to go to the dentist or to take his or her medicine.[20]

But while in most instances a statute that simply recognizes a parent's authority or responsibility to exercise a child's privacy right on the child's behalf (and in his or her interest) would raise no serious constitutional question, that is not the case with respect to the particular privacy right that is here at issue, namely the right to decide whether a pregnant minor will continue or terminate her pregnancy. As Justice Powell explained in his plurality opinion for the United States Supreme Court in *Bellotti II*, *supra*, 443 U.S. 622, 642 [99 S.Ct. 3035, 3047-3048]: "The abortion decision differs in important ways from other decisions that may be made during minority. . . . [¶] The pregnant minor's options are much different from those facing a minor in other situations, such as deciding whether to marry. A minor not permitted to marry before the age of majority is required simply to postpone her decision. She and her intended spouse may preserve the opportunity for later marriage should they continue to desire it. A pregnant adolescent, however, cannot preserve for long the possibility of aborting, which effectively expires in a matter of weeks from the onset of pregnancy. [¶] Moreover, the potentially severe detriment facing a pregnant [minor] . . . is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. . . . In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible."

■■■ We agree. As we explained in another context in *In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [33 Cal.Rptr.2d 85, 878 P.2d 1297]: "Children are

---

[20]Similarly, we have no occasion in this case to question the validity of statutes that, for example, prohibit a minor from using a tanning facility without parental consent (Bus. & Prof. Code, § 22706, subd. (b)(3) & (4)), prohibit a minor, without parental consent, from undergoing voluntary sterilization (Fam. Code, § 6925, subd. (b)(1)) or indeed, prohibit a minor, with or without parental consent, from receiving a permanent tattoo (Pen. Code, § 653).

not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent." (See also *In re Roger S., supra,* 19 Cal.3d 921, 929-931 [parent may not waive a minor's right to due process before commitment to a mental hospital]; *In re Scott K., supra,* 24 Cal.3d 395, 403-404 [parent may not waive a minor's right to be free of unreasonable search and seizure].) The fundamental values and principles that a parent has transmitted to his or her daughter of course will play a substantial, and often a determinative, role in shaping a minor's decision in this matter. Nonetheless, because the decision whether to continue or terminate her pregnancy has such a substantial effect on a pregnant minor's control over her personal bodily integrity, has such serious long-term consequences in determining her life choices, is so central to the preservation of her ability to define and adhere to her ultimate values regarding the meaning of human existence and life, and (unlike many other choices) *is a decision that cannot be postponed until adulthood,* we conclude that a minor who is pregnant has a protected privacy interest under the California Constitution in making the decision whether to continue or to terminate her own pregnancy—and that this interest is intruded upon by the provisions of Assembly Bill 2274.[21]

As already noted, our conclusion that Assembly Bill 2274 intrudes upon a pregnant minor's protected autonomy privacy interest does not mean that the circumstances that the statute involves minors rather than adults, and is concerned with furthering the parent-child relationship, are irrelevant to the ultimate resolution of the constitutional issue presented by this case. These circumstances are in fact directly relevant in assessing the nature and strength of the state interests that may justify the legislation's impact upon the constitutionally protected privacy interests at issue. Under the framework established in *Hill,* however, we consider potential justifications for a challenged statute at a subsequent stage of the analysis, and not in determining the threshold question whether the statute implicates a protected privacy interest.[22]

---

[21]To avoid any misunderstanding, our conclusion in this regard is not intended, of course, to suggest that a pregnant minor's protected privacy interest in this setting is any greater than the interest of a pregnant adult. Assembly Bill 2274 makes no distinction with regard to different stages of pregnancy, and requires a pregnant minor to obtain parental consent or judicial authorization before obtaining an abortion at even the earliest stage, when a pregnant adult clearly would have the right to determine for herself whether to continue her pregnancy or have an abortion. We conclude that the state constitutional privacy provision accords a pregnant minor a similar protected privacy interest.

[22]We note that there is absolutely no basis for suggesting that this interpretation of the California constitutional privacy clause—namely, as affording constitutional protection to a minor's interest in determining, for herself, whether to continue or to terminate her pregnancy—constitutes an impermissible infringement of the federal constitutional right of a parent to

## B

We also conclude that plaintiff's constitutional challenge satisfies the second threshold element of *Hill*—"a reasonable expectation of privacy."

In discussing the application of this element to the athletic drug testing program challenged in *Hill*, the court in *Hill* explained that "the reasonable expectation of privacy of plaintiffs (and other student athletes) . . . must be viewed within the context of intercollegiate athletic activity and the normal conditions under which it is undertaken." (*Hill, supra*, 7 Cal.4th 1, 41.) Thus, *Hill* indicates that this element contemplates an inquiry into whether there is something in the particular circumstances in which an alleged intrusion of privacy arises that demonstrates the plaintiff has no reasonable expectation of privacy in that context, so that the alleged intrusion would not violate the state Constitution even if there were no justification for the allegedly intrusive conduct.

In the present case, the challenged statutory requirements apply to *all* pregnant minors and, unlike the drug testing program in *Hill*, are not confined to a specific setting or limited context. Because, as we have explained in the previous section, Assembly Bill 2274 impinges upon a fundamental autonomy privacy interest of pregnant minors protected by the state constitutional privacy clause, and because the statute applies to all such minors (whether 17 years of age, or much younger), there is absolutely nothing in the circumstances of the present case that would support a conclusion that the pregnant minors affected by this legislation do not have a "reasonable expectation of privacy" for purposes of the second element of the *Hill* test. Although it has been suggested that, in light of the general statutory rule requiring a minor to obtain parental consent for medical care,

direct the upbringing of his or her child. The United States Supreme Court has explained that "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant" (*Planned Parenthood of Missouri* v. *Danforth, supra*, 428 U.S. 52, 75 [96 S.Ct. 2831, 2844]). The high court has further held that even if a pregnant minor is not competent to give informed consent, a state must permit such a minor to obtain an abortion, without parental consent, if a judge or similar official determines that an abortion is in the minor's best interest. (*Bellotti II, supra*, 443 U.S. 622, 643-644 [99 S.Ct. 3035, 3048-3049] (plur. opn. of Powell, J.); *Casey, supra*, 505 U.S. 833, 899 [112 S.Ct. 2791, 2832].) Thus, the federal cases make clear that a parent's right under the federal Constitution to direct the upbringing of one's child does not include the right to decide whether a pregnant daughter will continue her pregnancy or have an abortion.

Indeed, if such an argument were sound, it would follow that a state would be prohibited, by the federal Constitution, from enacting a statute authorizing a minor to obtain an abortion without parental consent. As we have seen, California long had such a statutory provision, and defendants have cited no authority, and we are aware of none, holding that the federal Constitution precludes a state from adopting such a medical emancipation statute.

and the existence of numerous abortion/parental consent statutes in other states, a minor has no reasonable expectation of privacy in this context, it plainly would defeat the voters' fundamental purpose in establishing a *constitutional* right of privacy if a defendant could defeat a constitutional claim simply by maintaining that statutory provisions or past practices that are inconsistent with the constitutionally protected right eliminate any "reasonable expectation of privacy" with regard to the constitutionally protected right.

## C

Finally, in regard to the threshold elements, we conclude that the constitutional challenge to Assembly Bill 2274 also clearly satisfies the third threshold element of *Hill*—"a serious invasion of a privacy interest." As explained in the lead opinion in the recent decision in *Loder*, the application of this element in *Hill* demonstrates "that this element is intended simply to screen out intrusions on privacy that are de minimis or insignificant." (*Loder, supra,* 14 Cal.4th 846, 895, fn. 22 (lead opn. by George, C. J.).)

In the present case, the effect of Assembly Bill 2274 upon a pregnant minor's constitutional right of privacy cannot, by any stretch of the imagination, properly be characterized as "de minimis or insignificant." The statute significantly intrudes upon autonomy privacy by denying a pregnant minor the ability to obtain a medically safe abortion on her own, and instead requiring her to secure parental consent or judicial authorization in order to obtain access to the medical care she needs to terminate her pregnancy safely. In this respect, the statute denies a pregnant minor, who believes it is in her best interest to terminate her pregnancy rather than have a child at such a young age, control over her own destiny. In addition, the statutory requirement that the minor obtain parental consent or judicial authorization will delay the minor's access to a medically safe abortion in many instances, and thereby will increase, at least to some extent, the health risks posed by an abortion. Finally, in some instances, a minor who does not wish to continue her pregnancy but who is too frightened to tell her parents about her condition or go to court may be led by the statutory restrictions to attempt to terminate the pregnancy herself or seek a "back-alley abortion"— courses of conduct that in the past have produced truly tragic results—or, alternatively, to postpone action until it is too late to terminate her pregnancy, leaving her no choice but to bear an unwanted child. Of course, such consequences unquestionably would represent a most significant intrusion on the minor's protected privacy interest.

## D

In sum, plaintiffs' constitutional challenge to Assembly Bill 2274 satisfies the three threshold elements set forth in *Hill*. Accordingly, under the *Hill*

framework, to determine the validity of Assembly Bill 2274 we must consider whether the statute's intrusion on a pregnant minor's constitutional right of privacy is justified by the state interests relied upon in support of the legislation. (*Hill, supra,* 7 Cal.4th 1, 38.)

## VI

In analyzing the adequacy of the justifications tendered by defendants to support the challenged legislation, we begin by addressing two preliminary points. First, we determine the appropriate "standard" or "test" that the proffered justifications must satisfy. Second, we consider how the analysis of defendants' proffered justifications is affected by the circumstance that the constitutional challenge in this case is a "facial" challenge to the statute as a whole, rather than an "as applied" challenge to the statute's application to a particular individual or in a particular setting. We turn first to the question of the appropriate constitutional "standard" or "test" that the justifications must satisfy in this case.

## A

As we already have noted, in discussing the issue of the appropriate "standard" or "test" that a proposed justification must meet, the court in *Hill, supra,* 7 Cal.4th 1, while "declin[ing] to hold that *every* assertion of a privacy interest under article I, section 1 must be overcome by a 'compelling interest' " (*Hill, supra,* 7 Cal.4th 1, 34-35, italics added), explained that "[t]he particular context, i.e., the specific kind of privacy interest involved and the nature and the seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. *Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest.* If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed." (*Id.* at p. 34, italics added, fn. omitted.)

As we have explained, the statute at issue in this case unquestionably impinges upon "an interest fundamental to personal autonomy," indeed an interest that is "clearly among the most intimate and fundamental of all constitutional rights." (*Myers, supra,* 29 Cal.3d 252, 275.) Under *Hill* and prior decisions of this court (see, e.g., *People* v. *Belous, supra,* 71 Cal.2d 954, 964; *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 164 [219 Cal.Rptr. 387, 707 P.2d 760]), statutory provisions that intrude or impinge upon such a fundamental autonomy privacy interest properly must be evaluated under the "compelling interest" standard, i.e., the defendant must

demonstrate "a 'compelling' state interest which justifies the [intrusion] and which cannot be served by alternative means less intrusive on fundamental rights." (*White* v. *Davis, supra,* 13 Cal.3d 757, 772.)

Defendants argue that although the "compelling interest" standard may constitute the appropriate test for analyzing a statutory provision that impinges upon a pregnant *adult's* constitutional right of choice, a less rigorous standard should apply to a statute—such as Assembly Bill 2274—that affects the right of choice of a pregnant *minor.* Defendants note that federal decisions have adopted, for purposes of federal constitutional analysis, a less rigorous standard for evaluating the validity of statutes affecting pregnant minors. (See, e.g., *Planned Parenthood of Missouri* v. *Danforth, supra,* 428 U.S. 52, 75 [96 S.Ct. 2831, 2844] [burden on minor's privacy right may be justified by the state's showing of "any significant state interest . . . that is not present in the case of an adult"].) On the other hand, at least one other state supreme court, in applying an explicit state constitutional privacy provision to an abortion/parental consent statute, has concluded that its state constitutional provision mandates application of the compelling interest standard to a statute that impinges upon fundamental, constitutionally protected privacy rights of minors as well as to a statute that impinges upon similar rights of adults. (*In re T.W.* (Fla. 1989) 551 So.2d 1186, 1195.)

We conclude that, under the California constitutional privacy clause, the statute here at issue must be evaluated under the "compelling interest" standard. When a statute significantly intrudes upon a fundamental, autonomy privacy interest of a minor, we believe that proper respect for a minor's state constitutional right of privacy requires a showing that the intrusion upon such a basic and fundamental right is necessary to further a "compelling"—i.e., an extremely important and vital—state interest. (See *American Pediatrics I, supra,* 214 Cal.App.3d 831, 843-845; accord, *Conservatorship of Valerie N., supra,* 40 Cal.3d 143, 164 [applying "compelling interest" standard in evaluating validity of statute restricting fundamental, autonomy privacy interest of incompetent adult].) As *Hill* indicates, under article I, section 1, of the California Constitution a statutory intrusion upon an autonomy privacy interest of such a fundamental nature may not be justified simply by showing that the statute serves a legitimate "competing interest" sufficient to justify an impingement upon a "less central" privacy interest. (*Hill, supra,* 7 Cal.4th at p. 34.)

In applying a test less rigorous than the "compelling interest" standard to evaluate statutes that impinge upon a minor's privacy right, the federal decisions have relied upon a state's "somewhat broader authority to regulate the activities of children . . . ." (*Planned Parenthood of Missouri* v. *Danforth, supra,* 428 U.S. 52, 74 [96 S.Ct. 2831, 2843].) As we already have

indicated, the circumstance that the statute at issue is directed at minors unquestionably is relevant in determining the nature and strength of the state interests that defendants contend are served by Assembly Bill 2274. Numerous California decisions recognize that the state has a special and particularly compelling interest in protecting the health and welfare of children. (See, e.g., *Michael M.* v. *Superior Court, supra,* 25 Cal.3d 608, 611-612; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 512 [194 Cal.Rptr. 431, 668 P.2d 738].) As these decisions demonstrate, a statute's relationship to minors properly is employed in the constitutional calculus in determining whether an asserted state purpose or interest is "compelling." Because the statute's impact on minors is taken into account in assessing the importance of the state interest ostensibly served by the infringement, in our view it is not appropriate *additionally* to lower the applicable constitutional standard under which the statute is to be evaluated simply because the privacy interests at stake are those of minors.

 We conclude that, under the California constitutional privacy clause, a statute that impinges upon the fundamental autonomy privacy right of either a minor or an adult must be evaluated under the demanding "compelling interest" test.

### B

Next, we consider the effect of the circumstance that this case involves a challenge to the constitutionality of the statute "on its face," rather than to the constitutionality of the statute "as applied" to a particular person, group of persons, or setting covered by the statute. Defendants contend that because this case involves a facial challenge to the statute, their burden of justification may be satisfied simply by demonstrating that the provisions of the statute constitutionally may be applied in even a single circumstance covered by the statute. Thus, defendants maintain that this facial challenge to the statute must be rejected if they are able to establish, for example, that the statutory requirement for parental consent or judicial authorization is justified as applied to the relatively small subclass of pregnant minors who lack the mental capacity to give informed consent to an abortion, even though the statute is not limited to this class of minors—and even if the statute is invalid as to all other pregnant minors.

As we shall explain, defendants' contention lacks merit. If the analytical approach proposed by defendants were valid, even the broadest statutory prohibition on abortion—a statute that, for example, prohibited abortion *under all circumstances*—could not be found unconstitutional on its face, because the statute would encompass *some* circumstances—for example, a

late-term abortion completely unrelated to the protection of the life or health of the pregnant woman—in which an abortion constitutionally could be prohibited. Similarly, a statute that prohibited *all adult* women from obtaining an abortion without first securing either the consent of a spouse, parent, or guardian, or authorization from a court, likewise could not be found unconstitutional on its face, because such a law might be valid as applied to the small class of pregnant adult women who are legally incompetent to give informed consent to the procedure. No California decision has taken such a restrictive approach in evaluating a facial constitutional challenge to a law, such as that at issue here, that directly and substantially impinges upon fundamental constitutional privacy rights in the vast majority of its applications.

On the contrary, under the constitutional analysis traditionally applied in past California privacy cases, when, as here, a statute, as written, broadly impinges upon fundamental constitutional privacy rights in its general, normal, and intended application, a court, in assessing the statute's constitutionality, must determine whether the justifications for the statute outweigh its impingement on privacy rights and the statute is narrowly drawn to avoid unnecessary impingement on such rights. ▇▇ A statute that imposes substantial burdens on fundamental privacy rights with regard to a large class of persons may not be sustained against a facial constitutional attack simply because there may be a small subclass of persons covered by the statute as to whom a similar but much more narrowly drawn statute constitutionally could be applied. Thus, contrary to defendants' contention, a facial challenge to a statutory provision that broadly impinges upon fundamental constitutional rights may not be defeated simply by showing that there may be some circumstances in which the statute constitutionally could be applied, when, as here, there is nothing in the language or legislative history of the provision that would afford a reasonable basis for severing the asserted constitutionally permissible applications of the statute from the provision's unconstitutional applications.

Past California cases make this point clear. For example, in *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313], one of this court's earliest decisions affording explicit protection to a constitutional right of privacy, the court concluded that the financial disclosure statute at issue in that case, which applied to an extremely broad range of local and state public officers (as well as candidates for such offices) and required extensive disclosure of private financial information, was unconstitutional as a violation of the constitutional right of privacy. Although the court in *City of Carmel-by-the-Sea* explicitly acknowledged that "[i]t may well be that such extensive disclosure rules [as those

embodied in the challenged statute] may appropriately be imposed by the Legislature upon its own members" and "may also be appropriate for other public officials or employees" (2 Cal.3d at p. 272)—classes of public officials that fell within the scope of the challenged statute—the court nonetheless determined that the statute properly should be held unconstitutional on its face, explaining: "When, as here, a statute contains unconstitutionally broad restrictions and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction, *the statute is void in its entirety regardless of whether it could be narrowly applied to the facts of the particular case before the court.* The only way in which the statute now at issue could be limited to a proper scope with respect to the officials and employees of plaintiff city would be by reading into it numerous qualifications and exceptions, thereby performing a wholesale rewriting of the statute which the courts cannot reasonably be expected to undertake. [Citations.] We conclude that the statute is unconstitutional in its entirety." (*Ibid.*, italics added.)

In like manner, this court's decision in *Myers, supra,* 29 Cal.3d 252 found that a statute that provided public funding for the medical expenses of an indigent pregnant woman who chose to bear a child, but denied similar funding for medical expenses if such a woman chose to have an abortion, was unconstitutional *on its face,* even though some indigent women covered by the statute may have been able to obtain funding for an abortion from private charitable sources. (See 29 Cal.3d at pp. 275-276; accord, e.g., *Blair v. Pitchess* (1971) 5 Cal.3d 258, 282 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206] ["It is, of course, an accepted principle of judicial review that 'courts will limit the operation of a statute by construction or severance of the language to avoid unconstitutionality. Where, however, unconstitutionality cannot reasonably be avoided in this way, *a statute cannot be upheld merely because a particular factual situation to which it is applicable may not involve the objections giving rise to its invalidity.* [Citations.] *If the rule were otherwise, the determination of constitutionality would be a piecemeal and unpredictable process.* [Citations.]" (Italics added.)]; *Mulkey v. Reitman* (1966) 64 Cal.2d 529, 543-545 [50 Cal.Rptr. 881, 413 P.2d 825]; *In re Blaney* (1947) 30 Cal.2d 643, 655-656 [184 P.2d 892].)

Thus, past California cases do not support defendant's claim that a statute whose broad sweep directly impinges upon the fundamental constitutional privacy rights of a large class of persons may not be found invalid on its face so long as there are *any* circumstances in which the statute's restrictions constitutionally may apply.

The United States Supreme Court has followed a similar approach in addressing facial constitutional challenges to statutory restrictions on abortion. In *Roe v. Wade, supra,* 410 U.S. 113, for example, the court invalidated

*in its entirety* a Texas statute, concluding that it "sweeps too broadly [because it] makes no distinction between abortions performed early in pregnancy and those performed later, and . . . limits to a single reason, 'saving' the mother's life, the legal justification for the procedure." (*Id.* at p. 164 [93 S.Ct. at p. 732].) Thus, even though, under the principles enunciated in *Roe*, the Texas statute constitutionally could have been applied to at least some pregnant women who fell within the statute's coverage (i.e., those women in their last trimester for whom an abortion was not necessary to preserve their life or health), the court nonetheless invalidated the law in its entirety, rejecting the argument—explicitly advanced in a dissenting opinion—that because the restrictions imposed by the law constitutionally could be applied to *some* women covered by the statute, the court was precluded from striking down the statute on its face. (*Id.* at pp. 177-178 [93 S.Ct. at p. 739] (dis. opn. of Rehnquist, J.).)

Similarly, in its more recent decision in *Casey, supra,* 505 U.S. 833, the high court adopted a comparable approach in striking down, on its face, a spousal-notification provision contained in the abortion statute before it. The plurality opinion in *Casey* explained that "[r]espondents attempt to avoid the conclusion that [the spousal-notification provision] is invalid by pointing out that it imposes almost no burden at all for the vast majority of women seeking abortions. They begin by noting that only about 20 percent of the women who obtain abortions are married. They then note that of these women about 95 percent notify their husbands of their own volition. Thus, respondents argue, the effects of [the challenged provision] are felt by only one percent of the women who obtain abortions. Respondents argue that since some of these women will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions. *For this reason, it is asserted, the statute cannot be invalid on its face.*" (*Id.* at p. 894 [112 S.Ct. at p. 2829], italics added.)

The plurality opinion in *Casey, supra,* 505 U.S. 833, speaking in this passage for a majority of the court (see *id.* at p. 922 [112 S.Ct. at pp. 2843-2844] (opn. by Stevens, J.); *ibid.* (opn. by Blackmun, J.)), rejected the argument, explaining: "We disagree with respondents' basic method of analysis. [¶] The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant. [¶] . . . [A]s we have said, [the spousal-notification provision's] real target . . . is married women seeking abortions who do not wish to notify their

husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement. The unfortunate yet persisting conditions we document above will mean that *in a large fraction of the cases in which [the spousal-notification provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid." (Id.* at pp. 894-895 [112 S.Ct. at pp. 2829-2830], italics added.)[23]

Thus, *Casey, supra,* 505 U.S. 833, makes it clear that, under the federal Constitution, a facial constitutional challenge to a statute that significantly impinges upon a woman's fundamental constitutional right of choice may not be defeated simply by showing that there may be *some* circumstances in which the statute constitutionally might be applied. Under *Casey,* if a statute operates as a substantial obstacle to such choice "in a large fraction" of the cases to which the statute applies (*id.* at p. 895 [112 S.Ct. at pp. 2829-2830]), the statute is unconstitutional on its face. And in *Casey,* as in *Roe* v. *Wade, supra,* 410 U.S. 113, the court's determination that the challenged provision was unconstitutional on its face was plainly a considered decision, reached in the face of a dissenting opinion that explicitly argued, as defendants argue here, that in order to prevail in a facial challenge to such a provision the opponents of the provision "must 'show that no set of circumstances exist under which the [provision] would be valid.' [Citation.]" (*Casey, supra,* 505 U.S. at pp. 972-974 & fn. 2 [112 S.Ct. at p. 2870] (dis. opn. of Rehnquist, C. J.); see also *Fargo Women's Health Org.* v. *Schafer* (1993) 507 U.S. 1013, 1014 [113 S.Ct. 1668, 1669, 123 L.Ed.2d 285] (conc. opn. of O'Connor, J., joined by Souter, J.) [discussing this aspect of *Casey* in an opinion accompanying a denial of a stay request]; *Janklow* v. *Planned Parenthood, Sioux Falls Clinic* (1996) 517 U.S. 1174, 1175 [116 S.Ct. 1582, 1583, 134 L.Ed.2d 679] (Stevens, J., mem. re: den. of cert.)[24]

---

[23]Contrary to the suggestion in Justice Brown's dissent (dis. opn. of Brown, J., *post,* at p. 423, fn. 3), the paragraph in *Casey* that follows the above passage (*Casey, supra,* 505 U.S. 833, 895 [112 S.Ct. 2791, 2829-2830]) does *not* suggest that *Casey's* analysis of the circumstances in which an abortion statute properly may be invalidated on its face does not apply to a facial challenge to a parental consent statute. Instead, that paragraph in *Casey* simply reflects the high court's conclusion that, as a substantive matter, its invalidation of the spousal consent provision was not inconsistent with its prior decisions upholding parental consent statutes.

[24]Indeed, most of the United States Supreme Court decisions in the abortion context have involved facial constitutional challenges to statutory provisions, and whenever the court has determined that the defenders of a measure have failed to provide a sufficient justification to support a challenged provision's overall impingement upon the constitutional rights at issue, the court has struck down the provision "on its face," even if the statute may encompass *at least some situations in which its provisions would not unduly burden the constitutional right.* (See, e.g., *Hodgson* v. *Minnesota, supra,* 497 U.S. 417, 450-455 [110 S.Ct. 2926, 2945-2948] [striking down two-parent notification provision on its face, even though the

Contrary to defendants' contention, language in this court's decision in *Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145] (*Tobe*) is in no way inconsistent with the foregoing principles. The language in *Tobe* upon which defendants rely states: " ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' (*Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438], quoting *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215].)" (*Tobe*, *supra*, 9 Cal.4th 1069, 1084, original italics.)

The decision in *Tobe*, *supra*, 9 Cal.4th 1069, and the decisions in *Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251 [5 Cal.Rptr.2d 545, 825 P.2d 438], and *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168 [172 Cal.Rptr. 487, 624 P.2d 1215], from which *Tobe* drew the language in question, make it clear that a law may not be held unconstitutional on its face simply because those challenging the law may be able to hypothesize some instances in which application of the law might be unconstitutional. In each of these cases, the court found that the statute in question clearly was constitutional in its general and ordinary application, and explained that such a law could not be struck down "on its face" merely because there might be some instances in which application of the law might improperly impinge upon constitutional rights. (See also *Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45, 59-61 [51 Cal.Rptr.2d 837, 913 P.2d 1046].) None of the cases suggests, however, that where a statute broadly impinges upon fundamental constitutional rights, the statute may not be held invalid on its face so long as there is *any* person covered by the law as to whom the statute's requirements constitutionally may be applied. (See, e.g., *Tobe*, *supra*, 9 Cal.4th 1069, 1109 [" [A] facial challenge to a law [that

opinion acknowledged there are some families in which such a requirement would not unduly burden the minor's right]; *Akron I*, *supra*, 462 U.S. 416, 434-438 [103 S.Ct. 2481, 2494-2497] [invalidating, on its face, a requirement that all second trimester abortions be performed in a hospital, even though the court recognized that there are some circumstances in which the health risks associated with a particular pregnancy could justify such a requirement]; *Doe* v. *Bolton*, *supra*, 410 U.S. 179, 193-195 [93 S.Ct. 739, 748-749] [invalidating, on its face, a requirement that all abortions, including first trimester abortions, be performed in a licensed hospital].)

Although three justices of the United States Supreme Court recently have questioned the soundness of *Casey*'s approach to the facial invalidity question (see *Janklow* v. *Planned Parenthood, Sioux Falls Clinic*, *supra*, 517 U.S. 1174, 1176-1181 [116 S.Ct. 1582, 1584-1587] (dis. from den. of cert. by Scalia, J., joined by Rehnquist, C. J., and Thomas, J.), these justices' views did not prevail on this point in *Casey*, *supra*, 505 U.S. 833.

directly impinges upon a fundamental constitutional right] on grounds that it is overbroad . . . is an assertion that the law is invalid in all respects and cannot have *any* valid application [citation] *or* a claim that the law sweeps in a substantial amount of constitutionally protected conduct." (Second italics added.)].) Instead, as noted above, our cases establish that when a statute broadly and directly impinges upon the fundamental constitutional privacy rights of a substantial portion of those persons to whom the statute applies, the statute can be upheld only if those defending the statute can establish that, considering the statute's general and normal application, the compelling justifications for the statute outweigh the statute's impingement on constitutional privacy rights and cannot be achieved by less intrusive means.

Accordingly, we now turn to the question whether defendants have met that burden here.

## VII

■ In defending the challenged statutory provisions, defendants rely upon two interests assertedly furthered by Assembly Bill 2274: (1) the protection of the physical, emotional, and psychological health of minors, and (2) the preservation and promotion of the parent-child relationship. The trial court concluded that both of these interests are "compelling interests" for purposes of constitutional analysis, and on appeal plaintiffs have not taken issue with that determination. We agree that the state's interests in protecting the health of minors and in preserving and fostering the parent-child relationship are extremely important interests that rise to the level of "compelling interests" for purposes of constitutional analysis.

After determining that these two interests or purposes constitute "compelling interests," however, the trial court went on to find, on the basis of the evidence presented at trial, that defendants had failed to establish that the provisions of Assembly Bill 2274 actually would further either of these interests. On the contrary, the trial court found that the provisions of Assembly Bill 2274 were likely to harm rather than protect the health of pregnant minors, and that the statute also was likely to be detrimental to the parent-child relationship.

On appeal, the parties dispute the weight that properly should be given to the trial court's findings in this regard. Plaintiffs contend that the evidence clearly supports the trial court's findings and that they should be confirmed by this court, but defendants maintain that the trial court failed to give proper deference to the legislative findings accompanying the statute.

■ As a general rule, "[i]t is not the judiciary's function . . . to reweigh the 'legislative facts' underlying a legislative enactment." (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 372 [204

Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].)[25] When an enactment intrudes upon a constitutional right, however, greater judicial scrutiny is required. (See, e.g., *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119] ["[T]he ordinary deference a court owes to any legislative action vanishes when constitutionally protected rights are threatened. 'The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice.' [Citations.] . . . [W]e would abandon our constitutional duty if we took at face value the municipality's determination . . . ."].)

Numerous decisions establish that when a statute impinges upon a constitutional right, legislative findings with regard to the need for, or probable effect of, the statutory provision cannot be considered determinative for

[25]The United States Supreme Court decision in *Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456 [101 S.Ct. 715, 66 L.Ed.2d 659] exemplifies the general rule. In that case, a Minnesota law prohibiting the retail sale of milk in plastic nonreturnable, nonrefillable containers, but permitting such sale in other nonreturnable, nonrefillable containers such as paperboard milk cartons, was challenged on the ground that, as an empirical matter, the legislation would not serve the legislative purposes—promoting resource conservation, easing solid waste disposal problems, and conserving energy—that the statute was designed to promote. The trial court conducted extensive evidentiary hearings into the statute's probable consequences, and, after finding the evidence in sharp conflict, concluded that it was obliged to weigh and evaluate the evidence itself. The trial court ultimately resolved the evidentiary conflict in favor of those challenging the legislation, concluding that the legislation " 'will not succeed in effecting the Legislature's published policy goals . . .' " (449 U.S. at p. 460 [101 S.Ct. at p. 722]), and on this basis the trial court found the statute unconstitutional. On appeal, the United States Supreme Court reversed, explaining that in cases in which the "rational basis" test is applicable, "[s]tates are not required to convince the courts of the correctness of their legislative judgments. . . . [¶] . . . Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence that the legislature was mistaken." (449 U.S. at p. 464 [101 S.Ct. at p. 724]; see also *Firemen* v. *Chicago, R. I. & P. R. Co.* (1968) 393 U.S. 129, 138-139, 143 [89 S.Ct. 323, 327-328, 330, 21 L.Ed.2d 289].)

In a different context, in rejecting the contention that a Georgia capital punishment statute should be held unconstitutional on the ground that it had not been empirically established that the death penalty is, in fact, an effective deterrent, the United States Supreme Court explained in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] that the question of the deterrent value of capital punishment effectively involves a policy decision that appropriately should be left to the legislative branch. The court stated: "Statistical attempts to evaluate the worth of the death penalty as a deterrent to crimes by potential offenders have occasioned a great deal of debate. . . . [¶] Although some of the studies suggest that the death penalty may not function as a significantly greater deterrent than lesser penalties, there is no convincing empirical evidence either supporting or refuting this view. . . . [¶] The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. . . ." (428 U.S. at pp. 184-186 [96 S.Ct. at pp. 2930-2931], fns. omitted.)

constitutional purposes. As we explained in our recent decision in *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473]: "Although courts must give legislative findings great weight and should uphold them unless unreasonable or arbitrary, '. . . we also must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." . . .' . . . '[T]he deference afforded to legislative findings does "not foreclose [a court's] independent judgment on the facts bearing on an issue of constitutional law." . . .' " (Citations omitted.)[26] ▉ Accordingly, in this case we must go beyond the legislative findings accompanying the statute to determine whether the provisions of Assembly Bill 2274 can be sustained, as defendants maintain, on the basis of the state's interests in protecting the health of minors and in preserving and promoting the parent-child relationship.

The Florida Supreme Court addressed a virtually identical issue in the case of *In re T.W.*, *supra*, 551 So.2d 1186. In that case, the court was faced with the question whether a Florida abortion/parental consent statute violated the express constitutional right of privacy contained in the Florida Constitution.[27] As defendants contend here, the State of Florida argued that the statute should be upheld on the basis of the state's interests in protecting the health of minors and in preserving the parent-child relationship. After explaining that the applicable constitutional test for evaluating the statute under the Florida Constitution was the "compelling interest" standard (551 So.2d at p. 1192), the Florida court went on to address, and reject, the state's

---

[26]Federal decisions, reviewing federal constitutional challenges to statutes affecting reproductive rights, are in accord. (See, e.g., *Casey, supra*, 505 U.S. 833, 887-898 [112 S.Ct. 2791, 2825-2831] [invalidating provision imposing spousal-notification requirement; court rejected the legislative determination that such a requirement promoted the family relationship]; *Hodgson* v. *Minnesota, supra*, 497 U.S. 417, 450-455 [110 S.Ct. 2926, 2945-2948] [invalidating a statute imposing a two-parent notification requirement; the court rejected the legislative determination that such notification would enhance family relations and provide added protection for minors]; *Akron I, supra*, 462 U.S. 416, 434-438 [103 S.Ct. 2481, 2494-2497] [invalidating an ordinance that required all second trimester abortions to be performed in a hospital; the court rejected a legislative determination that such a requirement was a reasonable health regulation]; *Carey* v. *Population Services International* (1977) 431 U.S. 678, 696 [97 S.Ct. 2010, 2022, 52 L.Ed.2d 675] [invalidating a statute prohibiting distribution of contraceptives to minors; the court rejected the state's claim, unsupported by evidence, that such a ban could be justified as a means of discouraging early sexual behavior].)

[27]Article I, section 23, of the Florida Constitution, enacted by the voters in 1980, provides: "Right of privacy.—Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law."

contention that the challenged statute could be sustained on the basis of the two interests proffered by the state.

The Florida Supreme Court stated in this regard: "We agree that the state's interests in protecting minors and in preserving family unity are worthy objectives. Unlike the federal Constitution, however, which allows intrusion based on a 'significant' state interest, the Florida Constitution requires a 'compelling' state interest in all cases where the right to privacy is implicated. [Citation.] We note that Florida does not recognize these two interests as being sufficiently compelling to justify a parental consent requirement where procedures other than abortion are concerned. . . . [¶] Under [the applicable Florida] statute, a minor may consent, without parental approval, to any medical procedure involving her pregnancy or her existing child—no matter how dire the possible consequences—except abortion. Under *In re Guardianship of Barry*, 445 So.2d 365 (Fla. 2d DCA 1984) (parents permitted to authorize removal of life support system from infant in permanent coma), this could include authority in certain circumstances to order life support discontinued for a comatose child. In light of this wide authority that the state grants an unwed mother to make life-or-death decisions concerning herself or an existing child without parental consent, we are unable to discern a special compelling interest on the part of the state under Florida law in protecting the minor only where abortion is concerned. We fail to see the qualitative difference in terms of impact on the well-being of the minor between allowing the life of an existing child to come to an end and terminating a pregnancy, or between undergoing a highly dangerous medical procedure on oneself and undergoing a far less dangerous procedure to one's pregnancy. If any qualitative difference exists, it certainly is insufficient in terms of state interest. Although the state does have an interest in protecting minors, 'the selective approach employed by the legislature evidences the limited nature of the . . . interest being furthered by these provisions.' [Citation.] We note that the state's adoption act similarly contains no requirement that a minor obtain parental consent prior to placing a child for adoption, even though this decision is clearly fraught with intense emotional and societal consequences." (*In re T.W., supra*, 551 So.2d 1186, 1195, fn. omitted.)

In our view, the Florida Supreme Court's reasoning in *In re T.W., supra*, 551 So.2d 1186, is persuasive. As the court observed, the state's contention that the imposition of a parental consent requirement in the abortion context was necessary in order to protect the physical, emotional, or psychological health of the minor and to preserve the parent-child relationship was belied by the numerous, analogous circumstances in which Florida authorized a

pregnant minor to obtain other medical care, or to make equally significant decisions affecting herself and her child, without parental consent.[28]

This same reasoning applies to Assembly Bill 2274. Defendants' contention that the restrictions imposed by that statute upon a minor's constitutionally protected right of privacy are necessary to protect the physical and emotional health of a pregnant minor is undermined by the circumstance that California law authorizes a minor, without parental consent, to obtain medical care and make other important decisions in analogous contexts that pose at least equal or greater risks to the physical, emotional, and psychological health of a minor and her child as those posed by the decision to terminate pregnancy. As we have seen, like the Florida statute noted in *In re T.W.*, *supra*, 551 So.2d 1186, Assembly Bill 2274 authorizes a pregnant minor, without parental advice or consent, to make the decision to continue her pregnancy and give birth to a child (rather than have an abortion), a decision that often will have exceedingly far-reaching consequences for the minor's future. (See, e.g., *Michael M.* v. *Superior Court*, *supra*, 25 Cal.3d 608, 612.)[29] Furthermore, Assembly Bill 2274 authorizes a minor who has decided to continue her pregnancy to obtain medical care, without parental consent, for all conditions relating to pregnancy, thus permitting a minor who, for example, develops life-threatening medical complications during her pregnancy to make medical decisions relating both to her own health and to her fetus's survival, without parental consent, in circumstances that may pose much greater risks than generally are presented in undergoing an abortion. (See, e.g., 25 Cal.3d at p. 611.)[30]

In addition, when a minor gives birth to a child, California law, like the applicable Florida law noted in *In re T.W.*, *supra*, 551 So.2d 1186, 1195,

[28]Although we agree with the reasoning of the Florida decision in *In re T.W.*, *supra*, 551 So.2d 1186, some of the language of the opinion is potentially confusing. The court in *In re T.W.* states that other statutory provisions indicate that the state's interests in protecting minors and in preserving family unity are not "sufficiently compelling to justify a parental consent requirement." The opinion's analysis makes it clear, however, that the court in *In re T.W.* was not suggesting that the interests of "protecting minors" and "preserving family unity" were not, in themselves, sufficiently important or vital interests to be characterized as "compelling," but rather was explaining that the other Florida statutes to which it referred demonstrated that imposition of a parental consent requirement was not necessary to serve or further those important interests.

[29]In upholding the constitutional validity of California's statutory rape provision in *Michael M.*, the court, quoting a then recently published article, observed: " 'The social consequences of teenage childbearing are even more pervasive than the health consequences. Thus, eight out of 10 women who first become mothers at age 17 or younger never complete high school—twice as high a proportion as those who do not give birth until they are 20 or older. A recent study clearly finds that the pregnancy directly causes the dropout, independent of any effect of antecedent education achievement or aptitude.' [Citation.]" (*Michael M.* v. *Superior Court*, *supra*, 25 Cal.3d 608, 612.)

[30]As the court noted in *Michael M.*, "births to teenage mothers pose substantially increased medical risks as evidenced by the record of complications reported on the birth certificates in

authorizes the minor to decide, without parental advice or consent, whether or not to give her child up for adoption. (See Fam. Code, §§ 8700, subd. (b), 8814, subd. (d).) It is particularly difficult to reconcile defendants' contention—that parental or judicial involvement in the abortion decision is necessary to protect a minor's emotional or psychological health—with these statutory provisions authorizing a minor who has given birth to consent, on her own, to the adoption of her child. "The decision to relinquish motherhood after giving birth would seem to have at least as great a potential to cause long-lasting sadness and regret as the decision not to bear a child in the first place." (Donovan, Our Daughters' Decisions: The Conflict in State Law on Abortion and Other Issues (Alan Guttmacher Institute, 1992) p. 21.)

Moreover, the existence in California of numerous other "limited medical emancipation" statutes that authorize minors, without parental consent, to obtain medical care in a variety of settings relating to sexual activity further undermines defendants' claim that Assembly Bill 2274 is necessary to protect the health of minors or to sustain the parent-child relationship. As noted at the outset of this opinion, over the past 30 years the Legislature has enacted a series of statutes authorizing minors, *without parental consent*, to obtain medical care related to the diagnosis or treatment *of sexually transmitted diseases* (Fam. Code, § 6926), *rape* (Fam. Code, § 6927), and *sexual assault* (Fam. Code, § 6928). As is indicated by our earlier discussion of these provisions (see, *ante*, pp. 316-317), the statutes in question reflect a long-standing legislative recognition that (1) minors frequently are reluctant to disclose to their parents medical needs arising out of the minor's involvement in sexual activity and may postpone or avoid seeking such care if parental consent is required, and (2) as a consequence, the health of minors generally will be protected best in this setting by authorizing minors to obtain medical care relating to such activity without parental consent.

The premise underlying these numerous and well-established statutes authorizing a minor, in analogous circumstances, to obtain medical care without parental consent is fundamentally inconsistent with defendants' contention that Assembly Bill 2274's imposition of a parental consent (or judicial authorization) requirement before a pregnant minor may obtain a physician-performed abortion is necessary to protect the health of such minor or to support the parent-child relationship. Indeed, these numerous statutes suggest that Assembly Bill 2274's imposition of a parental consent or judicial authorization requirement is likely to impair, rather than protect, the health of pregnant minors who do not wish to bear a child. In this context, the introduction of a parental consent or judicial authorization

one-fourth of recent teenage pregnancies. [Citation.]" (*Michael M.* v. *Superior Court, supra,* 25 Cal.3d 608, 611.)

requirement may well lead those minors who are too frightened or ashamed to tell their parents or a judge about their condition either to forgo proper medical care and seek to terminate their pregnancy through a dangerous self-induced or back-alley abortion, or, alternatively, to postpone action until it is too late safely to terminate pregnancy, at which point such minors will have no choice but to endure the increased physical, emotional, and psychological risks posed by an unwanted full-term pregnancy and birth.

Accordingly, like the Florida Supreme Court in *In re T.W.*, *supra*, 551 So.2d 1186, we conclude that in view of the numerous statutes authorizing a minor, without parental consent, to obtain medical care or make other fundamental decisions for herself and her child in other, analogous settings, Assembly Bill 2274 cannot properly be sustained on the ground that its requirements are necessary either to protect the health of a pregnant minor or to protect the minor's relationship with her parent. (Accord, *Denver Area Educ. Tel.* v. *FCC* (1996) 518 U.S. 727 [116 S.Ct. 2374, 2393, 135 L.Ed.2d 888] (lead opn. of Breyer, J.) ["[W]e can take Congress' different . . . treatment of a highly similar problem at least as some indication that more restrictive means are not 'essential' (or will not prove very helpful). Cf. *Boos* v. *Barry*, 485 U.S. 312, 329 . . . (1988) (existence of a less restrictive statute suggested that a challenged ordinance, aimed at the same problem, was overly restrictive)." (Italics omitted.)]; *Hodgson* v. *Minnesota*, *supra*, 497 U.S. 417, 455 [110 S.Ct. 2926, 2947] ["These [other] statutes provide testimony to the unreasonableness of the Minnesota two-parent notification requirement and to the ease with which the State can adopt less burdensome means to protect the minor's welfare."].)[31]

This conclusion, moreover, is supported not only by consideration of the numerous related California statutory provisions, but also by the overwhelming evidence, much of it uncontested, that was introduced at the trial in this case. As the Court of Appeal observed in its decision below: "The evidence was nothing less than overwhelming that the legislation would not protect these interests, and would in fact *injure* the asserted interests of the health of minors and the parent-child relationship." (Italics in original.)

---

[31]The Supreme Judicial Court of Massachusetts recently upheld its state's abortion/parental consent law against a state constitutional challenge (except for a provision of the law requiring the minor to obtain the consent of both parents). (*Planned Parenthood* v. *Attorney General* (1997) 424 Mass. 586 [677 N.E.2d 101].) The Massachusetts Constitution, however, unlike the California and Florida Constitutions, does not contain an explicit privacy provision, and under Massachusetts law (again unlike California and Florida law) the parental consent statute in question was not subject to scrutiny under the demanding "compelling interest" test. (See 677 N.E.2d at pp. 103-104 & fn. 4.) For these reasons, we believe the decision of the Florida Supreme Court in *In re T.W.*, *supra*, 551 So.2d 1186, constitutes the more relevant authority.

As we have seen, prior to the enactment of Assembly Bill 2274 pregnant minors in California for many years had been authorized to obtain medically safe abortions without parental consent. Defendants presented no empirical studies or other comparable evidence at trial to demonstrate that this long-standing policy had proven detrimental to the physical, emotional, or psychological health of pregnant minors or had affected family relationships adversely. To the contrary, the testimony of the numerous expert witnesses called by plaintiffs established that the pre-Assembly Bill 2274 statutory provision was successful both in protecting the physical, emotional, and psychological health of minors and in supporting parent-child relationships. This testimony further indicated that the imposition of a statutory requirement compelling a pregnant minor to obtain parental consent or judicial authorization before obtaining a medically safe abortion was likely to be detrimental both to the health of such minors and to their family relationships.

The testimony revealed, in this regard, that an abortion, when performed by qualified medical personnel, is one of the safest medical procedures, and that the risk of medical complications resulting from continuing a pregnancy and giving birth is considerably greater than that posed by an abortion. The testimony also revealed that the overwhelming majority of minors who become pregnant have the requisite maturity and capacity to give informed consent to an abortion, and that the interests of those relatively few pregnant minors who do not have the capacity to provide informed consent remain fully protected under the pre-Assembly Bill 2274 statute, because a physician may not perform any medical procedure, including an abortion, unless he or she determines that the patient is capable of giving (and has given) informed consent. (See *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, 883.) Of course, physicians are well qualified to determine a minor's capacity to provide informed consent and regularly do so in providing medical care under California's numerous medical emancipation statutes.

The evidence introduced at trial further established that the majority of pregnant minors consult their parents before obtaining an abortion, without being compelled to do so by statute, and that many minors who do not voluntarily consult their parents have good reason to fear that informing their parents will result in physical or psychological abuse to the minor (often because of previous abusive conduct or because the pregnancy is the result of intrafamily sexual activity). The testimony disclosed that the primary determinant of whether a pregnant minor will consult her parent or parents is the quality of the parent-child relationship that existed before the minor became pregnant, and not the presence or absence of a parental

consent statute such as Assembly Bill 2274.[32] The evidence further indicated that to the extent the provisions of Assembly Bill 2274 were to cause a pregnant minor from an abusive or potentially abusive family to seek parental consent, the statute would endanger the minor by leading her to place herself at physical or mental risk and would exacerbate the instability and dysfunctional nature of the family relationship.

Finally, the testimony also indicated that although the judicial bypass procedure in Assembly Bill 2274 provides a mechanism by which a pregnant minor may avoid informing her parents of her pregnancy, resort to this judicial procedure inevitably will delay the minor's access to a medically safe abortion, thereby increasing the medical risks posed by the abortion procedure, and will inflict emotional and psychological stress upon a minor without providing any greater protection of the interests of either a mature or immature minor than what is provided by the minor's own health care provider under the pre-Assembly Bill 2274 law. Furthermore, several witnesses testified that past experience in other jurisdictions demonstrates that at least some minors who are too frightened or ashamed to consult their parents also will be too frightened or ashamed to go to court (often fearing that their presence at the courthouse might be discovered and disclosed by a neighbor or acquaintance), and may resort to the dangerous alternatives of either attempting to terminate their pregnancy themselves or seeking an illegal, back-alley abortion. (See also Note, *Hodgson* v. *Minnesota: Chipping Away at Roe v. Wade in the Aftermath of Webster* (1991) 18 Pepperdine L.Rev. 955, 955-956 [describing the tragic case of Becky Bell, a 17-year-old Indiana girl who, too frightened to seek parental consent or judicial authorization, died after obtaining an illegal abortion].)

In sum, as the Court of Appeal observed, the evidence introduced at trial overwhelmingly indicated that Assembly Bill 2274 would not serve—but rather would impede—the state's interests in protecting the health of minors and enhancing the parent-child relationship.

Accordingly, when we consider the numerous, analogous California statutory provisions authorizing a minor, without parental consent, to make medical and other significant decisions with regard to her own and her child's health and future, as well as the overwhelming evidence introduced at trial, we conclude that both the trial court and the Court of Appeal correctly determined that defendants have failed to establish that Assembly Bill 2274's infringement upon a pregnant minor's fundamental constitutional

---

[32]The evidence at trial indicated that health clinics that provide pregnancy counseling and treatment routinely encourage minors to consult with their parents except in circumstances in which such consultation is likely to lead to abuse.

privacy interest is necessary to further the state's interests in protecting the health of minors or the parent-child relationship.

Finally, an amicus curiae brief filed in this case suggests that Assembly Bill 2274 may be justified by the state's interest in ensuring that the determination whether a pregnant minor is sufficiently competent and mature to consent to an abortion is made in a fair and unbiased manner. The brief acknowledges that, even in the absence of Assembly Bill 2274, a health care provider may not provide medical or surgical care relating to pregnancy unless the provider determines that the minor is capable of giving "informed consent" to the procedure (see *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, 883), but argues that a health care provider who agrees to perform an abortion at a minor's request may have a conflict of interest (pecuniary, ideological, or both) that would impair the provider's ability to make an unbiased decision with regard to whether the minor is capable of providing informed consent. As a consequence, the amicus curiae brief maintains, Assembly Bill 2274 permissibly requires that the determination of the minor's competence or maturity be made by the minor's parent or by a court.

We conclude that Assembly Bill 2274 cannot be sustained on this theory. Nothing in the record justifies an assumption that licensed health care providers cannot be trusted to make an unbiased determination as to whether a minor is capable of giving informed consent to an abortion, or, indeed, suggests that the Legislature entertained any such view. None of the legislative findings supports such a proposition.[33] It is clear that a statute that impinges upon a fundamental constitutional right cannot be upheld on the

---

[33]Justice Brown's dissent asserts that the opinion is mistaken in stating that nothing in the record suggests that the Legislature entertained the view that health care providers cannot be trusted to make unbiased determinations with regard to a minor's capacity to give informed consent to an abortion. (Dis. opn. of Brown, J., *post,* at pp. 434-435.) As support, the dissent quotes a passage from a document it cites as "Legis. Analysis Supporting Assem. Bill No. 2274." (*Ibid.*) Although the cited document bears the self-styled title of "Legislative Analysis Supporting Assembly Bill 2274," the document was not prepared by a sponsoring member of the Legislature or by legislative staff, but, as the dissent notes, rather is an "alternative analysis," written and submitted by an organization supporting the legislation because of the organization's dissatisfaction with the bill analysis that had been prepared by the Senate committee staff itself. (Christian Action Council, unofficial analysis designated as "Legislative Analysis Supporting Assembly Bill 2274 (Frazee), As Amended in Assembly June 25, 1987," submitted to Sen. Com. on Health and Human Services, pp. 1-2.) Even if it were appropriate to take judicial notice of this document (no one has requested that we do so; the document simply is appended to an amicus curiae brief filed in this matter), its existence does not alter our view that there is nothing in the record that suggests that *the Legislature* entertained the view that licensed health care providers cannot be trusted to make unbiased determinations as to whether a minor is capable of giving informed consent to an abortion. As we have noted, none of the legislative findings included in the legislation supports such a proposition.

basis of unsupported speculation that the Legislature believed that health care professionals would not perform their duties in an honest and ethical manner. (Accord, *Carey* v. *Population Services International, supra,* 431 U.S. 678, 696 [97 S.Ct. 2010, 2022] ["when a State . . . burdens the exercise of a fundamental right, its attempt to justify that burden as a rational means for the accomplishment of some significant state policy requires more than a bare assertion, based on a conceded complete absence of supporting evidence, that the burden is connected to such a policy"]; *Mississippi University for Women* v. *Hogan* (1982) 458 U.S. 718, 730 [102 S.Ct. 3331, 3339, 73 L.Ed.2d 1090] ["although the State recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective is the actual purpose underlying the discriminatory classification"].) Indeed, as we have seen, in numerous analogous contexts the Legislature has authorized minors to obtain medical care without parental consent or judicial authorization, thus recognizing the general competence of health care professionals to determine whether a minor is capable of giving informed consent. (See, e.g., Fam. Code, §§ 6925 [prenatal care], 6926 [care for communicable disease], 6927 [care for rape], 6928 [care for sexual assault], 6929 [care for drug or alcohol related problem].) There simply is no basis on the present record for concluding that a physician is capable of determining whether a pregnant minor is competent to give informed consent to necessary medical care when the minor chooses to proceed with her pregnancy, but is incapable of determining whether such a minor is competent to give informed consent when the minor chooses to terminate her pregnancy.

The dissenting opinions of Justices Baxter and Brown advance an argument related to that raised by amicus curiae, suggesting that if it is constitutionally permissible to require a physician to determine that a pregnant minor has the requisite understanding and maturity to give informed consent before performing an abortion without parental consent, it must be constitutionally permissible to require that the informed consent decision be made by a judge rather than a physician. (See dis. opn. of Baxter, J., *post,* at pp. 410-411; dis. opn. of Brown, J., *post,* at p. 434.) The suggested conclusion, however, does not follow from the premise. A physician must also determine that an adult woman has the capacity to give informed consent before performing an abortion at her request, or—for that matter—any medical procedure. That does not mean, however, that the state constitutionally may require all pregnant women, before they may obtain an abortion, to secure a court order certifying that they are competent to provide informed consent. A legislative measure that requires a woman to go to court, to reveal her condition to a judge, and to submit to a judicial determination of competency obviously imposes a substantially greater intrusion on privacy than one that permits a woman to obtain an abortion from a physician in the same manner

as she may obtain other medical care. And the increased intrusion on autonomy privacy imposed by a judicial authorization requirement may be even greater with regard to pregnant minors, because minors frequently may be too embarrassed or frightened to seek judicial authorization and may endanger their health or forfeit their right of choice rather than venture into an unfamiliar and intimidating court setting. Further, as already noted, there is no reasonable basis for concluding that a physician is able to determine the competency of a pregnant minor to provide informed consent when the minor chooses to continue her pregnancy but that the competency determination must be made by a judicial officer when the minor chooses to terminate her pregnancy.[34]

In sum, as concluded by the courts below, defendants have failed to demonstrate adequate justification for the statute's intrusion upon a pregnant minor's right of privacy under the California Constitution.

## VIII

For the foregoing reasons, we conclude that Assembly Bill 2274 violates the right of privacy set forth in article I, section 1, of the California Constitution. The judgment of the Court of Appeal, upholding the judgment of the trial court, is affirmed.

---

[34]Furthermore, we do not agree with the suggestion that one effect of the trial court's judgment in this case—invalidating Assembly Bill 2274 as a whole, including the provision establishing a judicial bypass procedure—would be to leave a pregnant minor (who a treating health care provider finds lacks the capacity to give informed consent) without any means of obtaining a medically safe abortion if the minor reasonably fears that informing a parent will place her in physical danger or if her parent, once notified, refuses to consent to an abortion. Under the applicable federal decisions, a state that in general requires a pregnant minor to secure parental consent before obtaining an abortion must provide the minor with the option of obtaining an abortion without parental consent by demonstrating to an unbiased official (who has the power to authorize the abortion) either that the minor is sufficiently mature to make the decision on her own or, if not sufficiently mature, that it is in the best interests of the minor to terminate her pregnancy. (See, e.g., *Bellotti II, supra,* 443 U.S. 622, 643-644 [99 S.Ct. 3035, 3048-3049] (plur. opn.); *Casey, supra,* 505 U.S. 833, 899 [112 S.Ct. 2791, 2832].) Thus, even without an explicit statutorily prescribed "judicial bypass" procedure, a pregnant minor who is denied medical care relating to pregnancy because of a doctor's determination that she lacks the capacity to give informed consent, but who is too frightened to seek—or unable to obtain—a parent's consent for such care, is entitled to seek a court order authorizing such medical care. A similar procedure is available, for example, when a parent, on the basis of his or her own religious beliefs, refuses to consent to a blood transfusion or other medical care for a child that a treating physician concludes is necessary for the child's health. (See, e.g., *In re Eric B.* (1987) 189 Cal.App.3d 996 [235 Cal.Rptr. 22].) We see no reason why a similar procedure cannot be invoked on behalf of a pregnant minor who is incapable of giving informed consent to treatment relating to her pregnancy. (Cf. *Akron I, supra,* 462 U.S. 416, 441 [103 S.Ct. 2481, 2498] ["[A] state court presented with a state statute specifically governing abortion consent procedures for pregnant minors will attempt to construe the statute consistently with constitutional requirements."].)

Werdegar, J., and Chin, J., concurred.

**KENNARD, J.—** ██ I concur in the judgment. Before this court granted a rehearing in this matter, I authored a dissenting opinion setting forth my views, which have not changed and which are in substantial agreement with the reasoning of the plurality opinion. Because that dissenting opinion no longer appears in the Official Reports (see Cal. Rules of Court, rule 976(d)), I reiterate that opinion here in relevant part, with additions in brackets and deletions reflected as [].

California's parental consent law, which prohibits abortions for women under the age of 18 years without either the consent of one parent or judicial authorization, may at first glance appear so eminently reasonable that its constitutional validity could scarcely be in doubt. But evidence received at the trial of this case, much of it based on the experience of other states with similar laws, shows that the benevolent appearance of parental involvement laws is deceiving; the laws have serious adverse effects and yield few benefits for children or society.

In brief, the relevant facts are these: Most adolescent women who become pregnant will consult a parent voluntarily, and those who do not frequently have good reasons for not doing so. With a parental consent law in effect, some pregnant adolescents who do not voluntarily consult a parent will seek and obtain judicial authorization, but the delay caused by the procedure will increase the medical risks of the abortion significantly without in any way enhancing the process by which the adolescent makes the abortion decision. Others will reveal their pregnancy to a parent and request consent, but will derive little or no benefit from parental consultation that is legally coerced rather than voluntary. Finally, there will be some pregnant adolescents who cannot or will not obtain parental consent for an abortion and who will not seek judicial authorization because they perceive this process as unbearably intimidating, dangerous, or humiliating. Some of these adolescents will risk their health and their very lives with illegal or self-induced abortion, while others will delay any decision until abortion is no longer feasible and will bear a child they are ill equipped to care for.

Determining the constitutional validity of a law having such paradoxical and potentially serious effects is no easy task. Indeed, this case presents a confluence of state constitutional issues of great complexity and delicacy. We must adjudicate rights under the state constitutional right of privacy in the always thorny context of abortion, rendered all the more volatile and challenging because the rights at issue are those of adolescents rather than adults. And we must do so using a test newly established in *Hill* v. *National*

*Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633]. Without question this is one of the most important and difficult cases we have decided in many years.

[]

I [join in] [] affirm[ing] the judgment of the Court of Appeal holding that California's parental consent law violates the right of privacy guaranteed by our state Constitution. As the evidence received at the trial of this case persuasively demonstrates, the great majority of pregnant adolescents who do not voluntarily consult their parents are sufficiently mature to make the abortion decision by themselves and should be permitted to do so in consultation with their physicians and without requiring parental consent or judicial authorization.

There is a very small group of pregnant adolescents for whom parental consent is not an available option but who are too immature to give informed consent to an abortion. Almost all members of this group are under the age of 14 years. Because the Legislature has not enacted a parental consent law applying solely to these younger adolescents, and thus the issue is not now before this court, I do not decide whether a parental consent law so narrowed in focus would violate the state constitutional right of privacy, although I note that the interests of these younger adolescents would be better served by a law that allowed their physicians or others concerned with their welfare to petition for judicial authorization on their behalf. The present parental consent [law], by contrast, requires the adolescent herself to shoulder the entire burden of initiating legal proceedings to obtain judicial authorization.

I

Preliminarily, it is essential to state what this case is *not* about.

The morality of abortion is *not* at issue in this case. As this court has noted, the morality of abortion is "a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles." (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 284 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] (lead opn. by Tobriner, J.), fn. omitted.) The United States Supreme Court has made the same point: "Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. . . . Our obligation is to define the liberty of all, not to mandate our own moral code." (*Planned Parenthood of Southeastern Pa.* v. *Casey* (1992) 505 U.S. 833, 850 [112 S.Ct. 2791, 2806, 120 L.Ed.2d 674].)

Nor is this case about the value of parental involvement in the decision of a pregnant adolescent to continue or terminate her pregnancy. On the contrary, all parties and all members of this court agree that, *in general*, an adolescent who learns she is pregnant and is considering an abortion will benefit substantially from consultation with a parent and should be encouraged to do so. Parental assistance is important and beneficial because, *in general*, no one knows the child as well, or cares as deeply about the child's welfare, as the parent.

Likewise, all parties and all members of this court agree that parental involvement will not benefit every pregnant adolescent. Not every pregnant adolescent has parents out of the comforting and idyllic world of a Norman Rockwell painting. Indeed, anyone familiar with the dependency cases heard in this state's juvenile courts understands that many pregnant adolescents have no competent and caring parent to consult, and that for them parental consultation is simply not an option.

What *is* this case about? The primary issues are these: (1) Will the parental consent law advance the state's interest in protecting the physical and mental health of adolescent women []? (2) If the law will accomplish this purpose for only a small percentage of the adolescents affected by its provisions, is there some other way to do so without the substantial adverse effects that will arise from the legally mandated invasion of the privacy rights of the many adolescents who wish to have an abortion, are capable of giving informed consent, and cannot or will not obtain parental consent?

This court is fortunate to have a well-developed factual record [] with which to resolve these issues. At the trial, 25 witnesses testified in person and 6 others by deposition. The witnesses included distinguished professionals in the fields of medicine, psychology, adolescent development, reproductive health statistics, and family violence, as well as lawyers, counselors, and judges who have participated in the implementation of similar laws in other states. Based on this evidence, the superior court issued a 39-page statement of decision containing many findings of fact. *On appeal, the state has not challenged the sufficiency of the evidence to support these findings.*

In its statement of decision, the superior court acknowledged that "the State has a compelling interest in the protection of minors from physical, psychological and emotional harm." But the court found no evidence that the parental consent law would further that interest. In particular, the court found:

1. "[A]n abortion is one of the safest medical procedures available for all women and, in particular, for teenagers. The risk of complications in

pregnancy and childbirth are significantly higher for all women and particularly for younger teenagers."[1]

2. "The medical history relevant to the abortion procedure is the type of information the minor herself would best know and, in fact, might be hesitant to disclose in the presence of a parent."[2]

3. "[M]inors rarely, if ever, experience complications following an abortion."

4. "[F]or most women, abortion poses no threat to their psychological or emotional well-being. . . . [A]dolescents are at no special risk and are actually less likely than adult women to experience any adverse psychological reaction to abortion."[3]

---

[1]Michael Policar, a medical doctor who is board certified in obstetrics and gynecology and a member of the faculty of the Medical School of the University of California at San Francisco, testified that "abortion is the safest operation which is available in the United States . . . it has the lowest rate of deaths associated with it and also has the lowest rate of serious complications in comparison to any other operation which is widely performed in this country." He testified that adolescents are even less likely than adults to experience medical complications after abortion.

Philip Darney, a medical doctor who is board certified in obstetrics, gynecology and preventative medicine, similarly testified that "[e]lective abortion has a very low complication rate at [San Francisco General Hospital] and at other institutions" and that this low complication rate "applies to teens as well."

In *Hodgson* v. *Minnesota* (1990) 497 U.S. 417 [110 S.Ct. 2926, 111 L.Ed.2d 344], Justice Thurgood Marshall cited a study concluding that a "minor's overall risk of dying from childbirth is over nine times greater than [the] risk of dying from [a] legal abortion." (*Id.* at p. 467 [110 S.Ct. at p. 2954] (conc. & dis. opn. of Marshall, J.), citing Greydanus & Railsback, *Abortion in Adolescence* (1985) 1 Seminars in Adolescent Med. 213, 214.)

[2]Dr. Darney (see fn. 1, *ante*) testified: "I have never in the course of more than 15 years of doing abortions of teenagers and others felt that I didn't get an adequate history from the patient to deal with problems that might come up in the course of an abortion."

Dr. Policar (see fn. 1, *ante*) testified that adolescents are able to provide a medical history for abortion "as well as any other group of individuals" but also that teens are reluctant to disclose some relevant facts, such as previous abortions or sexually transmitted diseases, in the presence of their parents.

Curtiss Eugene Weidmar, a medical doctor and the Director of Public Health for El Dorado County, testified that a medical history is necessary to determine contraindications before prescribing oral contraceptives, and that this history is routinely taken from the minor without involving the parent.

[3]Nancy Adler, a professor of medical psychology in the Department of Psychiatry and Pediatrics of the University of California at San Francisco, testified that she was part of an expert panel appointed by the American Psychological Association to survey the scientific literature on the psychological responses to abortion. This survey resulted in an article of which Dr. Adler was the lead author. (Adler et al., *Psychological Responses After Abortions* (1990) 248 Science 41.) From the literature review, Dr. Adler concluded that "for the vast majority of women having their first trimester procedure, . . . there is no hazard to mental

5. "[P]arental involvement in this specific area may have an adverse psychological effect . . . if it takes on a coercive character, and . . . the ability to make an autonomous decision about abortion is an important predictor of a minor's satisfaction with her decision."[4]

---

health, that the predominant responses to abortion are positive and that the negative responses tend to be mild and transient." She also found that there was no evidence that adolescents were particularly vulnerable to serious adverse psychological responses to abortion.

Nada Logan Stotland, a board-certified psychiatrist who is also associate professor of clinical psychiatry and associate professor of clinical obstetrics and gynecology at the University of Chicago, testified that she had reviewed the scientific literature on psychiatric consequences of abortion and "according to the published literature, the majority of women who undergo abortions experience relief afterwards. Some smaller proportion experience loss and some guilt and, again, in the reported literature, the vast majority of those responses are transient and self-limited. That is they don't require intervention by a professional." She also testified that "[i]n every study, the incidence [of adverse psychiatric sequelae] following childbirth is considerably higher, on the order of four times as high following childbirth as following abortion." She also testified that age by itself was not a risk factor, that adolescents were no more likely than adults to experience adverse psychiatric effects. These conclusions appear in a chapter she wrote in a peer reviewed book, of which she was the editor, that was published by the American Psychiatric Press, which is the press of the American Psychiatric Association. (Stotland, *Psychiatric Issues in Abortion* in Psychiatric Aspects of Abortion (Stotland edit. 1991).) She noted that the 1991 literature review published by the American Psychiatric Association reached similar conclusions. (Dagg, *The Psychological Sequelae of Therapeutic Abortions—Denied and Completed* (1991) 148 Am. J. of Psychiatry 578.)

This finding is also supported by the testimony of Laurie Schwab Zabin, Ph.D., an associate professor at Johns Hopkins School of Hygiene and Public Health. In her expert opinion, based on her own research (Zabin et al., *When Urban Adolescents Choose Abortion: Effects on Education, Psychological Status and Subsequent Pregnancy* (1989) 6 Fam. Planning Perspectives 248) and that of others in the field, abortion does not have any negative psychological effect on adolescents.

This conclusion is further supported by the testimony of Dr. Policar (see fn. 1, *ante*), who testified that emotional reaction to abortion "serious enough to require consultation with a psychiatrist . . . literally never occurs" and that less serious emotional reactions, which would be referred to a social worker, are rare for all women and even more so for teens.

David Elkind, a child psychologist and professor of child study at Tufts University, testified: "In terms of negative impact, I think it's been well-established in studies that there are, so far as we know, no negative sequelae to abortion long-term."

[4]Dr. Adler (see fn. 3, *ante*) testified that a woman is more likely to have negative psychological responses following abortion if the woman was coerced by her parents or partner to terminate a pregnancy that she would have preferred to continue.

Dr. Stotland (see fn. 3, *ante*) testified that lack of autonomy or control over the abortion decision is associated with a negative psychiatric outcome and that pressure from a parent can therefore have a negative impact on the psychiatric outcome of an adolescent's abortion decision.

Based on her research, Dr. Laurie Zabin (see fn. 3, *ante*) testified that whether an adolescent is later satisfied with her decision to terminate a pregnancy by abortion is not significantly related to whether the adolescent consulted a parent before making the decision. Those who independently made the decision to terminate or not terminate the pregnancy were significantly more likely to be satisfied with the decision than those who succumbed to pressure from a parent or other adult.

6. "[W]ith the exception of the small percentage of very young adolescents, again the great majority of minors possess the cognitive ability and maturity to make a fully-informed choice as to abortion and are competent to give informed consent to abortion . . . ."[5]

7. "[A]s to that small percentage of minors who are not competent to give informed consent, medical ethics and practices preclude abortion in the absence of parental approval."[6]

The superior court then considered whether the parental consent law would further the state's compelling interest in "preserving and fostering the parent-child relationship." On this point, the court made these findings:

1. "[A] majority of minors voluntarily consult with a parent as to their decision to have an abortion."

2. "[P]arental involvement laws do not serve to change the numbers [that is, do not increase the number of minors who consult with a parent as to their decision to have an abortion]."[7]

3. "Rather than legislation, the chief determinant of whether a minor consults a parent appears to be the quality of the relationship established between the parent and child before the pregnancy."[8]

4. "[I]f a trusting and supportive relationship between a parent and child has not already been established, it is unlikely that the State can create in a moment of crisis what the parents were unable to develop over the course of the preceding years."

---

[5]The evidence supporting this finding is discussed in the text, *post*, at pages 371 through 373.

[6]Dr. Policar (see fn. 1, *ante*) testified that the "vast majority" of adolescents are capable of giving informed consent and that he would not perform an abortion on an adolescent or any other patient without informed consent.

Adele D. Hofmann, a medical doctor and professor of pediatrics and director of adolescent medicine at the University of California at Irvine, testified that generally adolescents are capable of giving informed consent and that no adolescent can be treated on her own consent unless that consent is informed. Dr. Stotland (see fn. 3, *ante*) testified to the same effect.

[7]Robert Blum, a medical doctor and professor of pediatrics at the University of Minnesota, testified to a 1984 study based on interviews with minors who were at clinics awaiting abortions in Minnesota (which had a two-parent notification law) and Wisconsin (which had no parental involvement law). The study concluded that the Minnesota law had no effect on the number of minors who consulted one parent, and only a slight effect on the number who consulted both parents. (Blum et al., *The Impact of a Parental Notification Law on Adolescent Abortion Decision-making* (1987) 77 Am. J. Pub. Health 619.)

[8]Based on his study (see fn. 7, *ante*), Dr. Blum testified that the most important factors influencing whether a pregnant minor consulted a parent (almost invariably her mother) were the quality of the relationship, the age of the minor (younger minors being far more likely to consult), and the family's socio-economic status.

5. "[F]or a significant number of minors, parental consultation is not a realistic option."[9]

Regarding the effect of a judicial bypass procedure, the superior court found that in other states with parental consent laws, "rather than further the State's interest in the health of its minors, or even having no effect at all, the legislation actually had a detrimental effect." In particular, the court found:

1. The bypass procedure delays the performance of the abortion, and "increases the likelihood of a second trimester abortion." This delay significantly increases the medical risks of abortion.[10]

---

[9]In states with parental involvement laws, the reasons minors give for not consulting their parents include fear of a physically or emotionally abusive parent, fear of being ejected from the home, concern that the parent will not keep the information confidential, and an unwillingness to give upsetting news to a parent who is physically or emotionally fragile.

Although the experts who testified did not agree on the percentage of families that qualify as dysfunctional or abusive, they agreed that the number of such families was significant. Moreover, evidence in the record indicates that for teens who become pregnant, the percentage of families that are abusive and/or dysfunctional is much higher than for teens generally.

Lenore E. A. Walker, a psychologist specializing in family violence and abuse, testified that approximately 25 to 30 percent of families in the United States "will have some form of domestic or family violence at some part of their life history" and that an adolescent revealing her pregnancy to her parents is likely to trigger violence or some other form of abuse in such families. (See also *Hodgson* v. *Minnesota, supra,* 497 U.S. 417, 439 [110 S.Ct. 2926, 2939] [referring to "the distressingly large number of cases in which family violence is a serious problem"]; testimony of social worker Jeth Gold stating that some parents "react very violently when they find out their child is sexually active"; testimony of Dr. Adele Hofmann (see fn. 6, *ante*) citing instances of a parent inflicting physical injury on the adolescent after learning of her pregnancy.)

Charles R. Figley, a psychologist and a professor at Florida State University, testified that approximately 10 percent of families would not have any of the characteristics necessary for providing appropriate support to a pregnant minor. He also testified that forcing a pregnant adolescent to involve her parents in the abortion decision would be inappropriate if the parents are psychologically or physically abusive.

W. Robert Beavers, a psychiatrist and clinical professor of psychiatry at the University of Texas, Southwestern Medical Center, testified about a test (the Beavers System Model) he developed to rate family competence. Using this test, he found that 5 percent of families attained the optimal level of competence, 38 percent were judged "adequate," 38 percent were judged "mid-range," 16 percent were "borderline," and 3 percent were "severely dysfunctional." He also testified that child abuse occurs in 3 to 5 percent of American families. He conceded that some teens cannot involve parents in the abortion decision.

[10]Anita Lorraine Nelson, a medical doctor who is board certified in obstetrics and gynecology, an assistant professor at the School of Medicine at the University of California at Los Angeles, and the medical director of women's health clinics in the Los Angeles area, testified that in her opinion implementation of California's parental consent law would cause minors to delay abortions, resulting in significantly increased medical risks. Dr. Adler (see fn. 3, *ante*)

2. "In addition to adverse medical consequences, the bypass procedure entails serious psychological and emotional consequences."[11]

3. The bypass procedure does not assist pregnant minors in making "a mature and informed decision."[12]

testified to the same effect, adding that delay increases the psychological as well as the medical risks.

Dr. Policar (see fn. 1, *ante*) testified that the risk of complications in an abortion increases 50 percent per week for each week after the 10th week of pregnancy.

Jamie Ann Sabino, a Massachusetts attorney who is cochair of the Judicial Consent for Minors Lawyer Referral Panel in that state, testified that for minors who use the Massachusetts bypass procedure, "there is at least a week but more like a 2-week delay."

[11]Gerald Martin, a Minnesota district court judge from the Duluth area, testified: "It's clearly a very nerve-racking, tense, stressful experience for them."

Lynne MacBean, the volunteer coordinator of the Guardian Ad Litem Program in Minneapolis, Minnesota, testified that the judicial bypass procedure is very difficult and frightening for minors even though the judges who hear the petitions are careful to act in a nonthreatening manner. (See also *Hodgson* v. *Minnesota, supra,* 497 U.S. 417, 441 [110 S.Ct. 2926, 2940] ["The court experience produced fear, tension, anxiety, and shame among minors . . . ."]; testimony of social worker Jeth Gold that "[t]he court system is a fearful, anxiety-producing, intimidating experience for most kids.")

Jamie Ann Sabino (see fn. 10, *ante*) testified: "I see a very high level of stress in the young women going to court that I have represented including crying, freezing in court, wringing of their hands, telling me how scared they are, telling me that they have had nightmares, that they can't sleep."

[12]The judges testifying that judicial bypass procedures provide no benefit to minors were Minnesota District Court Judges Gerald Martin and Allen Oleisky, and former Massachusetts Superior Court Judge Rudolph F. Pierce.

Lynne MacBean (see fn. 11, *ante*) testified that the judicial bypass process does not assist minors in deciding whether to continue or terminate their pregnancies because their decisions have already been made when they seek judicial authorization. Jamie Ann Sabino (see fn. 10, *ante*) testified to the same effect. She added that, in her opinion, the Massachusetts parental involvement law "has created a substantial burden for the young women in Massachusetts and that it has not met—it is not substantively working, it has not met any of the stated goals of the statute or the state interests involved." She noted that during the 10 years the law had been in effect, Massachusetts courts had ruled on approximately 9,000 bypass petitions, of which all but 13 were granted. All 13 denials were appealed and only one was affirmed (in that case the parents gave consent and the minor obtained the abortion). The overwhelming majority of petitions (97-98 percent) were granted on the ground of maturity.

Paula Marie Wendt, the director of an abortion facility in Minnesota, cited similar statistics for Minnesota: Of three thousand bypass petitions heard during a five-year period, only nine were initially denied and most of those nine were eventually granted. She also testified that in her opinion the Minnesota parental involvement law did not assist minors' decisionmaking and provided no benefit to minors.

In *Hodgson* v. *Minnesota, supra,* 497 U.S. 417, 441, footnote 29 [110 S.Ct. 2926, 2940], Justice John Paul Stevens cited similar testimony by a judge to the effect that judicial bypass serves no useful public purpose. When judicial bypass is invoked, authorization is granted so routinely that judges view the procedure as a "rubber stamp." (See *id.* at p. 436, fn. 21·[110 S.Ct. at p. 2937] (conc. opn. of Stevens, J.) [noting that of 3,573 petitions filed in Minnesota courts, 6 were withdrawn, 9 were denied, and 3,558 were granted]; *id.* at p. 477 [110 S.Ct. at p. 2959] (conc. & dis. opn. of Marshall, J.) [citing judge's testimony characterizing the bypass as a "rubber stamp"].)

Summing up, the superior court made this finding:

"One must conclude from all of the evidence presented as to the effectiveness of the judicial bypass procedure that the procedure has no effect on a minor's ultimate decision with respect to abortion nor on the process by which that decision is made. Further, rather than providing a benefit to minors, the bypass procedure poses a gratuitous threat to their physical and emotional well-being."

Concluding that the parental consent law violates the right of privacy guaranteed by article I, section 1, of the California Constitution, the superior court declared the law invalid and permanently enjoined its enforcement. On appeal, a unanimous Court of Appeal affirmed.

## II

The issue before this court is whether California's parental consent law violates the privacy rights of minors guaranteed by the California Constitution.

Unlike the federal Constitution, the California Constitution expressly recognizes and safeguards the right of privacy. In article I, section 1, the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." (Italics added.) The words "and privacy" were added by an initiative adopted by the voters on November 7, 1972 (hereafter the Privacy Initiative).

The elements of a cause of action for invasion of the state constitutional right to privacy are: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy on the plaintiff's part; and (3) an invasion of the privacy interest that is "serious" rather than "slight or trivial." (*Hill* v. *National Collegiate Athletic Assn., supra*, 7 Cal.4th 1, 35-37.) Once a plaintiff has established these elements, the defendant may defend on the basis "that the invasion of privacy is justified because it substantively furthers one or more countervailing interests." (*Id.* at p. 40.) If this defense is raised, the plaintiff may rebut it by "showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." (*Ibid.*)

### A. *Legally Protected Privacy Interest*

Privacy interests are of two kinds: (1) autonomy privacy, which is the interest "in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference"; and (2) informational privacy, which is the interest in preventing "dissemination or misuse

of sensitive and confidential information." (*Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1, 35.)

A woman's decision to continue or terminate a pregnancy implicates both of these privacy interests, but I will focus here only on the interest in autonomy privacy. Because I conclude that the parental consent law is an unconstitutional invasion of the autonomy interest, I need not and do not address whether it is also an unconstitutional invasion of the informational privacy interest.

"It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties." (*Bellotti* v. *Baird* (1979) 443 U.S. 622, 655 [99 S.Ct. 3035, 3054, 61 L.Ed.2d 797] (conc. opn. of Stevens, J.).) Few decisions are more intimate or more important in determining the subsequent course of a woman's life than her decision to continue or terminate a pregnancy. Not surprisingly, this court has recognized that the state constitutional right of privacy protects a woman's right to choose whether or not to give birth, including the right to terminate a pregnancy by abortion. (See *Committee to Defend Reproductive Rights* v. *Myers*, *supra*, 29 Cal.3d 252, 262; *People* v. *Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194].)

[]

The term "interest" generally means "having a share or concern" in something so that one is "liable to be affected or prejudiced" depending on its condition or outcome. (*Estate of Brown* (1938) 24 Cal.App.2d 573, 575 [75 P.2d 658].) The term may be used to refer to "the object of any human desire" (Rest.2d Torts, § 1, p. 2), whether beneficial or not, or only to "that which is 'truly good for a person whether he desires it or not.'" (Houlgate, The Child & the State, A Normative Theory of Juvenile Rights (1980) p. 105, quoting Feinberg, Social Philosophy (1973) p. 26; see also *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629, 631 [92 P.2d 678] [defining "interest" as "anything that is profitable or beneficial"].) But the term "interest," by itself, "carries no implication that the interest is or is not given legal protection." (Rest.2d Torts, § 1, com. a, p. 2.) When an interest has legal protection, it is then referred to as a "right." (*Id.*, § 1, com. b, p. 2.)

Every pregnant woman, regardless of age, is vitally affected by the decision to continue or terminate her pregnancy and stands to gain or lose depending upon whether that decision is made without interference by the state or any other third party and without public disclosure. Thus, the privacy

*interest* in procreative choice does not vary based on the age or maturity of the pregnant woman whose choice is at issue.

This is not to say that a child's privacy *right* in procreative choice under the state Constitution is equal in all respects to that of an adult. Generally speaking, children's constitutional *rights* are not coextensive with those of adults in similar situations. (See, e.g., *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 545 [91 S.Ct. 1976, 1986, 29 L.Ed.2d 647] [no right to jury trial in juvenile court delinquency adjudication]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 170 [64 S.Ct. 438, 444, 88 L.Ed. 645] [stating that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults"].) But this is not because of any inherent qualitative difference between the interests of children and those of similarly situated adults; rather, it is because children's interests are counterbalanced by other significant interests, including the interest of the state, as *parens patriae*, in protecting youth, the interest of parents in preserving their relationships with and their authority over their children, and the interests shared by children and their parents in family autonomy and family privacy. (See Mnookin et al., In the Interest of Children (1985) p. 32; Keiter, *Privacy, Children, and Their Parents: Reflections on and Beyond the Supreme Court's Approach* (1982) 66 Minn. L.Rev. 459, 492-493.)

Under *Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th 1, a court considers these countervailing interests in due course *after* it has found the elements of a privacy cause of action: (1) a significant, legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) an actual or threatened invasion of this privacy interest that is sufficiently serious to warrant constitutional protection. If these elements are present, the scope of the *right* of privacy in a given context can be determined only by undertaking the full analysis mandated by this court's decision in *Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th 1.

[]

[] [N]othing in the history or language of the privacy provision of the California Constitution suggests that it was intended for adults alone or that children were to receive only some greatly watered-down protection. The ballot pamphlet argument in support of the Privacy Initiative advised voters that the initiative "creates a legal and enforceable right of privacy for *every Californian*" and, even more explicitly, that "[t]here should be no ambiguity about whether our constitutional freedoms are for every man, woman *and child* in this state." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11, pp. 26-27, underlining deleted, italics added.)

B. *Reasonable Expectation of Privacy*

During childhood and adolescence, a person prepares for life as an adult, gradually assuming greater control and responsibility over his or her life. The pace of this developmental process should be regulated so that it is neither too fast nor too slow. The emerging adults should be neither charged with responsibilities they are not yet competent to handle nor deprived of control over matters they are perfectly able to deal with on their own.

During the process of human growth, therefore, the individual's competence gradually increases, accompanied by a gradual increase in the control a person exercises over his or her life. This expanding competence and control, in turn, supplies the individual with a reasonable expectation that he or she will be permitted to exercise that control without undue interference from parents or others who are charged with supervising the child's development. Accordingly, we may conclude that an adolescent has a reasonable expectation of autonomy privacy—that is, the power to make a decision without outside interference, observation, or disclosure—as to decisions that are within that person's competence and that are protected by the right of privacy for adults.

An adult woman's decision to either continue a pregnancy to term or terminate it by abortion is protected by the right of privacy under both the state and federal Constitutions. (*Roe* v. *Wade* (1973) 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147]; *Doe* v. *Bolton* (1973) 410 U.S. 179 [93 S.Ct. 739, 35 L.Ed.2d 201]; *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, 262.) An adolescent woman may reasonably expect the same privacy protection *if* she is mature enough to make the decision competently by herself. The question, then, is this: At what point in a woman's growth from childhood to adulthood does she acquire the competence to make this decision?

After considering the evidence presented by the parties in this case, the superior court found that "with the exception of the small percentage of very young adolescents . . . the great majority of minors [who have become pregnant] possess the cognitive ability and maturity to make a fully-informed choice as to abortion and are competent to give informed consent to abortion."

The evidence at trial amply supports this finding. Gary Melton, a professor of psychology, testified that after the United States Supreme Court's decisions in *Bellotti* v. *Baird, supra,* 443 U.S. 622 and *H. L.* v. *Matheson* (1981) 450 U.S. 398 [101 S.Ct. 1164, 67 L.Ed.2d 388], the American

Psychological Association set up an interdivisional committee to study issues related to adolescent abortion. Professor Melton was selected to chair this committee. After surveying the relevant scientific literature, this committee determined, among other things, that although a number of relevant studies had been performed, there was no basis in existing research to conclude that adolescents as a group were less competent than adults to make decisions concerning abortion. (See Am. Psychological Assn., Interdivisional Committee on Adolescent Abortion, *Adolescent Abortion: Psychological and Legal Issues* (Jan. 1987) 42 Am. Psychologist 73.) These conclusions were published in book form, and were later reviewed and adopted by the National Academy of Sciences. Professor Melton testified that "at least from the age of 14 or so" adolescents have the ability to "comprehend the information that's given to them and to weigh it rationally at adult-like levels." He further testified that adolescents are "able to reason about real life situations and to do so in ways that show a good comprehending of circumstances and a rational logical process of dealing with that information." Finally, he testified that this evidence of adolescents' competence in making decisions applies to health care decisions in general and to decisions concerning abortion in particular.

Michael Saks, a social psychologist and professor at the University of Iowa College of Law, testified about a working paper he wrote for the Office of Technology Assessment of the United States Congress addressing this question: "At what age are adolescents competent to make their own health care decisions?" After surveying the relevant psychological studies, he concluded that there are no detectable differences between mid-adolescents and young adults in their 20's regarding their ability to make such decisions, and thus adolescents are competent to consent to general health care by the age of 14.

Based on her own research and her review of another study, Nancy Adler, a professor of medical psychology in the Department of Psychiatry and Pediatrics at the University of California at San Francisco, testified that in her opinion adolescents do not differ from adults in their ability to understand the risks and benefits of abortion. (See also, Houlgate, The Child & the State, A Normative Theory of Juvenile Rights, *supra*, at p. 72 [stating that available empirical evidence "does not give any support to the claim that children over the age of thirteen or fourteen years lack the capacity for rational choice"].)

[]

[] [T]he [] concept of legal minority, or nonage, embodies an assumption of incompetence to exercise the full panoply of rights and privileges available to adults. Our laws have established various age restrictions for voting,

driving motor vehicles, purchasing alcoholic beverages, and the like. Because individuals mature at different rates, these age limits are a necessarily inexact and therefore arbitrary measure of maturity, but they have nonetheless been accepted as constitutionally valid for most purposes. But not for all.

There are some decisions so fundamental and so "life-shaping" that age limits are not constitutionally acceptable as a means of conclusively determining that an adolescent below the prescribed age is not yet ready to assume sole responsibility for those decisions. The decision to continue or terminate a pregnancy is one such decision. The United States Supreme Court has so held. (*Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52, 74 [96 S.Ct. 2831, 2843, 49 L.Ed.2d 788]; *Bellotti* v. *Baird, supra,* 443 U.S. 622, 643 & fn. 23 [99 S.Ct. 3035, 3048].)

The abortion decision is different not only because [] a pregnancy decision fundamentally affects the subsequent course of a woman's life, but also because, unlike a decision concerning marriage or sterilization [], the abortion decision is highly time sensitive. Although marriage and sterilization can be postponed to adulthood, the option of abortion "effectively expires in a matter of weeks from the onset of pregnancy." (*Bellotti* v. *Baird, supra,* 443 U.S. 622, 642 [99 S.Ct. 3035, 3047].) "[T]he abortion decision is one that simply cannot be postponed, or it will be made by default with far-reaching consequences." (*Id.* at p. 643 [99 S.Ct. at p. 3048].)

Regardless of age restrictions, therefore, an adolescent's expectation of privacy is reasonable as to decisions with the following characteristics: (1) they are protected by the right of privacy for adults, (2) they are within the adolescent's competence, (3) they have serious and enduring consequences, and (4) they cannot be postponed to the age of legal majority. (See Keiter, *Privacy, Children, and Their Parents: Reflections on and Beyond the Supreme Court's Approach, supra,* 66 Minn. L.Rev. 459, 503, 517.)

For those adolescents of sufficient maturity (that is, generally, adolescents of 14 years or older), the decision to continue or terminate a pregnancy has each of these characteristics. These adolescents therefore have a reasonable expectation of autonomy privacy in the making of this decision.

C. *Seriousness of the Invasion*

An important purpose of the Privacy Initiative was to "safeguard[] certain intimate and personal decisions from government interference in the form of penal and regulatory laws." (*Hill* v. *National Collegiate Athletic Assn., supra,*

7 Cal.4th 1, 36.) The parental consent law at issue here is both penal and regulatory—it imposes criminal sanctions on any doctor who performs an abortion in violation of its provisions, and it regulates abortions by requiring a pregnant adolescent woman who has decided to terminate her pregnancy to obtain either the consent of a parent or judicial authorization for the abortion procedure.

Although the parental consent law does not absolutely preclude mature adolescent women from obtaining abortions without parental consent, the trial court record convincingly demonstrates that resort to the judicial bypass procedure by those adolescents unable or unwilling to obtain parental consent is time-consuming and emotionally traumatic, and it exposes the affected minors to significantly increased medical risks occasioned by the delay attributable to the procedure. (See *Bellotti* v. *Baird, supra,* 443 U.S. 622, 642-643 [99 S.Ct. 3035, 3047-3048] [stating that the right to terminate a pregnancy "effectively expires in a matter of weeks"].)

That pregnant adolescents find the judicial bypass procedure highly repugnant and that it operates as a major obstacle to their exercise of free choice are illustrated by the tragic story of Becky Bell, who died at the age of 17 as a result of complications from an illegal abortion. When she learned she was pregnant, she also learned that under the law of her state (Indiana) she could obtain a legal abortion without parental consent only by applying to a juvenile court judge for a waiver of the consent requirement. "What does a judge have to do with this?" she reportedly asked a counselor. Unwilling to reveal her very personal decision for scrutiny by a judge, she resorted to an illegal abortion, a choice that cost her her life. (See Note, *Hodgson* v. *Minnesota: Chipping Away at Roe* v. *Wade in the Aftermath of Webster* (1991) 18 Pepperdine L.Rev. 955; Tribe, Abortion: The Clash of Absolutes (1990) p. 203; *Indiana Dad in S.F. to Tell How Abortion Law Led to Death,* S.F. Chronicle (Jan. 22, 1996) p. A15, cols. 1-4.)

I therefore agree with the Court of Appeal that the parental consent law invades the privacy interests of pregnant adolescents in a way that is not "slight or trivial." (*Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th 1, 37.)

[]

[Although California law long required parental consent for many medical procedures,] [] an abortion is unlike [other medical procedures] [] in constitutionally significant ways. As previously mentioned, the *decision* to continue or terminate a pregnancy is exceptional and virtually unique among

decisions that an adolescent woman might be called upon to make, because it both has profound nonmedical implications for the subsequent course of a woman's life and is time sensitive, requiring a decision within days or at most weeks. (*Bellotti* v. *Baird*, *supra*, 443 U.S. 622, 642-643 [99 S.Ct. 3035, 3047-3048].) Similarly, as a medical procedure, an abortion is exceptional; if the pregnancy is proceeding normally, abortion is an elective procedure, yet one that is medically time sensitive and that has far-reaching nonmedical implications for the subsequent course of the patient's life. It is also a medical procedure for which the utmost confidentiality is generally expected.

In addition, the Legislature has generally *not* required parental consent for medical procedures relating to sexuality and procreation. For example, minors are "medically emancipated"—that is, they may obtain medical treatment without parental consent—for purposes of prescribing and furnishing contraceptive drugs and devices (Fam. Code, § 6925), for medical treatment relating to pregnancy (*ibid.*), for the diagnosis and treatment of sexually transmitted diseases, rape, and sexual assault (*id.*, §§ 6925-6928), and for testing for HIV infection (Health & Saf. Code, § 121020, subd. (a)(1) [minors 12 years and older deemed competent to consent]). Indeed, except for sterilization, abortion is the only medical procedure related to sexuality and procreation for which the Legislature has required parental consent. Accordingly, the statutory scheme regarding medical treatment for persons under the legal age of majority, [] provides an additional ground for concluding that the parental consent law at issue here is a serious invasion of the privacy interests of pregnant adolescents.

[] [Although] a number of other states have enacted parental consent laws[,] [] the Florida Supreme Court, the only other state court to consider the constitutionality of a parental involvement law under a state constitutional right of privacy, [has] concluded that the [Florida parental consent] law violated the right of privacy guaranteed by the Florida Constitution. (*In re T.W.* (Fla. 1989) 551 So.2d 1186, 1194.)

Plaintiffs have established the elements of a cause of action for invasion of the state constitutional right of privacy—a legally protected privacy interest, a reasonable expectation of privacy, and a serious invasion of the protected privacy interest. Therefore, the burden shifts to the state to establish justification for the parental consent law.

D. *Legal Standard*

The [] proper legal standard by which to judge the state's asserted justification for the parental consent law is the compelling state interest standard [].

The compelling state interest standard is required by this court's previous decision in *Hill*. Without qualification, we there said: "Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest." (*Hill* v. *National Collegiate Athletic Assn., supra*, 7 Cal.4th 1, 34; see also *id.* at pp. 59 (conc. & dis. opn. of Kennard, J.), 62 (conc. & dis. opn. of George, J.), 73 (dis. opn. of Mosk, J.).) The burdens that the parental consent law imposes on a pregnant adolescent's decision to terminate her pregnancy constitute an obvious invasion of an interest fundamental to personal autonomy. Therefore, the compelling interest standard applies.

The compelling interest standard is no less applicable because the parental consent law's burdens are imposed on minors rather than adults. As previously mentioned, the state Constitution's privacy guarantee extends equally to "every man, woman *and child* in this state." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27, italics added.)

### E. *Justification*

The [] [state argues that the parental consent law furthers] the state's []interest in protecting the physical and mental health of unemancipated minors.[] The superior court considered this interest compelling, as do I. But I also agree with the superior court's conclusion that the state has failed to demonstrate that the parental consent law advances this interest.

The [] [state has argued] that the parental consent law will protect the physical and mental health of pregnant adolescents because, for those pregnant adolescents who cannot or will not obtain parental consent, it affords them a judicial bypass procedure through which a judge may authorize the abortion upon determining either that the adolescent is mature enough to make the decision by herself or, if not, that the abortion would be in her best interests. [] [Although] the adolescent's physician is required to make the same determination of maturity in deciding whether the adolescent has given informed consent to the abortion [], [] [the state argues] that an additional maturity determination by a judge will better protect the adolescent's physical and mental health because (1) unlike the physician, the judge has no pecuniary interest in the decision and is thus more objective [], and (2) if the adolescent is not sufficiently mature to give informed consent to an abortion, the judge can authorize the abortion upon a finding that it is in the adolescent's best interests, whereas the adolescent's physician may not proceed without the informed consent of either the adolescent or her parents []. []

[] [In] determining whether a law furthers an identified state interest, a court must consider both the positive and negative impacts of the law on that interest. Only by such a balanced inquiry may a court determine whether, considering all effects of the legislation, both positive and negative, the legislation on balance advances the interest offered to justify it. Accordingly, I will consider first the claimed beneficial effects of the legislation, and then any detrimental effects, as they relate to the physical and mental health of pregnant adolescents seeking abortions.

### 1. *Superiority of judges over physicians in making the maturity determination*

[] The [] [state's argument] that doctors may not be relied upon to act impartially "is necessarily somewhat degrading to the conscientious physician, particularly the obstetrician, whose professional activity is concerned with the physical and mental welfare, the woes, the emotions, and the concern of his [or her] female patients." (*Doe* v. *Bolton, supra*, 410 U.S. 179, 196 [93 S.Ct. 739, 750].) Determining whether a patient has given informed consent to a proposed medical procedure is an integral part of the practice of medicine with respect to patients of all ages (see *Arato* v. *Avedon* (1993) 5 Cal.4th 1172, 1182-1184 [23 Cal.Rptr.2d 131, 858 P.2d 598]; *Riese* v. *St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322-1323 [271 Cal.Rptr. 199]), and the physician's license provides sufficient assurance that the physician will do so competently, fairly, and objectively (see *Doe* v. *Bolton, supra*, 410 U.S. 179, 199-200 [93 S.Ct. 739, 751-752]). Should a particular physician fail to do so, the consequences would include professional censure, revocation or suspension of the medical license, and tort liability to the patient for negligence or battery. The state has not demonstrated that these safeguards are inadequate.

Indeed, the [] assertion that physicians cannot be relied upon to make the maturity determination accurately, fairly, and objectively is supported by no evidence in the present record. Mere supposition, even when plausible, is insufficient. When a state law burdens the exercise of a fundamental right, the government's "attempt to justify that burden as a rational means for the accomplishment of some significant state policy requires more than a bare assertion, based on a conceded complete absence of supporting evidence, that the burden is connected to such a policy." (*Carey* v. *Population Services International* (1977) 431 U.S. 678, 696 [97 S.Ct. 2010, 2022, 52 L.Ed.2d 675], fn. omitted (plur. opn. by Brennan, J.); see also *id.*, p. 702 [97 S.Ct. at p. 2025] (conc. opn. of White, J.) ["the State has not demonstrated that the prohibition against distribution of contraceptives to minors measurably contributes to the deterrent purposes which the State advances as justification

for the restriction"]; *New Jersey Citizen Action* v. *Edison TP.* (3d Cir. 1986) 797 F.2d 1250, 1257 ["when, as here, fundamental free speech interests are patently burdened, the district court not only is free to but indeed is required to overturn regulations that are premised on legislative assumptions contradicted by facts in the record"].)

Finally, the state has less restrictive alternatives available. It could by statute regulate the manner in which physicians make the informed consent determination for adolescents seeking abortion, just as it may regulate other aspects of medical treatment, to ensure that the determination is made according to the highest professional standards.

### 2. Best interests authorization for immature minors

The [] [state has argued] that the judicial bypass option furthers the physical and mental health of pregnant immature minors who seek an abortion without parental consent because it permits judicial authorization of abortions for these minors if abortion would be in their best interests. I agree that the law as it exists without the parental consent legislation does not well serve the needs of pregnant immature minors who seek an abortion but cannot obtain parental consent.

But immature minors (that is, generally, those below the age of 14) constitute only a very small percentage, certainly less than 5 percent, of the entire class of adolescents who seek abortions without parental consent.[13] This is so for two reasons: the pregnancy rate for adolescents below the age of fourteen is much lower and their rate of voluntary parental involvement much higher than for older adolescents. (See Alan Guttmacher Inst., Sex and America's Teenagers (1994) pp. 49, 81, fn. 151.) Because the group of immature minors is so small compared with the larger class of pregnant minors affected by the parental consent law, and because a law could easily be tailored to affect only this group, the parental consent law may not be justified on the ground that it advances the welfare of pregnant immature minors who seek an abortion without parental consent.

As I mentioned at the outset, because the parental consent law at issue in this case applies to all unemancipated minors, I need not and do not decide whether a more narrowly drawn law, applying only to adolescents under the age of 14 years, would violate the state constitutional right of privacy. I note, however, that California's existing parental consent law [] is subject to

---

[13]Jamie Ann Sabino (see fn. 10, *ante*) testified that "probably under three or four percent" of the adolescents who sought judicial authorization for abortion in Massachusetts were 14 years of age or under.

criticism insofar as it requires a child who is or may be immature to herself shoulder the burden of initiating and pursuing legal proceedings to obtain judicial authorization for an abortion. By comparison, the Legislature has established a judicial authorization procedure for adults who lack the capacity to give informed consent to a medical procedure (Prob. Code, § 3200 et seq.), but the Legislature has provided that proceedings to obtain this authorization may be commenced not only by the patient, but also by his or her physician, spouse, relative, friend, "or other interested person" (*id.,* § 3203, subd. (c)). Thus, the Legislature has implicitly recognized that it may be unreasonable to require an adult who is incapable of giving informed consent to a medical procedure to undertake the task of commencing legal proceedings for judicial authorization. For an immature adolescent seeking an abortion without parental consent, it seems equally unreasonable to expect the adolescent to apply for judicial authorization. The physician who has determined that the adolescent is too immature to give informed consent to an abortion, or another individual counseling the adolescent, should be able to request judicial authorization on the adolescent's behalf. (See Keiter, *Privacy, Children, and Their Parents: Reflections on and Beyond the Supreme Court's Approach, supra,* 66 Minn. L.Rev. 459, 514 & fn. 272.)

### 3. *Detrimental effects of bypass procedure—delay and emotional distress*

The superior court found that the judicial bypass option would in many cases delay performance of the abortion until the second trimester, thereby significantly increasing the medical risks and the cost of the procedure. [] The evidence presented at trial supports the superior court's conclusion []. For example, Dr. Policar (see fn. 1, *ante*) testified that after the 10th week of pregnancy, the medical risks "go up quite precipitously" and in fact increase at the rate of "50 percent for every week beyond the tenth week." Paula Marie Wendt (see fn. 12, *ante*) testified that delay associated with the judicial bypass procedure in Minnesota has caused some abortions to be performed in the second trimester (that is, after the thirteenth week of pregnancy) that otherwise would have [been] performed during the first trimester. I note also that in *Hodgson* v. *Minnesota, supra,* 497 U.S. 417, United States Supreme Court Justice Thurgood Marshall cited a study finding that "for women 19 years old and younger, the number of deaths per 100,000 abortions was 0.2 for the first 8 weeks of pregnancy, 0.6 for weeks 9 through 12, 3.4 for weeks 13 through 16, and 7.8 for week 17 and after." (*Id.* at pp. 465-466 [110 S.Ct. at pp. 2953-2954] (conc. & dis. opn. of Marshall, J.), citing Cates et al., *The Risks Associated With Teenage Abortion* (1983) 309 New Eng. J. Med. 621, 623.)

The superior court also found that the judicial bypass option would subject the adolescents who use it to considerable emotional trauma. [] [Although

this] emotional distress [usually] would be transitory, causing no adverse psychological effects long term, [] the true significance of the emotional distress occasioned by judicial bypass lies not in its long-term psychological impact but in its short-term behavioral impact. Adolescents will be extremely reluctant to use a procedure they perceive and experience as stressful, dangerous, and humiliating,[14] and they will go to great lengths to avoid such a procedure, turning instead to illegal abortions or self-induced abortions, or delaying all action until abortion is no longer feasible, thereby allowing the decision to be made by default rather than by careful and mature reflection and deliberate choice.

[]

Furthermore, judicial bypass will not be a realistic option for many adolescents in rural, sparsely populated counties because of the long distances required to reach a courthouse and because of the unacceptable risk that confidentiality will be lost by a chance encounter with a relative, neighbor, or acquaintance at the courthouse. Also, many counties in California have no providers for second trimester abortions (see trial testimony of Dr. Michael Policar), so that delays occasioned by the judicial bypass procedures may effectively preclude abortions for some minors living in these counties.

Like the superior court and the Court of Appeal, I conclude that any beneficial effect of the parental consent law on the physical and emotional well-being of pregnant adolescent minors seeking abortion would be outweighed by the detrimental effect of the judicial bypass, and thus that on

---

[14]Jeth Gold, a social worker in San Francisco, testified that adolescents find any court appearance stressful because they "perceive court as a place you go when you have committed a crime," because they may be required to answer questions even if they would prefer not to, because their answers may cause trouble for parents or friends or sexual partners, and because the result of the court proceeding may profoundly affect their lives. He added that the stress would increase if the adolescents expected to be questioned about intimate topics like sexuality. Dr. Anita Lorraine Nelson (see fn. 10, *ante*) testified that in California many Hispanic adolescents have the particular fear that going to court could lead to the deportation of parents or other relatives who are illegal immigrants. Jamie Ann Sabino (see fn. 10, *ante*) testified that adolescents seeking judicial authorization for abortion in Massachusetts worry that authorization will be denied, that they will be forced to reveal intimate details of their lives to a stranger, and that confidentiality may be lost if they encounter an acquaintance of their parents at the courthouse. Paula Marie Wendt (see fn. 12, *ante*) testified that adolescents seeking abortions in Minnesota "are afraid that they are going to be recognized, that somebody will see them, that their confidentiality will not be protected" and they "feel like they are a criminal if they go to court and that's going to be a record against them or somebody can use it against them in the future." As a result, she added, "[s]ome are just too afraid to even think about going to court." Dr. Lenore E. A. Walker (see fn. 9, *ante*) testified that it would be particularly difficult for adolescents from abusive families to seek judicial authorization because such adolescents have "learned secrecy" and "do not see authority figures as helpful to them."

balance the parental consent law would not further the state's compelling interest in the physical and emotional well-being of children.

### 4. *Increasing parental involvement in adolescents' abortion decisions*

To justify the parental consent law's serious invasion of the privacy interests of pregnant adolescents seeking abortion, the [] [state asserts] that the law will increase parents' involvement in their children's abortion decisions. [] [Indeed,] to many disinterested observers[,] increasing parental involvement may appear to be the legislation's primary purpose.

The law existing before and apart from the parental consent law permitted but did not require parental involvement; it left to the pregnant adolescent herself the decision whether or not to consult her parents. Under the parental consent law also, parental involvement is permitted but not required, the only difference being that a pregnant adolescent who chooses not to involve a parent must obtain judicial authorization for an abortion. Is this change likely to *increase* the rate or incidence of parental involvement that would occur in the law's absence by causing at least some minors who would not otherwise do so to consult a parent before making the abortion decision?

After considering evidence concerning the experience with parental involvement laws in Massachusetts and Minnesota, the superior court found that these laws do not in fact increase the number of minors who consult their parents about the abortion decision. [] [T]he evidence to support this finding is far from conclusive but is probably sufficient to support the more cautious finding that any increase in parental involvement resulting from parental involvement laws is probably not great.

Of greater significance, in my view, is the superior court's related finding that when a pregnant adolescent consults a parent against her better judgment and only to avoid having to apply for judicial authorization, the adolescent is unlikely to derive any of the benefit that would normally be expected from parental consultation. The superior court reasoned that an adolescent's initial reluctance to consult a parent often evidences a significant underlying problem or dysfunction in the parent-child relationship. Although facing and jointly resolving a crisis situation—such as an adolescent's unplanned pregnancy (which must be resolved under the time constraints imposed by the steeply escalating medical risks of abortion as the pregnancy progresses beyond the 10th week)—can strengthen a parent-child relationship that is fundamentally sound, a flawed relationship is likely to further deteriorate or unravel under this sort of pressure, resulting in emotional, psychological, and even physical harm to the child. Thus, it is

doubtful that parental consultation that is coerced by a parental consent law will, on balance, benefit or strengthen parent-child relationships. This reasoning is supported by the evidence presented at the trial in superior court. (See fn. 4, *ante*; see also Rhode, *Politics and Pregnancy: Adolescent Mothers and Public Policy* (1991) 1 S. Cal. Rev. L. & Women's Stud. 99, 126 [stating that "[v]irtually every major professional study has concluded that compulsory parental involvement ill serves adolescent needs and family relationships"]; Keiter, *Privacy, Children, and Their Parents: Reflections on and Beyond the Supreme Court's Approach, supra,* 66 Minn. L.Rev. 459, 500-501 [stating that "[w]henever notification or consent requirements mandate parental involvement, conflict between the parent and child portending severe disruption of the family is likely"].)

If the goal is to encourage beneficial parent-child communications about a pregnant adolescent's options, there are feasible and effective alternatives having a lesser impact on privacy interests.

For example, the state could act to ensure that before an abortion is performed adolescents are advised in an effective but noncoercive manner to consult their parents,[15] and that adolescents who are reluctant to do so receive appropriate professional assistance in working with their parents. The evidence at trial revealed that in California many and perhaps most pregnancy tests are performed in health clinics that receive state funding. The state may attach conditions to this funding, including adherence to counseling protocols. Through such protocols, the state may insist that adolescents who have tested positive for pregnancy are encouraged to consult their parents. To ensure that this encouragement is effective, the state may provide written materials and videos to use either as training aids for the counselors or to be shown or given directly to the adolescents.[16] In addition, the state could ensure that the clinics make their facilities available, or the state could provide its own facilities, so that adolescents may discuss their pregnancies with their parents in a neutral setting and in the presence of a trained and supportive counselor or family therapist. (See Rhode, *Politics and Pregnancy: Adolescent Mothers and Public Policy, supra,* 1 S. Cal. Rev. L. & Women's Stud. 99, 126 [advocating "voluntary parental outreach

---

[15]A number of witnesses at the trial testified about the "options counseling" given at health clinics in California to adolescents who have tested positive for pregnancy. Without exception, they testified that during this counseling adolescents *are* encouraged to discuss the fact of their pregnancy, and their plans for dealing with it, with their parents. (See, e.g., testimony of Dr. Nelson, Dr. Policar, Dr. Hofmann, Catherine Dodd, Ellen Eidem.)

[16]For example, Catherine Dodd, the former director of the Women's Health Center at San Francisco General Hospital, testified that the clinic has prepared a pamphlet entitled, Talk to My Parents? which it provides to teens to assist them in discussing sensitive issues such as contraception and abortion with their parents.

programs" thàt "seek to improve family communication and adolescent decision-making skills while avoiding the notice or consent requirements that deter teenagers from seeking assistance"].)

I conclude that the state has failed to justify the parental consent law's serious invasion of the privacy interests of pregnant adolescents.

## CONCLUSION

California's parental consent law was enacted to protect the physical and mental health of pregnant adolescents and to give these adolescents the benefit of consultation with a caring and supportive parent. Laudable purposes, to be sure. But the parental consent law also seriously invades the privacy interests of adolescents, and when a law burdens fundamental rights, "merely stating a laudable purpose" is insufficient. (*People* v. *Glaze* (1980) 27 Cal.3d 841, 848 [166 Cal.Rptr. 859, 614 P.2d 291].) The constitutionality of a law is judged not by the value of the policies it seeks to implement, but by "the objective effect of the legislative terms." (*County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 727 [119 Cal.Rptr. 631, 532 P.2d 495].)

Benefiting from the experience of other states with similar laws, and a well-developed trial record, this court is equipped to assess the "objective effect" of the parental consent law. What the trial record shows is that most pregnant teenagers consult their parents voluntarily, and that there are a variety of reasons why the others do not. Some merely wish to spare their parents' feelings, but others do not consult their parents because the parents are physically or emotionally abusive or because parent-child relations have broken down or would break down completely if the pregnancy were disclosed. The delays caused by the judicial bypass option will move many abortions into the second trimester, significantly increasing medical risks. To avoid having to reveal their pregnancy to a judge and submit to the judge's questioning about their decision to terminate the pregnancy, some pregnant teenagers will obtain illegal abortions, and may die as a result, and others will delay taking any action until an abortion is no longer feasible. As Professor Laurence Tribe has summed it up, "parental consent and notice requirements may sound like moderate recognitions of the parents' central role in family life but are likely in practice to achieve little and to cause great grief." (Tribe, Abortion: The Clash of Absolutes, *supra*, p. 203.)

[]

As United States Supreme Court Justice Lewis Powell has written, "[t]he need to preserve the constitutional right and the unique nature of the abortion

decision, especially when made by a minor, require a State to act with particular sensitivity when it legislates to foster parental involvement in this matter." (*Bellotti* v. *Baird, supra,* 443 U.S. 622, 642 [99 S.Ct. 3035, 3047] (lead opn. by Powell, J.).) California's parental consent law, though certainly well intentioned, lacks the sensitivity required to satisfy the privacy guarantee of our state Constitution. Because the parental consent law seriously invades the privacy interests of minors, and because its practical effects are such that it does not significantly advance any countervailing interest of either the state, the pregnant minor women, or their parents, I [] [concur in the judgment] uphold[ing] the decisions of the superior court and the Court of Appeal declaring unconstitutional and enjoining the enforcement of the parental consent law on the ground that it violates the right of privacy guaranteed to every Californian—man, woman, *and child*—by our state Constitution.

**MOSK, J.**—I dissent.

The plurality hold that Assembly Bill No. 2274, which prohibits unemancipated minors—including girls as young as nine years old—from obtaining abortions without either consent by a parent or a legal guardian or authorization by a neutral juvenile court judge, violates article I, sections 1 and 7 of the California Constitution. As I shall explain, I strongly disagree. Setting aside any personal beliefs concerning the morality—and politics—of abortion, I conclude the law is valid and should not be enjoined. Accordingly, I would reverse the judgment of the Court of Appeal.

I.

Enacted by the Legislature in 1987 (Stats. 1987, ch. 1237, §§ 2, 3), Assembly Bill No. 2274 amends former Civil Code section 34.5 (now Family Code section 6925) to exclude abortion from the medical procedures for which an unemancipated minor may give consent "[without] disaffirmance because of minority." (Fam. Code, § 6921.) It also added former section 25958 to the Health and Safety Code (now Health & Saf. Code, § 123450, in subd. (a)) providing that "[e]xcept in a medical emergency requiring immediate medical action, no abortion shall be performed upon an unemancipated minor unless she first has given her written consent to the abortion and also has obtained the written consent of one of her parents or legal guardian."

Assembly Bill No. 2274 includes judicial bypass provisions, with the following requirements. If an unemancipated minor's parent or guardian is unavailable or refuses consent, or if the unemancipated minor elects not to

seek consent, she may file a petition in the juvenile court. (Health & Saf. Code, § 123450, subd. (b).) The court must assist her, or a person she designates, in preparing the petition and notices; it must also advise her that she has a right to court-appointed counsel, and it may appoint a guardian ad litem. (*Ibid.*) A hearing must be set within three days of filing the petition. (*Ibid.*) At the hearing, the juvenile court must determine whether the unemancipated minor is "sufficiently mature and sufficiently informed to make the decision on her own regarding an abortion." (*Id.*, subd. (c).) If it finds that she is, and that she has consented on that basis, it must grant the petition. (*Id.*, subd. (c)(1).) If it determines that she is not sufficiently mature, it must grant the petition nevertheless if an abortion would be in her "best interest," but must otherwise deny the petition. (*Id.*, subd. (c)(2).)

The Judicial Council adopted rules and developed forms to implement the judicial bypass provisions. (Cal. Rules of Court, rule 240; Cal. Standards Jud. Admin., § 23.) Those rules require, inter alia, that the hearings "be conducted informally in the chambers of a judge of the superior court, sitting as a juvenile court." (Cal. Rules of Court, rule 240(e).) The petitioner may, if she desires, be accompanied by a "support person" and "one or more parents or a guardian." (*Ibid.*) The hearing "may be conducted immediately if a courtroom or chambers is available; otherwise it shall be scheduled and conducted not more than three calendar days after the date of filing." (*Id.*, rule 240(d).) If the court grants the petition, it must "immediately provide [the] petitioner with two certified copies of the Order Authorizing Abortion Without Parental Consent and the Confidential Affidavit of Minor," and explain to the petitioner that, to establish her identity, she should take one copy of each document to the provider of any abortion. (*Id.*, rule 240(g).) If the court denies the petition, it must make "findings of facts and state the evidence supporting each finding in its order of denial." (*Id.*, rule 240(h).) Moreover, if the court denies the petition, it must advise the petitioner of her right to appeal, that the appeal will be decided within five court days of filing the notice of appeal, that she is entitled to an attorney, and that the appeal and the attorney will not cost her or her parents or guardian any money. (*Id.*, rule 240(i).) The court must immediately appoint counsel if petitioner has not been represented at the hearing. (*Ibid.*)

Assembly Bill No. 2274 was to become effective January 1, 1988. Before that date, in November 1987, plaintiffs American Academy of Pediatrics, California District IX; the California Medical Association; the American College of Obstetricians and Gynecologists, District IX; Planned Parenthood of Alameda-San Francisco; and Philip Darney, M.D., sought declaratory and injunctive relief, on the ground that the legislation violates the right to privacy under article I, section 1 of the California Constitution.

In December 1987, the superior court issued a preliminary injunction enjoining enforcement of any provision of Assembly Bill No. 2274. The People appealed. In October 1989, the Court of Appeal affirmed the order granting issuance of the preliminary injunction and remanded for trial.[1] In October and November 1991, the superior court conducted a 16-day trial, without a jury. Twenty-five expert witnesses testified, including physicians, psychologists, lawyers, counselors, and judges; an additional six expert witnesses were heard by deposition.

In June 1992, the trial court issued a lengthy statement of decision and a judgment declaring Assembly Bill No. 2274 unconstitutional and permanently enjoining its enforcement. Specifically, it ruled that the legislation violates the rights to "autonomy" and "informational" privacy under California Constitution, article I, section 1, and the right to equal protection of the laws under article I, section 7.

The People appealed from the judgment. While the appeal was pending, we laid down, in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*), the standard for deciding claims under the state constitutional right to privacy. The Court of Appeal concluded that "although the superior court could not and did not specifically employ the approach established in *Hill*, its decision remains valid." It affirmed the judgment on the ground that Assembly Bill No. 2274 violates an unemancipated minor's right to autonomy privacy. It declined to decide whether it also violates her rights to informational privacy or to equal protection. We granted review.

II.

In resolving the present challenge to Assembly Bill No. 2274 under the California Constitution, we are bound by the " 'incontrovertible conclusion that the California Constitution is, and always has been, a document of independent force.' " (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 261 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] (plur. opn. of Tobriner, J.).) Thus, although we may derive guidance from the numerous decisions of the United States Supreme Court concerning comparable statutes, we are not bound by its determinations.[2] Just as the rights guaranteed by the California Constitution are "not dependent on those

---

[1]The Court of Appeal concluded, inter alia, that the right to privacy under the California Constitution extends to the decision whether to undergo childbirth, does not distinguish between the right to privacy of adults and children, and may not be intruded upon absent a compelling state interest.

[2]The United States Supreme Court has addressed the constitutionality of parental notice and consent requirements in numerous decisions, recently in *Lambert* v. *Wicklund* (1997) 520 U.S.

guaranteed by the United States Constitution" (Cal. Const., art. I, § 24), our interpretation of those rights, including the right to privacy, is not dependent on analogous federal decisions.

Nor are the California and United States Constitutions identical. In 1972, the electors added the explicit right to "privacy" to the other inalienable rights enumerated in article I, section 1 of the state Constitution; "[t]he federal constitutional right of privacy, by contrast, enjoys no such *explicit* constitutional status." (*Committee to Defend Reproductive Rights* v. *Myers*, *supra*, 29 Cal.3d 252, 262-263 (plur. opn. of Tobriner, J.), italics in original.)

Moreover, "we have on numerous occasions construed the California Constitution as providing greater protection than that afforded by parallel provisions of the United States Constitution." (*Committee to Defend Reproductive Rights* v. *Myers*, *supra*, 29 Cal.3d at p. 261, fn. 4 (plur. opn. of Tobriner, J.).) Thus, we recognized state constitutional right of procreative choice in *People* v. *Belous* (1969) 71 Cal.2d 954 [80 Cal.Rptr. 354, 458 P.2d 194], four years before the United States Supreme Court acknowledged the existence of a comparable right under the Fourteenth Amendment, in *Roe* v. *Wade* (1973) 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147]: "The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex." (*People* v. *Belous*, *supra*, 71 Cal.2d at p. 963.) In *Committee to Defend Reproductive Rights* v. *Myers*, *supra*, a plurality reiterated the "basic recognition that, for a woman, the constitutional right of choice is essential to her ability to retain

___ [117 S.Ct. 1169, 137 L.Ed.2d 464]. (See also *Planned Parenthood of Southeastern Pa.* v. *Casey* (1992) 505 U.S. 833 [112 S.Ct. 2791, 120 L.Ed.2d 674]; *Ohio* v. *Akron Center for Reproductive Health* (1990) 497 U.S. 502 [110 S.Ct. 2972, 111 L.Ed.2d 405]; *Hodgson* v. *Minnesota* (1990) 497 U.S. 417 [110 S.Ct. 2926, 111 L.Ed.2d 344]; *Akron* v. *Akron Center for Reproductive Health* (1983) 462 U.S. 416 [103 S.Ct. 2482, 76 L.Ed.2d 687]; *Planned Parenthood Assn.* v. *Ashcroft* (1983) 462 U.S. 476 [103 S.Ct. 2517, 76 L.Ed.2d 733]; *H. L.* v. *Matheson* (1981) 450 U.S. 398 [101 S.Ct. 1164, 67 L.Ed.2d 388]; *Bellotti* v. *Baird* (1979) 443 U.S. 622 [99 S.Ct. 3035, 61 L.Ed.2d 797]; *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [96 S.Ct. 2831, 49 L.Ed.2d 788].) Most recently, in *Casey*, a majority of the court upheld a Pennsylvania statute requiring that before an unemancipated minor under the age of 18 may obtain an abortion she must obtain the consent of one of her parents or opt for a judicial procedure that allows her to bypass the consent requirement. (505 U.S. at p. 899 [112 S.Ct. at p. 2832] (opn. of O'Connor, Kennedy, and Souter, JJ.) ["Our cases establish, and we reaffirm today, that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided that there is an adequate judicial bypass procedure."]; and *id.* at pp. 970-971 [112 S.Ct. at p. 2869] (conc. & dis. opn. of Rehnquist, C. J.) ["We think it beyond dispute that a State 'has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely.' [Citation.] A requirement of parental consent to abortion, like myriad other restrictions placed upon minors in other contexts, is reasonably designed to further this important and legitimate state interest."].)

personal control over her own body." (29 Cal.3d at p. 274 (plur. opn. of Tobriner, J.).)

Recently, in *Hill*, this court reaffirmed that the right to privacy under the California Constitution, including "central, autonomy-based privacy rights" in the area of procreation, is distinct from, and in some respects broader than, the federal right. (*Hill, supra*, 7 Cal.4th at p. 49; see also *id.* at pp. 73-86 (dis. opn. of Mosk, J.).) For example, unlike under the Fourteenth Amendment, the right to privacy under the California Constitution applies to nongovernmental as well as governmental action.

Nevertheless, it bears emphasis that the present case, concerning the right of unemancipated minors to privacy in the area of reproductive choice, involves a question of first impression. Although *Myers* and *Belous* upheld an adult woman's right to be free of undue intrusion or burden in making the intimate and fundamental decision whether to bear a child, those precedents are not readily applicable to young adolescents who may lack the maturity and understanding to exercise informed choice without parental or other adult oversight.

This case is not about the morality of abortion. "The morality of abortion is not a legal or constitutional issue; it is a matter of philosophy, of ethics, and of theology. It is a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles." (*Committee to Defend Reproductive Rights* v. *Myers, supra*, 29 Cal.3d at p. 284, fn. omitted (plur. opn. of Tobriner, J.).) Rather, "[o]ur obligation is to define the liberty of all, not to mandate our own moral code." (*Planned Parenthood of Southeastern Pa.* v. *Casey, supra*, 505 U.S. at p. 850 [112 S.Ct. at p. 2806].)

Nor, despite some of the more rhetorical assertions of the parties and amici curiae, does this case require us to choose between two extreme results, i.e., either "forc[ing] at least some minor mothers to carry unwanted pregnancies to term" or "prohibit[ing] parental involvement in an unemancipated minor's decision to terminate a pregnancy by abortion." Similarly, we are not called upon to approve or disapprove of Assembly Bill No. 2274 as a matter of social policy.

Instead, we must undertake the more modest, if difficult, task of determining whether Assembly Bill No. 2274 survives under those provisions of our Constitution protecting the rights to privacy and equal protection. I conclude that it does.

## III.

The plurality purport to apply the standard articulated in our recent decision in *Hill, supra,* 7 Cal.4th 1, for deciding claims under the state constitutional right to privacy. Instead, they reverse the principle, sub silentio.

### a.

Under *Hill,* "a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by [a] defendant constituting a serious invasion of privacy." (*Hill, supra,* 7 Cal.4th at pp. 39-40.) Only then does the burden shift to the defendant to plead and prove "as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests." (*Id.* at p. 40.)

As to the third threshold element—"conduct by a defendant constituting a serious invasion of privacy" (*Hill, supra,* 7 Cal.4th at p. 40)—*Hill* emphasized that the invasion must be substantial. "No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. . . . Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." (*Id.* at p. 37; accord, *id.* at p. 68 (conc. & dis. opn. of George, J.) ["Under the third element adopted by the majority, a plaintiff is not entitled even to put a defendant to the burden of presenting a justification for its conduct unless the plaintiff can establish not only that the defendant's conduct infringes upon a constitutionally protected privacy interest, but that the invasion of privacy is 'sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an *egregious* breach of the social norms underlying the privacy right.' "], italics in original; see also *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 44 [32 Cal.Rptr.2d 200, 876 P.2d 999].)[3]

Plainly, Assembly Bill No. 2274 does not constitute an "egregious breach of the social norms underlying the privacy right" of unemancipated minors.

---

[3]The test crafted by the majority in *Hill* was obviously intended to confine privacy litigation in the area of personal autonomy rights to invasions that are truly serious, i.e., offensive to a reasonable person. The majority in *Hill* appears to have been particularly concerned that, unless we so confined the right to privacy, it would become a "back door" legal theory in employment cases. I was the only member of the court dissenting in *Hill.* (7 Cal.4th at pp. 73-110 (dis. opn. of Mosk, J.).) Two members of the present plurality filed concurring and dissenting opinions. (See *id.* at pp. 62-73 (conc. & dis. opn. of George, J.) [dissenting from the majority opinion "insofar as it fashions a novel general legal standard for

It requires parental consent or a determination from a juvenile court judge that an unemancipated minor seeking an abortion is mature, or, even if not, that terminating her pregnancy is in her best interest. California has long required parental consent before an unemancipated minor can undergo most medical procedures. There is, moreover, under our statutes, a general presumption that an unemancipated minor, unlike an emancipated minor or an adult woman, is *incapable* of informed consent.[4]

Nor do our social values and traditions exist in a vacuum. Thus, it is of some significance that most states have required parental notice or consent before an unemancipated minor can terminate her pregnancy by an abortion.[5]

Moreover, the United States Supreme Court, in upholding parental notice and consent statutes, has repeatedly emphasized that such requirements are consistent with our national social norms about the interests of unemancipated minors. That an unemancipated minor might prefer, for any number of

---

the evaluation of privacy claims arising under the California Constitution" (*id.* at p. 62) but concurring in the disposition]; *id.* at pp. 58-62 (conc. & dis. opn. of Kennard, J.) [concurring in the "basic legal analysis" (*id.* at p. 58) but dissenting from the disposition].)

[4]Even under the medical emancipation provisions, the right to consent is limited to a handful of medical procedures and treatment. (See, e.g., Fam. Code, § 6924, subd. (b)(1) & (2) [minor 12 years or older may consent to mental health treatment if, in the opinion of the attending professional, he or she is "mature enough to participate intelligently" in the services *and* would present a danger of serious physical or mental harm to self or to others without the treatment *or* is the alleged victim of incest or child abuse]; *id.,* § 6926 [minor 12 years of age or older may consent to medical care related to diagnosis or treatment of infectious, contagious, or communicable disease]; *id.,* § 6927 [minor 12 years of age or older may consent to medical care related to diagnosis or treatment for rape]; *id.,* § 6928 [minor may consent to medical care related to diagnosis and treatment for sexual assault]; *id.* § 6929 [minor 12 years of age or older may consent to medical care and counseling related to diagnosis and treatment of drug or alcohol related problem].) Moreover, many of the provisions require parental notice and involvement. Thus, treatment for mental health problems, sexual assault, and alcohol or drug abuse requires involvement of the minor's parent or guardian unless, in the opinion of the professional treating or counseling the minor, it would be inappropriate. (*Id.,* §§ 6924, subd. (b)(2)(B), 6928, subd. (c), 6929, subd. (c).) The right of even an "independent minor" to confidentiality as against his or her parents is also limited under the "medical emancipation" statutes. Thus, although a minor 15 years of age or older may consent to medical care if he or she is living separate and apart from parents or guardian and is financially independent, "[a] physician and surgeon or dentist may, *with or without the consent of the minor patient,* advise the minor's parent or guardian of the treatment given or needed if the physician and surgeon or dentist has reason to know, on the basis of the information given by the minor, the whereabouts of the parent or guardian." (*Id.,* § 6922, subd. (c), italics added.)

[5]States with consent or notification requirements for minors in force include: Alabama, Arkansas, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana Nebraska, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, West Virginia, Wisconsin, and Wyoming. Evidently the people in a majority of states, acting through their Legislatures, have rejected the conclusion that a requirement of parental consent or judicial authorization is detrimental to the health of such minors and to their family relationships.

reasons, not to be required to obtain consent from a parent or appear before a juvenile court judge—and may not have been required to do so previously—does not mean, as the Court of Appeal concluded, that the legislative act is an "egregious breach of social norms" in requiring her to do so.

Although they advert to the *Hill* standard, a plurality now appear to have had second thoughts, at least with regard to how it applies in this case. Rather than return to first principles, however, they prefer to maintain the fiction that they are merely following the true holding in *Hill*, while, in effect, returning to a slightly modified version of the "compelling interest" standard expressly rejected in *Hill*. (See *Hill*, *supra*, 7 Cal.4th at pp. 32-35; *id.* at pp. 62-70 (conc. and dis. opn. of George, J.).) Under their revised standard, to establish a "serious" invasion of privacy, a plaintiff need only establish a more than "de minimis" intrusion. Not surprisingly, they conclude that plaintiffs have done so here.

### b.

No longer compelled by the old *Hill* standard—which now apparently fails to command a majority of the court—and unpersuaded by a new plurality's revised standard, I prefer to apply neither in assessing the validity of Assembly Bill No. 2274.

In my dissent in *Hill*, I reviewed, in its full context, the right to privacy declared in article I, section 1 of the California Constitution. I set out the law relating to a plaintiff's right of action thereunder as follows: "[T]he plaintiff must plead that he has a right of privacy and that it was interfered with by the defendant. The defendant may then plead, beyond simple denial, that any conduct on his part adversely affecting the right of privacy was justified by a compelling public need if it rose to the level of abridgment or that it was allowed as reasonable if it did not. The plaintiff must prove his right of privacy and the defendant's interference therewith by shouldering the generally applicable burden of proof by a preponderance of the evidence [citation]. The defendant must prove under the same burden the justification or allowance of his conduct." (*Hill*, *supra*, 7 Cal.4th at pp. 85-86 (dis. opn. of Mosk, J.).)

Under that test, I conclude that plaintiffs have not properly pleaded and proved that Assembly Bill No. 2274 interferes with the right to privacy of unemancipated minors. That is because, with respect to whether an unemancipated minor has a legally protected privacy interest concerning reproductive choice, our consistent precedents compel the conclusion that she has such an interest but it is neither coequal with that of an adult, nor, in the case

of an *immature* unemancipated minor, absolute even in the early stages of pregnancy. It is not the case, as the plurality erroneously conclude, that the legally protected privacy interest in procreative choice does not vary based on the maturity or cognitive ability of the person whose choice is at issue.[6]

The privacy provision of the California Constitution does not expressly distinguish between adults and minors. It provides that "*All people* . . . have inalienable rights. Among these are . . . privacy." (Cal. Const., art. I, § 1, italics added.) Nor does the ballot argument in favor of Proposition 11, which added the express right to privacy to the California Constitution, offer relevant extrinsic evidence on this point. It appears to draw no distinction between adults and children. "This amendment creates a legal and enforceable right of privacy for every Californian." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 26.) Its definition refers broadly to the right to privacy as "the right to be left alone." (*Id.* at p. 27.)

Although we have not previously addressed the point in the context of the right to privacy, our analysis of the closely related right to liberty under the California Constitution requires the conclusion that the privacy interests of an unemancipated minor are qualitatively different from those of an adult and subject both to reasonable regulation by the state to an extent not permissible with adults and to control by the unemancipated minor's parents to an even greater extent.

In *In re Roger S.* (1977) 19 Cal.3d 921 [141 Cal.Rptr. 298, 569 P.2d 1286], we assessed the state constitutional right of a 14-year-old unemancipated minor, committed to a state hospital on the application of his parent, to an opportunity for a precommitment hearing before a neutral fact finder. We concluded that "the personal liberty interest of a minor is less comprehensive than that of an adult, and a parent or guardian not only may but must curtail that interest in the proper exercise of his obligation to guide the child's development . . . ." (*Id.* at p. 927.)

We emphasized that although " '[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority,' " "the liberty interest of a minor is not coextensive with that of an adult." (*In re Roger S., supra,* 19 Cal.3d at pp. 927-928.) An unemancipated

---

[6] It bears emphasis that the present case, concerning the right of unemancipated minors to privacy in the area of reproductive choice, involves a question of first impression. Although we have previously affirmed "[t]he fundamental right of [a] woman to choose whether to bear children" (*People* v. *Belous, supra,* 71 Cal.2d at p. 963), that precedent is not readily applicable to young adolescent girls who may lack the maturity and understanding to exercise informed choice without parental or other adult oversight.

minor's liberty interest is more limited both as related to his or her parents and as against the state. "Parents, of course, have powers greater than that of the state to curtail a child's exercise of the constitutional rights he may otherwise enjoy, for a parent's own constitutionally protected 'liberty' includes the right to 'bring up children. . . .' " (*Id.* at p. 928.) This parental right involving an unemancipated minor is not unlimited; it may be curtailed by the state " 'if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.' " (*Ibid.*) "We emphasize here our assumption that the great majority of parents are well motivated and act in what they reasonably perceive to be the best interest of their children. That fact cannot, however, detract in any way from the child's right to procedures that will protect him from arbitrary curtailment of his liberty interest in . . . a drastic manner no matter how well motivated." (*Id.* at p. 936.)

The state may also curtail an unemancipated minor's constitutional right to liberty. " '[E]ven where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." ' " (*In re Roger S., supra,* 19 Cal.3d at p. 928.)

In *In re Roger S.,* we balanced the liberty interest of a 14-year-old unemancipated minor as against his parents and as against the state regarding the right to due process in proceedings to admit him to a state mental hospital. We determined that "no interest of the state or a parent sufficiently outweighs the liberty interest of a minor old enough to independently exercise his right to due process to permit the parent to deprive him of that right." (*In re Roger S., supra,* 19 Cal.3d at p. 931.) The unemancipated minor's liberty interest did not, however, entitle him to all the same procedural protections as an adult in the same situation. (*Id.* at p. 935.)

Although *In re Roger S.* involved the state constitutional right to liberty, a similar analysis applies to the closely related right to privacy.[7] Here, as in *In re Roger S.,* we must balance the constitutional rights of an unemancipated

---

[7]Indeed, in *In re Roger S.,* we repeatedly relied on decisions of the United States Supreme Court concerning the right to privacy, including decisions specifically involving the right of minors to obtain abortions. Thus, we cited *Planned Parenthood of Missouri* v. *Danforth, supra,* 428 U.S. 52, in support of our conclusion that the liberty interest of a minor is qualitatively different from that of an adult. (*In re Roger S., supra,* 19 Cal.3d at p. 931.) *Danforth* underscored the state's "somewhat broader authority to regulate the activities of children than of adults" and emphasized that, in holding the legislation at issue in that case invalid, it did not "suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." (*Planned Parenthood of Missouri* v. *Danforth, supra,* 428 U.S. at pp. 74-75 [96 S.Ct. at pp. 2843-2844].) In a recent case implicating the privacy rights of unemancipated minors, the United States Supreme Court observed: "Tradi-

minor—in this case the right to make the fundamentally private decision whether or not to bear a child—with the right of the parent, and of the state in loco parentis, to oversee critical decisions that may affect the welfare of the unemancipated minor, and, if appropriate, to decide what is in her best interest.

From *In re Roger S.* we may derive the following principles. First, an unemancipated minor's constitutional rights are not equal to, but are more limited than, those of an adult, both as against his or her parents and as against the state. Second, an unemancipated minor has a right to procedures that will protect him or her from arbitrary and drastic curtailment of constitutional rights by his or her parents, or, presumably, the state, no matter how well motivated. Third, a mature unemancipated minor, as opposed to one who is immature, has an increased right to exercise her constitutional rights, but even a mature unemancipated minor is not entitled to all of the same procedural protections as an adult in the same situation.[8]

Applying those principles to the privacy right asserted here yields several elementary conclusions.

First, as a general matter, the right to privacy of an unemancipated minor is more limited than that of an adult. An unemancipated minor has limited privacy rights as against the state. The state can intervene in his or her interests, including by requiring or precluding medical treatment. (See, e.g.,

---

tionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, i.e., the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians." (*Vernonia School Dist. 47J* v. *Acton* (1995) 515 U.S. 646, 654 [115 S.Ct. 2386, 2391, 132 L.Ed.2d 564].) Significantly, the plurality not only decline to be guided by the numerous federal precedents directly in point, but also ignore our own precedents concerning the rights, and limitations thereon, of unemancipated minors, including *In re Roger S.*

[8]In reviewing a Massachusetts abortion consent statute, Justice Powell wrote: "We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." (*Bellotti* v. *Baird, supra,* 443 U.S. at p. 634 [99 S.Ct. at p. 3043] (lead opn. of Powell, J.).) These grounds for distinguishing the rights of children from those of adults are deeply rooted in our culture and society. They are based on normative assumptions about the family, including the mutual interests of children and their parents and the benefits to children of parental guidance and control. As such, although not immutable or even pellucid, they are not subject to simple "proof" by the preponderance of the evidence through a battle of the experts, or to the vagaries of the adversarial process. In this case, the parties presented evidence and the trial court made extensive factual findings concerning the cognitive abilities of adolescents to make critical decisions and about the importance of the parental role in a child's exercise of her privacy interest concerning the decision to have an abortion. Those findings prove to be of limited application to an assessment of the constitutional interests involved in this case.

*In re Roger S.*, *supra*, 19 Cal.3d at p. 933; cf. *Bellotti* v. *Baird*, *supra*, 443 U.S. at p. 635 [99 S.Ct. at p. 3044] (lead opn. of Powell, J.) ["[T]he States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences."].)

By statute, the Legislature has in numerous areas curtailed an unemancipated minor's ability to make choices implicating privacy. Thus, before the age of 18, a minor is not "capable of consenting to and consummating marriage" without parental consent and a court order (Fam. Code, § 302); nor can an unmarried minor legally consent to sexual intercourse (Pen. Code, § 261.5). Among other restrictions implicating privacy, an unemancipated minor cannot obtain most medical and dental treatment, including most surgical procedures and even routine X-rays, without parental notification and/or consent, or, in certain circumstances, court consent. (Fam. Code, §§ 6910, 6911, 6922; Health & Saf. Code, § 123930; Pen. Code, § 11171.) An unemancipated minor may not, before the age of 18, undergo voluntary sterilization, with or without parental consent. (Fam. Code, § 6925, subd. (b)(1); Cal. Code Regs., tit. 22, § 70701, subd. (a)(1).) No minor may, before the age of 18, donate any part of his body in the event of his death (Health & Saf. Code, § 7150.5) or receive a permanent tattoo (Pen. Code, § 653), again regardless of parental consent. Minors are also restricted from obtaining a driver's license (Veh. Code, §§ 17700, 17701), or even using a tanning facility (Bus. & Prof. Code, § 22706, subd. (b)(3) & (4)), without parental consent.

Such restrictions are based, in large part, on an unemancipated minor's disability of nonage, including the inability to enter into a binding contract. (See Civ. Code, § 1556 ["All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights."].) They are premised on a fundamental social tenet that children require protection against their own immaturity and vulnerability in making decisions that may have serious consequences for their health and well-being. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 878 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392] [" 'The right of the infant to avoid his contracts is one conferred by law for his protection against his own improvidence and the designs of others.' "]; *Stanford* v. *Kentucky* (1989) 492 U.S. 361, 395 [109 S.Ct. 2969, 2989, 106 L.Ed.2d 306] (dis. opn. of Brennan, J.) ["[M]inors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life. [¶] . . . Adolescents 'are more vulnerable, more impulsive, and less self-disciplined than adults,' and are without the same 'capacity to control

their conduct and to think in long-range terms.'"]; accord, *Hodgson* v. *Minnesota, supra,* 497 U.S. at p. 459 [110 S.Ct. at pp. 2949-2950] (conc. opn. of O'Connor, J.); *Bellotti* v. *Baird, supra,* 443 U.S. at p. 635 [99 S.Ct. at p. 3044] (lead opn. of Powell, J.) ["Viewed together, our cases show that although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for 'concern, . . . sympathy, and . . . paternal attention.'"].)[9]

The Legislature has the power to remove the disability in certain instances, as in the so-called medical emancipation statutes. (Fam. Code, § 6920 et seq.; see also *Ballard* v. *Anderson, supra,* 4 Cal.3d at p. 878 [discussing express limitations on the power of unemancipated minors to disaffirm their contracts for medical services].) It is not, however, constitutionally required to do so. I discern no basis for concluding that the addition by the electors of an express privacy provision to article I, section 1 of the California Constitution was intended to remove entirely an unemancipated minor's disability of nonage—even though that disability necessarily places limits on liberty and privacy interests that do not apply to adults.

Unemancipated minors also have limited privacy interests as against a parent. We have recognized a parent's right to direct his or her child's upbringing as "'a compelling one, ranked among the most basic of civil rights.'" (*In re Roger S., supra,* 19 Cal.3d at p. 934; cf. *Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070, 39 A.L.R. 468] ["The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."].) Those rights include extensive power to direct the education of a child and to make critical decisions concerning medical treatment. The interest of a child in privacy yields to the necessity for parental guidance and oversight. A parent may, if he or she deems it advisable, give consent to most medical treatment of his or her unemancipated minor children, so long as it will not jeopardize health or safety—even if the child objects. Certainly, a parent can compel an obdurate six-year-old—or sixteen-year-old—to submit to a tetanus vaccination.

As observed by Richard M. Mosk, *Motion Picture Ratings in the United States* (1997) 15 Cardozo Arts & Ent. L.J. 135, 140, "Many aspects of our

---

[5]Some of the more obvious areas in which minors have fewer "rights" and greater restrictions on privacy and liberty than adults include the right to vote (Cal. Const., art. II, § 2) and the "right" to purchase or consume alcoholic beverages (Bus. & Prof. Code, § 25658, subd. (b)) or tobacco products (Pen. Code, § 308, subd. (b)). Minors must also attend school (Ed. Code, § 49100) and may be subject to curfews not imposed on adults (see *In re Nancy C.* (1972) 28 Cal.App.3d 747, 758 [105 Cal.Rptr. 113]).

legal system are premised on the principle that parents have certain responsibilities toward their children. . . . If we do not recognize and act upon what we consider parental responsibility, we risk erosion of parental accountability." Indeed, parents have a statutory responsibility to properly supervise the well-being of their children. (Pen. Code, § 270.)

Second, an unemancipated minor has a right to procedures that will protect her from arbitrary and drastic curtailment of her privacy interest by her parents, or, presumably, by the state, no matter how well motivated.

In *In re Roger S., supra*, 19 Cal.3d 921, we held that the physical restraint and injury to reputation of involuntary confinement in a mental hospital are consequences so severe that an unemancipated minor who is mature enough to participate intelligently in the decision must be permitted to assert her right to due process. Although pregnancy involves a different set of considerations, arbitrary curtailment of a pregnant unemancipated minor's privacy interest may result in emotional, physical, and psychological detriment. "[T]he potentially severe detriment facing a pregnant woman [citation] is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like the attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible. [¶] Yet, an abortion may not be the best choice for the minor." (*Bellotti* v. *Baird, supra*, 443 U.S. at p. 642 [99 S.Ct. at pp. 3047-3048] (lead opn. of Powell, J.).)

Justice Powell emphasized the "unique nature of the abortion decision, especially when made by a minor," which requires the state "to act with particular sensitivity when it legislates to foster parental involvement in this matter." (*Bellotti* v. *Baird, supra*, 443 U.S. at p. 642 [99 S.Ct. at p. 3047] (lead opn. of Powell, J.).) Because of the gravity of the decision whether to bear a child, I am persuaded that an unemancipated minor's interest in privacy under the California Constitution is at least as strong as that under the United States Constitution: Neither a parent nor the state can exercise an *absolute veto* over a mature unemancipated minor's decision to terminate a pregnancy. (See *Planned Parenthood of Missouri* v. *Danforth, supra*, 428 U.S. at p. 74 [96 S.Ct. at p. 2843] ["[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent."]; *Bellotti* v. *Baird, supra*, 443 U.S. at p. 643 [99 S.Ct. at p. 3048] (lead opn. of Powell,

J.) [if the state requires parental consent, it must provide for an alternative procedure for obtaining authorization for abortion].) The constitutionally protected interest in privacy of an unemancipated minor includes terminating her pregnancy if it is in her best interest to do so, or, if she is mature, if it is her informed decision to do so—even if her parent denies consent.

Third, although an unemancipated minor has a privacy interest if she is mature, even a mature unemancipated minor is not entitled to all of the same freedoms and protections as an adult in the same situation. Her interest in privacy is subject to greater restrictions, which may include parental consent or notice or judicial authorization that would not be required in the case of an adult woman.

In *In re Roger S.*, *supra*, we rejected the petitioner's suggestion that a minor is entitled to all the procedures needed before an adult may be involuntarily committed to a state mental institution. Instead, we required only that before a minor could be committed by his parents to a mental institution, he must be afforded procedures to ensure "a fair opportunity to establish that (1) he is not mentally ill or disordered, or that, (2) even if he is, confinement in a state mental hospital is unnecessary to protect him or others and might harm rather than improve his condition." (19 Cal.3d at p. 935.) We emphasized that "[p]rocedures designed to establish these facts are necessary to accommodate both the parent's right to control his child's development and the state's interest in limiting parental control when parental action may harm the physical or mental health of the child." (*Ibid.*)

Assembly Bill No. 2274 accommodates the same balance of interests: The parent's right to control his child's development is advanced by the consent requirement, while the state's interest in limiting parental control when it might harm the physical or mental health of the child is advanced by providing a judicial bypass that includes a prompt hearing before a juvenile court judge, confidentiality, and a right to counsel. As in *In re Roger S.*, *supra*, the procedures adequately "protect [her] from arbitrary curtailment of [her privacy] interest in such a drastic manner no matter how well motivated." (19 Cal.3d at p. 936.)

The legislation at issue here alters the procedure for an unemancipated minor obtaining an abortion, but it does not impose a restriction that could fairly be said to violate her interest in privacy. Indeed, the legislation *facilitates* the ability of a mature unemancipated minor to obtain an abortion, regardless of parental consent, if she so chooses. It also facilitates the ability of an immature unemancipated minor to obtain an abortion, again regardless of parental consent, if it is in her best interest. Moreover, it preserves the confidentiality of the decision-making process.

## IV.

Even under the plurality's newly revised standard, I conclude that Assembly Bill No. 2274 passes constitutional scrutiny.

Accepting the plurality's conclusion that plaintiffs have met the threshold requirement of establishing a more than "de minimis" breach of a privacy interest, the burden has shifted to the state to establish that Assembly Bill No. 2274 advances a compelling interest and is narrowly tailored. It has done so. The intrusion on any right to privacy enjoyed by an unemancipated minor is justified because it "substantively furthers one or more countervailing"—and, indeed, "compelling"—interests of the state.

The state unquestionably has an interest in protecting the physical and mental health of unemancipated minors. That interest is both legitimate and compelling. It includes assuring that an unemancipated minor who desires an abortion is capable of giving informed consent or, even if not, that an abortion is in her best interest.

Under prior law, absent any statutory requirement to the contrary, the determination of informed consent was left to the physician: "A minor of any age who is unable to convince competent medical authorities that she has the requisite understanding and maturity to give an informed consent for any medical treatment, including a therapeutic abortion, will be denied such treatment without the consent of either a parent or legal guardian." (*Ballard* v. *Anderson, supra,* 4 Cal.3d at p. 883, fn. omitted.) As the trial court here underscored: "[t]he physician who performs the abortion must be satisfied that the minor is, in fact, capable of giving informed consent for that procedure and that her decision to have an abortion, is, in fact, the result of such informed consent. If the physician is not satisfied in this regard, he/she cannot and will not perform an abortion."

Assembly Bill No. 2274 provides that the determination of informed consent will, instead, be made by a parent or a juvenile court judge. It presumes that a parent—as opposed to a physician—is the person most likely to have knowledge of an unemancipated minor's maturity and ability to give informed consent, and, unlike a physician, is capable of determining, in the case of an unemancipated immature minor, what is in her best interest. It provides, however, that when that presumption fails, or when an unemancipated minor either cannot or, for whatever reason, will not, seek consent from a parent, a neutral juvenile court judge, as opposed to a physician, must make the determination whether she is mature enough to give informed consent, or, as a physician *cannot* do, authorize an abortion that is nonetheless in her best interest.

The trial court concluded that the legislation, though perhaps reasonable in purpose, does not, in fact, advance any compelling interest. It based the

conclusion on extensive findings of fact and conclusions of law. Principally, it determined that abortion is "one of the safest medical procedures available for all women and, in particular, for teenagers"; that "for the great majority of minors, abortion has no serious medical, emotional, or psychological consequences and poses no significant risk to their physical well-being"; and that "with the exception of the small percentage of very young adolescents, again the great majority of minors possess the cognitive ability and maturity to make a fully informed choice."

The state contends that the evidence on these issues was conflicting and subject to debate; some of the findings are supported by studies whose results are, at the very least, counterintuitive, e.g., the finding that "adolescents as a group do not differ from adults as a group with respect to how they make the decision as to whether or not to have an abortion."[10] Moreover, it suggests that most of the statutes requiring parental consent for medical procedures are founded on the counterassumption that unemancipated minors are *not*, as a group, as capable as adults of making decisions about short- and long-term effects of medical procedures. In any event, it argues that the factual findings are immaterial; because the Legislature reasonably believed it was furthering legitimate interests, we must accept as true its "findings" to that effect.[11]

We need not decide whether the trial court's findings, if supported by substantial evidence, are binding on this court, and whether they can override contrary legislative findings. Even accepting those findings by the trial court that are supportable, I conclude they do not establish that the compelling interest of protecting the physical and mental health of unemancipated

---

[10]For example, amici curiae point to an article criticizing the studies on which the trial court relied as overstating what is known about the cognitive ability of minors to make decisions concerning health care, including decisions about abortion. The article stresses that there are "few data supporting the assertion of equivalent decision-making competence . . . [and] few studies in which subjects made decisions or in which adolescent and adult abilities were compared." (Gardner et al., *Asserting Scientific Authority: Cognitive Development and Adolescent Legal Rights* (June 1989) Am. Psychologist 895, 898.) The authors conclude that "[t]he assertion of equal decision-making capacity was unwarranted . . . because at present little is known about the relative decision-making competence of adolescents and adults." (*Id.* at p. 899.)

[11]The legislative "findings," culled from opinions of the United States Supreme Court, are as follows: "(a) the medical, emotional, and psychological consequences of an abortion are serious and can be lasting, particularly when the patient is an immature minor; (b) the capacity to become pregnant and the capacity for exercising mature judgment concerning the wisdom of an abortion are not logically related; (c) minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences of their *actions; (d)* parents ordinarily possess information essential to a physician's exercise of his or her best medical judgment concerning a minor child; and (e) parents who are aware that their minor daughter has had an abortion may better ensure that she receives adequate medical attention subsequent to her abortion." (Stats. 1987, ch. 1237, § 1, p. 4396.)

minors is not substantively advanced. That is, in large part, because the determination whether any *individual* unemancipated minor is sufficiently mature to make a fully informed choice about abortion cannot rest on statistics about "adolescents as a group" or generalities about "the great majority of minors." Although this is particularly crucial in the case of "very young adolescents," absent a bright line rule concerning when an unemancipated minor is "mature," *someone* must in every case make the determination whether an individual unemancipated minor is capable of giving informed consent, or, if not, whether the procedure is in her best interest. (*Ballard* v. *Anderson, supra,* 4 Cal.3d at p. 883.)[12]

The Legislature could reasonably determine that the decision should not be left in the hands of the treating physician, if for no other reason than that, in the case of an unemancipated minor, unlike an adult, there is no presumption that she is capable of giving informed consent.[13] Nor, of course, is a physician's determination that an unemancipated minor has given informed

---

[12]As Justice Powell noted in *Bellotti,* "the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." (*Bellotti* v. *Baird, supra,* 443 U.S. at p. 644, fn. 23 [99 S.Ct. at p. 3049] (lead opn. of Powell, J.).) "Not only is it difficult to define, let alone determine, maturity, but also the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended." (*Id.* at pp. 643-644, fn. 23.) Indeed, one of plaintiffs' own experts testified that "[t]o assume a 13-year old with a physical appearance of someone five years her senior has advanced cognitive skills is to run the risk of failing to reach the patient: it is akin to a misdiagnosis." Significantly, in oral argument, plaintiffs conceded that the capacity to give informed consent varies in the case of each individual unemancipated minor; thus, in response to our question whether a 17-year-old is capable of giving informed consent, counsel answered, "Maybe, maybe not."

For the same reason, I also reject the notion that Assembly Bill No. 2274 might be deemed constitutional as applied to unemancipated minors under the age of 14 and unconstitutional only as to minors 14 years and older. As Justice Brennan observed, "18 is the dividing line that society has generally drawn, the point at which it is thought reasonable to assume that persons have the ability to make, and a duty to bear responsibility for their, judgments." (*Stanford* v. *Kentucky, supra,* 492 U.S. at p. 396 [109 S.Ct. at p. 2989] (dis. opn. of Brennan, J.).) It is true that a minor 14 years or older may, inter alia, petition for emancipation (Fam. Code, § 7120), for a guardian (Prob. Code, § 1510, subd. (a)) or for a guardian ad litem (Code Civ. Proc., § 373), obtain a "junior permit" to operate a motor vehicle (Veh. Code, § 12513), or, under certain conditions, be detained in jail (Welf. & Inst. Code, § 207.1, subd. (d)), or found not to be a "fit and proper subject to be dealt with under the juvenile . . . law" (*id.,* § 707, subd. (a)). None of these statutes, however, suggests that a 14-year-old unemancipated minor *must* or *should* ordinarily be treated as an adult—indeed, they implicitly recognize that he or she is usually *not* mature enough to be so treated. Moreover, although some of these statutes arguably recognize the age of 14 as a dividing line between childhood and *adolescence* (as opposed to adulthood), the medical consent statutes have never created any bright line rule for adolescents of 14 years or older. Nor, in any event, was the evidence presented in the trial court sufficient to establish 14 as the age at which adolescents achieve sufficient maturity to give informed consent to medical procedures.

[13]In the leading case of *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1], we held that "a person of *adult years* and in sound mind" has the right to determine

consent legally dispositive. Moreover, a physician is ethically barred from performing an abortion without parental consent or judicial authorization—even if it is in the unemancipated minor's best interest—if she is *not* sufficiently mature to give informed consent. (*Ballard* v. *Anderson, supra*, 4 Cal.3d at p. 883.) Assembly Bill No. 2274 facilitates a determination of whether abortion is in the unemancipated minor's best interest in such cases, even if she cannot, or will not, obtain parental consent.[14]

There are, of course, additional considerations. In any individual case, factors beyond mere medical judgment may weigh in favor of, or against, an abortion. A parent may offer a more complete and accurate perspective on those factors than a physician; so also might a neutral juvenile court judge in a bypass procedure. Further, unlike a parent acting in the unemancipated minor's overall best interest or a neutral judge, a physician may have a " 'direct, personal, substantial, pecuniary interest in reaching a conclusion' " (*People* v. *Belous, supra*, 71 Cal.2d at p. 972), or a personal bias in favor of—or against—abortion. As Justice Stewart observed: "There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision of whether or not to bear a child. . . . It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." (*Planned Parenthood of Missouri* v. *Danforth, supra*, 428 U.S. at p. 91 [96 S.Ct. at p. 2851], fn. omitted (conc. opn. of Stewart, J.).) By the same token, she may not obtain objective counsel and support from the attending physician at an antiabortion, or "pro-life," pregnancy clinic.

The trial court's findings do not establish that voluntary parental involvement is detrimental. Indeed, on the contrary, the trial court determined, based on extensive uncontroverted evidence, that, ordinarily, encouraging unemancipated minors to consult with a parent about an abortion decision serves to promote the physical and emotional welfare of children. The legislation advances the state's compelling purpose to the extent that it encourages unemancipated minors to obtain parental consent.

The trial court also found, however, that "parental involvement laws do not serve to change the numbers." The finding is based primarily on a single

---

whether to submit to lawful medical treatment. (Italics added; see also Health & Saf. Code, § 7185.5, subd. (a) ["The Legislature finds that an adult person has the fundamental right to control the decisions relating to the rendering of his or her own medical care . . ."].) In the case of an unemancipated minor, however, there is no such absolute postulate.

[14]I do not, of course, doubt the professional integrity of conscientious physicians, including obstetricians. That does not mean, however, that the Legislature could not reasonably determine that the legal determination of an unemancipated minor's maturity should be made by judges, who, after all, are professionals of equal integrity.

study comparing the rate of involvement of parents in the abortion decisions of minors in Minnesota, which requires consent, and Wisconsin, which does not. (Blum et al., *The Impact of a Parental Notification Law on Adolescent Abortion Decision-making* (1987) 77 Am.J. Pub. Health 619.) The study is doubtful authority for the conclusion that enactment of the Minnesota parental involvement law had no effect on the percentage of adolescents who involved their parents in the abortion decision.[15] The additional evidence in point was conflicting and largely anecdotal.[16]

In any event, however, even if the rate of parental involvement remained the same, that fact would not be dispositive. The legislation takes into account that not all emancipated minors will seek parental consent; a significant number may not. Indeed, in some instances, it could be positively detrimental to an unemancipated minor to inform her parents. Again, that does not mean that a physician should—or can—make the determination whether the unemancipated minor is mature, or whether an abortion is nevertheless in her best interest. The Legislature has provided for a judicial bypass in those instances.

---

[15]The study involved interviews with a sample of minors from both states—148 in Minnesota and 37 in Wisconsin—who were about to undergo abortions at abortion clinics. More than half were 16 and 17 years old. None of the participants in the study was a minor who had decided to carry her pregnancy to term. The author of the study testified that the small number of minors interviewed in Wisconsin was not even intended to yield data from which to draw any conclusions about the rate of parental consent in Wisconsin. On the limited data, however, he concluded that the percentage of minors notifying one parent was about the same in both states. Significantly, under the Minnesota statute, enacted in 1981, a minor notifying only one parent must still obtain judicial authorization. (Minn. Stat. Ann. § 144.343, subd. (6) (West 1989); see *Hodgson* v. *Minnesota, supra,* 497 U.S. at p. 481 [110 S.Ct. at p. 2961] (conc. & dis. opn. by Kennedy, J.) [holding that a Minnesota provision requiring two-parent notification of abortion decision of a minor unless she obtains a judicial bypass is constitutional].) The data indicated that the percentage of minors notifying two parents was greater in Minnesota than Wisconsin.

[16]Thus, one witness for plaintiffs testified about her personal knowledge of instances in which minors had informed their parents rather than opt for a judicial bypass under the Minnesota law. Another witness for plaintiffs offered the contrary opinion concerning the Massachusetts law, testifying that she did not believe it has encouraged parental involvement or communication. She also testified, however, that no statistics were kept concerning the number of minors involving their parents in abortion decisions prior to the enactment of the statute. She was also unaware of any study in any other state that has implemented a consent statute concerning the percentage of minors who involve their parents in their abortion decision. The trial court also relied on a Michigan study conducted between 1974 and 1975, before the implementation of a parental consent requirement, indicating that 57 percent involved a parent in the decision, roughly the same percentage who did so in Minnesota according to the results of the Blum study. According to Professor Blum's testimony, however, it would be "plain and simply bad science" to derive any conclusions about the impact of a consent statute by comparing studies involving different time periods and different data sets in that manner.

The trial court concluded that a judicial bypass does not advance the state's purpose and would "result in more harm than help" for those unemancipated minors who lack a "realistic option" of consulting with their parents. The conclusion is unsound.

The trial court stated that the judicial bypass procedure "is of absolutely no benefit to minors": It "has no effect on a minor's ultimate decision with respect to abortion . . . [and] rather than providing a benefit to minors . . . poses a gratuitous threat to their physical and emotional well-being." The statements are based exclusively on expert testimony and submissions concerning judicial bypass procedures *in other states*. The trial court placed great emphasis on the testimony of three judges—two judges from Minnesota and one from Massachusetts—that they felt like "a rubber stamp" and did not "make any difference" in the decisions of the minors who petitioned for a judicial bypass. It also stressed the testimony of some out-of-state witnesses that adolescents using the bypass procedure manifest anxiety and find the experience "nerve-racking."[17]

Evidence concerning the way different statutes have operated in different states is of limited value in evaluating the constitutionality of Assembly Bill No. 2274.[18] Any assessment of the bypass system in the California juvenile courts must of necessity await implementation of the statute. We cannot determine, in advance of its implementation, that the judicial bypass under our legislation is pointless or unduly intimidating to minors, let alone that it poses a "threat to their physical and emotional well-being."

The findings are, moreover, largely beside the point. The purpose of the California judicial bypass is not to have an "effect" one way or another on a

---

[17]By contrast, a Minnesota judge, who had heard over a thousand petitions between 1981 and 1986, characterized the demeanor of the teenagers as "very calm. . . . I didn't really feel they were under a great deal of stress."

[18]It is merely speculative to conclude that the California judicial bypass will resemble those of Minnesota or Massachusetts. First, the applicable statutes are different in crucial ways. Assembly Bill No. 2274 requires the consent of only one parent; the Minnesota statute, as discussed, requires notice to *both* parents or judicial authorization; the Massachusetts statute requires consent of *both* parents or judicial authorization. (Minn. Stat. Ann. § 144.343, subd. (6); Mass. Gen. Laws Ann. ch. 112, § 12S (West 1995).) Thus, in both states, as opposed to California, even if one parent is notified *and consents*, a minor must invoke a judicial bypass. No evidence was presented concerning the judicial bypass in any of the states requiring only one parent's consent. Moreover, we cannot derive a general conclusion from the experience of only two states out of the more than twenty-five with judicial bypass procedures. As one amicus curiae points out, the Indiana judicial bypass procedure (which requires written consent from one parent or judicial authorization) has apparently not operated as a "rubber stamp": "[W]hat is routine in Massachusetts is all but unheard of in Indiana . . . ." (Quoting *Parental Consent to Abortion: How Enforcement Can Vary*, New York Times (May 28, 1992) p. A1.)

*mature* unemancipated minor's "ultimate decision with respect to abortion." Its purpose, instead, is to determine whether an unemancipated minor is, in fact, mature enough to give informed consent, and, if not, whether an abortion is in her best interest. Thus, even if the findings are accepted, i.e., that in most cases, an unemancipated minor seeking a judicial bypass will receive authorization for an abortion, the judicial bypass nonetheless advances substantial purposes not addressed by the prior law. It provides for a neutral judicial determination of each individual unemancipated minor's ability to give informed consent; it also allows immature unemancipated minors who cannot, for whatever reason, obtain parental consent, to obtain a determination by a juvenile court judge whether abortion is in her best interest and, if it is, authorization for the procedure.

Although requiring an unemancipated minor to obtain parental consent or a judicial bypass may result in some delay in obtaining an abortion, plaintiffs have not demonstrated that the legislation will result in a substantially increased health risk to unemancipated minors seeking abortion. An unemancipated minor who obtains parental consent may suffer no delay at all. Even if she uses the judicial bypass, once she files a petition with the juvenile court, the legislation requires that a hearing be set within three days and judgment must be entered within one day of submission of the matter. (Health & Saf. Code, § 123450, subds. (b) & (c).) Any appeal must be set within five days of filing the notice for appeal and judgment must be entered within one court day of submission of the matter. (*Id.*, subd. (d).) Use of the judicial bypass, then, may, at most, result in a delay of approximately two weeks. Although there is some degree of increased risk with delay, abortion remains, as the trial court found, "one of the safest medical procedures available for all women and, in particular, for teenagers." One physician testified that "it has the lowest rate of deaths associated with it and also the lowest rate of serious complications in comparison to any other operation which is widely performed in this country."[19]

I also conclude that the judicial bypass is minimally intrusive: it is speedy, informal, and confidential. There is no substantial evidence supporting the

---

[19]There is, in fact, no empirical evidence before us that the California law will actually result in a greater number of delayed abortions. A study on the impact of the Minnesota parental notification law over the period between August 1981 through March 1986 suggests that parental notification requirements may result in an overall *decrease* in the number of abortions for unemancipated minors—including late abortions. (Rogers et al., *Impact of the Minnesota Parental Notification Law on Abortion and Birth* (1991) 81 Am.J. Pub. Health 294, 296.) Thus, over the nearly six-year period covered by the study, "[t]he pre-enactment to post-enactment late abortion rate substantially declines for women of 15-17 years . . . ." (*Id.* at p. 296.) Although the late-to-early abortion *rate* increased, "a steep decline in early abortions, not an increase in late abortions, accounts for the increased late-to-early abortion ratio in 15-17 year old women." (*Ibid.*) The authors account for the increase in the proportion of late abortions as follows: "First, the law may have been more successful in preventing pregnancy among minors who would have had early abortions than among minors who would

trial court's "finding" that requiring an unemancipated minor to appear before a juvenile court judge for an expedited, informal hearing on these important questions—even if somewhat intimidating—poses a "gratuitous threat" to the physical and emotional well-being of either a mature or an immature unemancipated minor.

The state has carried its burden of showing that the legislation substantively furthers a "compelling interest" and that there were no less intrusive means of accomplishing its legitimate objectives. Accordingly, I proceed to the additional issues raised: whether Assembly Bill No. 2274 violates an unemancipated minor's right to informational privacy, and whether it violates the equal protection clause of article I, section 7 of the California Constitution.

## V.

The trial court erred in concluding that the judicial bypass procedures violate an unemancipated minor's right to informational privacy, i.e., the interest in preventing dissemination or misuse of sensitive confidential information.

As *Hill* emphasized, informational privacy is the "core value furthered by the Privacy Initiative." (*Hill, supra,* 7 Cal.4th at p. 35.) "A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity." (*Ibid.*) The right to informational privacy is not, however, absolute. "Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. . . . [¶] . . . [I]f intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged." (*Id.* at p. 38.)

The disclosures required under Assembly Bill No. 2274 do not violate an unemancipated minor's reasonable expectation of privacy or seriously invade her privacy interest. An unemancipated minor who seeks parental consent for an abortion will be required to disclose the fact of her pregnancy to her parents. In light of an unemancipated minor's limited privacy interest

have had late abortions. A second possibility is that the law caused delays for a greater percentage of a declining number of minors seeking abortions. Regardless, the claim that the law caused more minors to obtain late abortions is unsubstantiated. In fact, the reverse is true. For ages 15-17, the number of late abortions per 1,000 women decreased following the enactment of the law. Therefore, an increased medical hazard due to a rising number of late abortions was not realized." (*Id.* at p. 297.)

as against her parents, I conclude that her reasonable expectation of privacy is not violated. She may, of course, elect not to tell her parents anything at all and seek a judge's authorization.

An unemancipated minor who seeks judicial authorization for an abortion will be required to provide certain confidential information to the juvenile court. The disclosures required are minimal; Assembly Bill No. 2274 requires no more information than is necessary to satisfy the state's compelling interest in protecting the physical and mental health of unemancipated minors, by providing a judicial bypass for determining whether an unemancipated minor seeking an abortion is mature, or, if she is not, whether an abortion is in her best interest.

Thus, Assembly Bill No. 2274 permits a petitioner to use only her initials or a pseudonym and requires the juvenile court to ensure that the unemancipated minor's identity is held confidential. (Health & Saf. Code, § 123450, subd. (b).) Although the petitioner must file an affidavit with her real name and date of birth, any declarations bearing her real name must be sealed in an envelope marked confidential; all documents filed in any proceeding may be inspected only by the judge, specifically authorized court personnel, the petitioner, her attorney, and her guardian ad litem. (*Id.*, subd. (c); Cal. Rules of Court, rule 240(c) & (j); Judicial Council Forms, form AB-110.)

The medical information required to be disclosed is minimal. The forms adopted by the Judicial Council require the unemancipated minor to state how she knows she is pregnant, how many weeks pregnant she is, whether she has talked to someone about the medical and emotional consequences, and where she receives her usual health care. They do not require disclosure of detailed medical information or history. (Cal. Rules of Court, rule 240 (j); Judicial Council Forms, form AB-105.)

## VI.

Citing a plurality opinion in *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, the trial court also concluded that Assembly Bill No. 2274 violates equal protection by distinguishing between two similarly situated groups: pregnant unemancipated minors who choose abortion and pregnant unemancipated minors who choose to carry their pregnancies to term. It concluded that because unemancipated minors who carry their pregnancies to term may obtain medical care without parental consent, unemancipated minors who seek to terminate their pregnancies cannot be required to obtain consent or judicial authorization.

I disagree. Assembly Bill No. 2274 does not unfairly discriminate on the basis of an unemancipated minor's reproductive choice.

In *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, a plurality emphasized that "the decision whether to bear a child or to have an abortion is so private and so intimate that each woman in this state—rich or poor—is guaranteed the constitutional right to make that decision *as an individual,* uncoerced by governmental intrusion." (*Id.* at p. 284 (plur. opn. of Tobriner, J.), italics in original.) Accordingly, *Myers* invalidated budget act restrictions that eliminated Medi-Cal funding of abortion while maintaining Medi-Cal funding of prenatal care and childbirth, on the ground that the restrictions lacked compelling justification. *Myers* rejected the suggestion that restrictions on the funding of abortions relate to a legitimate state interest in encouraging childbirth: once the state " 'chooses to enter the constitutionally protected area of [reproductive] choice, it must do so with genuine indifference.' " (*Id.* at p. 285 (plur. opn. of Tobriner, J.).)

*Myers* is not controlling.[20]

First, Assembly Bill No. 2274 does not effectively nullify the constitutional right to abortion, through the "power of the purse" or otherwise. (See *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at p. 284 (plur. opn. of Tobriner, J.).) Nor does it involve imposing a condition on the enjoyment of publicly conferred benefits. The Court of Appeal's attempt to draw an analogy between the benefit of government funding and "the 'benefit' of consent without parental involvement" is wholly unpersuasive; indeed, the parties agree that for most unemancipated minors, parental involvement—not its absence—is beneficial. More fundamentally, unlike the legislation in *Myers,* Assembly Bill No. 2274 affects unemancipated minors, whose rights and interests, as discussed, are distinct from those of adult women.

Plaintiffs contend that because the "right" to give birth is not burdened with a consent requirement, no such burden can be imposed on the "right" to an abortion. They argue that the Legislature's decision to burden only abortion cannot be justified as promoting the welfare of teenagers because the medical, psychological, and social consequences of choosing teenage

---

[20]Nor, of course, is the Florida Supreme Court decision in *In re T.W.* (Fla. 1989) 551 So.2d 1186, on which the plurality place undue emphasis. The reasoning in that case is similar to *Myers* and should be rejected for the same reasons. I am more persuaded by the reasoning of the Massachusetts Supreme Court in *Planned Parenthood* v. *Attorney General* (1997) 424 Mass. 586 [677 N.E.2d 101] on the same point. "The claim that a pregnant unmarried minor is denied equal protection of the law fails because the classification made by [the statute] has a rational basis. The differences between an adult and a minor . . . and between the special considerations applicable to an abortion as opposed to some other intrusive medical procedure justify the special treatment that [it] accords to an unmarried pregnant minor who seeks to terminate her pregnancy." (*Id.* at p. 595, fn. 10 [677 N.E.2d at p. 106].)

motherhood are more profound than the consequences of terminating an unplanned pregnancy. Their suggestion that any burden on an unemancipated minor's reproductive choice must be "equal" fails to withstand scrutiny: an unemancipated minor seeking an abortion and an unemancipated minor carrying a pregnancy to term are not similarly situated.[21]

Thus, the Legislature could legitimately require that a pregnant unemancipated minor's interest in consenting to medical treatment differs depending on whether she chooses to carry her fetus to term or to obtain an abortion. It could reasonably, and neutrally, determine, as a matter of policy, that in the case of an unemancipated minor who is pregnant and intends to bear a child the public health interest in allowing her to obtain medical care for herself and her fetus is overriding, regardless of parental approval and whether or not the unemancipated minor is mature. It is widely accepted that early prenatal care can reduce medical risks and assure a healthy outcome for both mother and child. At the same time, the Legislature could neutrally determine that voluntary abortion, which ordinarily involves an *optional* surgical procedure with significant consequences, requires mature consent or a determination that it is in the unemancipated minor's best interest.

Plaintiffs implicitly concede as much when they acknowledge that the Legislature may recognize legitimate differences between the needs of women who choose childbirth or abortion. A fortiori, it may also do so in the case of unemancipated minors making the same choice, whose needs and interests may require protections distinct from those accorded to adult women.[22]

---

[21]Plaintiffs' argument both proves too much and too little. Sterilization, which also implicates the right to privacy and to reproductive choice, is unavailable to unemancipated minors regardless of parental consent. (Cal. Code Regs., tit. 22, § 70707.1, subd. (a)(1); *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 161 [219 Cal.Rptr. 387, 707 P.2d 760] ["[S]terilization is encompassed within the right to privacy," i.e., "the right of women to exercise procreative choice 'as they see fit.' "].) Yet, if plaintiffs' analysis is carried to its logical extension, the state could not preclude unemancipated minors from consenting to that procedure because it would discriminate on the basis of reproductive choice. On the other hand, although plaintiffs urge that every legislative finding in favor of mandatory parental or judicial consent for abortion applies with greater force to medical care for childbirth, they do not suggest that the Legislature could require a pregnant unemancipated minor to obtain consent from a parent or authorization from a judge to *give birth* or *not* to have an abortion. Nor do they suggest that the Legislature must *withhold* vital prenatal care from a pregnant unemancipated minor in the absence of parental consent if it requires consent for an abortion.

[22]Although they fail to acknowledge their reliance on *Myers*, the plurality's reasoning is clearly derivative of the lead opinion in that case. The gist of their argument is that the Legislature cannot require parental consent for abortion because it permits unemancipated minors to obtain prenatal care and some other limited medical treatment without parental consent. As discussed, I disagree with the plurality's conclusion that the existence of limited

Because I conclude, for all the foregoing reasons, that Assembly Bill No. 2274 withstands the constitutional challenges raised by plaintiffs, I would reverse the judgment of the Court of Appeal.

**BAXTER, J.**—I respectfully dissent.

Missing from the plurality and concurring opinions (hereafter majority) is a concise and accurate description of the change in California law occasioned by Assembly Bill No. 2274. This statute simply shifts the ultimate responsibility of determining whether a child is sufficiently mature to give informed consent to an abortion from the abortion provider to a neutral judge when a parent of the child has not consented to the abortion. Moreover, even when the judge concludes that a child is incapable of giving informed consent, an abortion may be ordered if the judge concludes it is in the child's best interest. Assembly Bill No. 2274 represents the collective judgment of the Legislature, patterned after numerous precedents of the United States Supreme Court, that this shift of responsibility is in the best interests of pregnant children and their parents.

The plurality opinion asserts that this shift of responsibility violates the California Constitution because the requirement that a court determine competence when a child seeks an abortion unless a parent has consented to the procedure impermissibly intrudes on the child's autonomy privacy. The opinion claims the Legislature has no reasonable basis for a conclusion that a physician, who is permitted to determine competence when a child seeks other pregnancy-related treatment, is unable to do so when the child wants an abortion. Moreover, it is suggested, mandating judicial consent is unreasonable because a child may be intimidated and reluctant to seek approval for an abortion if she must approach a judicial officer.

The plurality opinion simply substitutes the views and conclusions of the justices who ascribe to that opinion for those of the Legislature and ultimately constitutes judicial legislation. That physicians determine the competence of an adult to consent to abortion is irrelevant since children do not have the same autonomy privacy rights as adults. The observation that a physician may determine a child's competence to consent to other pregnancy-related medical treatment is also irrelevant. When a child seeks treatment related to a continuing pregnancy, the physician is not called upon to assess the child's competence to decide to continue the pregnancy.

---

medical emancipation statutes implicating reproductive choice establishes that Assembly Bill No. 2274 is "unnecessary" to protect the health of a minor or to support the parent-child relationship—is, indeed, positively detrimental to those compelling interests—and is, therefore, unconstitutional.

The Legislature can reasonably conclude, based on universally acknowledged facts, that children do not have the same capacity for mature decision-making as adults. For that reason, and because children are more vulnerable to outside pressures, a higher degree of care in assessing competence and assured neutrality in making that assessment is necessary for their protection. The ipse dixit of the plurality opinion—that there is no reasonable basis upon which the Legislature might conclude that physicians are not able to determine a child's competence to consent to an abortion—is misdirected therefore. The ability of any particular physician to assess a child's competence to consent to abortion is not in issue. Rather, the question is whether the Legislature can reasonably conclude that children who seek abortion are in need of additional protection.

In concluding that either parental consent or a judicial determination of competence should be required, the Legislature has considered the potential impact on pregnant children of requiring parental consent and of shifting the responsibility for assessing the competence of a child unwilling to seek parental consent to the court. The Legislature has weighed the competing considerations and, following United States Supreme Court precedent, has reasonably concluded that the need for neutrality and extra protection outweighs the burden imposed on the child. Nothing in the California Constitution permits a court to override that legislative judgment.

In short, the conclusion that a neutral judge rather than an abortion provider who may have an interest in the minor's decision should assess competence has been made by the Legislature. This court cannot say that the conclusion is wrong. Instead of acknowledging this constitutional reality, the plurality opinion focuses on implementing procedures which, with a single exception, have passed constitutional muster in every other state in which they have been challenged, and conclude that the California Constitution somehow prohibits imposing the burden of seeking judicial authorization for abortion on a pregnant minor. The child, they hold, must be permitted to seek an abortion without parental consent or a judicial determination that the child is either sufficiently mature to make such an important decision without parental guidance or that the abortion will be in the child's best interest.

That holding fails to accord deference to the Legislature, whose statement of its findings is more than adequate to explain the intent and purpose underlying Assembly Bill No. 2274. It is also sufficient to establish that the state has a substantial, and even compelling, interest in requiring that a neutral judge rather than an interested provider of abortions assess the child's ability to give voluntary and informed consent or determine whether

an abortion is in the child's best interest. Moreover, in reaching a contrary conclusion, the majority's construction of the privacy provision of article I, section 1 of the California Constitution (article I, section 1) departs radically from any defensible view of the voters' intent when they added a right of privacy to the Declaration of Rights in 1972 and undermines the fundamental and constitutionally protected right of parents to guide and control the upbringing of their children.

I agree with Justices Mosk and Brown, who accurately and persuasively refute the claim of the majority that the precedents on which their opinions rest support a conclusion that Assembly Bill No. 2274 is invalid. I write separately, however, to emphasize both the limited nature of the change in minor's abortion rights brought about by Assembly Bill No. 2274 and the extent to which the majority are forced to revise, overturn, and ignore precedent that would otherwise compel the court to uphold Assembly Bill No. 2274 in order to invalidate this carefully crafted legislative effort.

I

REVISION OF THE LEGAL RULES GOVERNING FACIAL CHALLENGES
TO THE CONSTITUTIONAL VALIDITY OF STATUTES

Only last year, this court, in a unanimous opinion, recognized and applied the well-established rule that a facial challenge to the constitutional validity of a statute must fail unless the statute is invalid in all of its applications, i.e., it must be invalid *"under any and all circumstances."* (*Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45, 60 [51 Cal.Rptr.2d 837, 913 P.2d 1046], original italics.) Until today the rule in civil actions challenging the validity of a statute was: " ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, . . . petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].)[1]

One might assume that, having conceded that there are children who are too immature to give informed consent to an abortion, as to whom a requirement of parental or judicial consent is constitutionally permissible, the majority would conclude that this attack on the facial validity of Assembly Bill No. 2274 fails. But no. Now the rules have changed, as they must if

---

[1]As we recognized in *Tobe* v. *City of Santa Ana, supra,* 9 Cal.4th at pages 1095-1096, a criminal defendant challenging a statute on vagueness grounds may assert its facial invalidity if the statute prohibits a substantial amount of constitutionally protected conduct, but that rule does not apply to persons who are not presently charged with violating the statute.

the majority is to invalidate this statute. Today the rule is that a facial challenge will be entertained if the statute "substantially impinges upon fundamental constitutional privacy rights in the vast majority of its applications." (Plur. opn. of George, C. J., *ante,* at p. 343.) It matters not that no minor is a party to this suit. No such exception to the rules governing facial challenges appears in this court's past decisions.

## II

### FAILURE TO ACCORD DEFERENCE TO LEGISLATIVE FINDINGS

The majority again (see *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543 [63 Cal.Rptr.2d 467, 936 P.2d 473]) decline to recognize the deference due legislative findings. The plurality opinion declares that no deference need be given if a statute affects a fundamental constitutional right. The concurring opinion of Justice Kennard appears to agree. Committee hearings, consideration of precedents of our nation's highest court, empirical research, and data from consultants, constituents, lobbyists, and others are henceforth irrelevant. The findings of a co-equal branch of government are meaningless. Instead, even in actions presenting only a facial challenge to a statute, evidence may be taken to demonstrate that the Legislature's conclusion that a statutory change is necessary or appropriate is wrong. The findings of a trial judge who hears only the evidence the parties to a single lawsuit choose, and can afford, to present will be paramount.

With due respect, that has not been and should not be the governing rule. "[D]ecisions dating back to the turn of the century require the courts to always presume that the Legislature acts with integrity and with an honest purpose to keep within constitutional restrictions and limitations. [Citations.] '[U]nder the doctrine of separation of powers neither the trial nor appellate courts are authorized to "review" legislative determinations.' [Citation.] Thus, the Legislature's determination of the facts warranting its action ' "must not be set aside or disregarded by the courts, unless the legislative decision is clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted . . . ." ' [Citations.] In other words, legislative determinations are not to be judicially nullified unless they are manifestly unreasonable, arbitrary or capricious. [Citations.] Judges may not substitute their judgment for that of the Legislature if there is any reasonable justification for the latter's action. [Citations.] This means that if reasonable minds may differ as to the reasonableness of a legislative enactment [citations], or if the reasonableness of the enactment is fairly debatable [citation], the enactment must be upheld."

*(Professional Engineers* v. *Department of Transportation, supra,* 15 Cal.4th at pp. 575-576, fn. omitted (dis. opn. of Baxter, J.).)

The majority's refusal to accord due deference to the Legislature's findings so as to invalidate Assembly Bill No. 2274 thus violates the separation of powers doctrine and results in a further step toward government by the judiciary.

When the Legislature adopted Assembly Bill No. 2274, it recited the findings which satisfied that body of the need for a change in California law. As the majority concede, those findings are derived in part from opinions of the United States Supreme Court which accept the accuracy of stated factual propositions as support for their conclusions that statutes like Assembly Bill No. 2274 would not violate any privacy interest a pregnant minor has under the United States Constitution. (See, e.g., *H. L.* v. *Matheson* (1981) 450 U.S. 398, 408, 411 [101 S.Ct. 1164, 1172, 67 L.Ed.2d 388]; *Bellotti* v. *Baird* (1979) 443 U.S. 622, 640 [99 S.Ct. 3035, 3046-3047, 61 L.Ed.2d 797] (lead opn. by Powell, J.).) The majority nonetheless reject both the conclusions of the Supreme Court and those of the California Legislature, a co-equal branch of government and the branch charged with resolving policy questions such as those arising in the debate over minors' abortion rights, in favor of findings by a single trial judge which support the majority view that Assembly Bill No. 2274 is invalid.

As I, and Justice Ardaiz in his dissenting opinion in *Professional Engineers* v. *Department of Transportation, supra,* 15 Cal.4th at page 586, have observed, a rule which permits a court to summarily disregard legislative findings has no support in our case law and does violence to the constitutional doctrine of separation of powers. (Cal. Const., art. III, § 3.)

III

REWRITING ARTICLE I, SECTION 1, TO ABROGATE PARENTAL RIGHTS

In 1972, concerned that theretofore private information was too easily accessible in an age of increased "surveillance and data collection" (*White* v. *Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222]), the citizens of this state added "privacy" to the rights secured in the Declaration of Rights of the California Constitution. At that time there was no reason to

believe that this right of privacy encompassed anything other than informational privacy.[2]

Today, culminating a quarter-century of increasingly expansive reading of the privacy provision of article I, section 1, the majority hold that, by adopting a constitutional right to privacy, the voters of this state intended to grant children the right to obtain abortions without the knowledge or consent of their parents or even of a judicial officer acting in the best interest of a child too immature to give consent. They do so notwithstanding their acknowledgment that in this state a child's right to obtain any type of medical care has always been subject to parental and legislative control, and despite their recognition that other aspects of this newly recognized right of minors to "autonomy privacy" in reproductive matters, i.e., the sexual conduct necessary to exercise this "right," is also subject to parental and legislative control. (See, e.g., Pen. Code, § 261.5.)

Nothing in the history of the privacy provision of article I, section 1, suggests that it was the intent of the voters that parents be denied their

---

[2]"[T]he moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy.

"The principal objectives of the newly adopted provision are set out in a statement drafted by the proponents of the provision and included in the state's election brochure. The statement begins: 'The proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. [¶] *At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.*' (Italics in original.)

"The argument in favor of the amendment then continues: 'The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.

" '*Fundamental to our privacy is the ability to control circulation of personal information.* [(Italics in original.)] This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.

" 'Even more dangerous is the loss of control over the accuracy of government and business records of individuals. Obviously if the person is unaware of the record, he or she cannot review the file and correct inevitable mistakes. . . . [¶] The average citizen . . . does not have control over what information is collected about him. Much is secretly collected . . . .' " (*White* v. *Davis, supra,* 13 Cal.3d at pp. 774-775.)

fundamental right to direct this aspect of the upbringing of their children, a right that finds its source in the federal Constitution[3] and that is also protected by the California Constitution. We have described this right of parents as "a compelling one, ranked among the most basic of civil rights." (*In re B.G.*, *supra*, 11 Cal.3d at p. 688.) Yet, abrogation of parental rights is the inevitable result of the majority's opinions. One looks in vain to the history and wording of the privacy provision to find an intent to limit parental rights. No such intent may be presumed, since parental rights are protected not only by the state Constitution, but also by the federal Constitution and may not be restricted by the state. Nor, even by the closest scrutiny of the entrails of the 1972 constitutional change can we discern a basis for concluding that the voters realized that they had excised, and intended to excise, from all other parental and state authority over minors, the right of parents and the state to control a child's access to abortion.

Moreover, the majority next relegate a competing *constitutional* interest—parental rights—to the status of simply another factor to be weighed as part of the state interest in Assembly Bill No. 2274. The majority fail to acknowledge that state and federal *constitutional* rights of a parent are not only a "compelling state interest" per se, but rights that were in no way diminished by the addition of a right of privacy to article I, section 1.

Of course, nothing said in these opinions has any impact on parents' rights under the federal Constitution. Whether the California Constitution, as construed by the majority to condition a parent's involvement in a minor daughter's decision to undergo an abortion on the child's willingness to seek the parent's advice and counsel, impermissibly intrudes on the parent's rights may yet be decided in another forum. The majority's wholesale abdication of the judiciary's obligation to protect and preserve parental rights under the California Constitution should not be overlooked, however.

Once again, past precedent is overlooked or ignored in the downgrading of the parents' constitutional rights. Until today, a court was obligated to use every effort to avoid finding that a newly adopted statute or constitutional provision effected a pro tanto repeal of an existing provision. Finding a pro tanto repeal is disfavored and is recognized only when there is a clear legislative intent that a newly enacted statute repeal existing legislation. (*Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 267 [41 Cal.Rptr.2d 220, 895 P.2d 56].) That rule was equally applicable to possibly conflicting constitutional provisions. Rather than finding a conflict

---

[3]See *Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 230 [92 S.Ct. 1526, 1540-1541, 32 L.Ed.2d 15]; *In re Roger S.* (1977) 19 Cal.3d 921, 934 [141 Cal.Rptr. 298, 569 P.2d 1286]; *In re B.G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244].)

and resulting pro tanto repeal, whenever possible the two were to be harmonized so as to give effect to both to the extent possible. (*City and County of San Francisco* v. *County of San Mateo* (1995) 10 Cal.4th 554, 563 [41 Cal.Rptr.2d 888, 896 P.2d 181].)

Were these well-established rules applied here, of course, the majority would be hard pressed to explain their implicit conclusion that when a right to privacy was added to article I, section 1, the electorate intended a pro tanto repeal of existing, fundamental, constitutionally protected, parental rights. In Assembly Bill No. 2274 the Legislature has acted to preserve and advance parental rights by creating a procedure which encourages parental involvement in a child's decision on whether or not to undergo an abortion. There is nothing unreasonable, irrational, or capricious in the Legislature's conclusion that parental consent should be required wherever possible and that when it is not feasible for a pregnant minor to consult with a parent, a judge, rather than an abortion provider, should decide if the minor child is sufficiently mature to give informed consent. In the constitutional world of the majority, by contrast, any third party, even one interested in avoiding parental responsibility—the father of the unborn child—may "assist" the minor in a round of "physician shopping" until a doctor is found who can be convinced that the minor is capable of giving informed consent.

IV

THE REVISION OF HILL

This court has long since expanded the privacy right found in article I, section 1, to encompass "autonomy" as well as "informational" privacy. (See *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 275 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; cf. *People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178]; *White* v. *Davis, supra,* 13 Cal.3d 757.) Now, only three years after enunciating, in a carefully crafted opinion, the elements identified in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*), as necessary to establish a violation of that right of privacy, the plurality opinion finds *Hill* too restrictive. What appeared to be a relatively insignificant modification of those elements in the lead opinion in *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (*Loder*), in which an "egregious" breach of social norms became a "serious" breach, now accelerates into a wholesale erosion of the threshold elements.

The plurality opinion confirms what *Loder* presaged. It is no longer necessary that a plaintiff establish the threshold elements identified in *Hill*

before the state must justify challenged legislation. According to the lead opinion in *Loder*, a not too subtle "stalking horse" for this opinion, and now repeated in this plurality opinion, *Hill* did not establish any new requirements. The threshold elements are simply irrelevant if the court considering a privacy claim believes the complaint alleges conduct which "significantly affects" a protected privacy interest. It is no longer necessary to determine at the outset whether a reasonable expectation of privacy exists in the circumstances. (*Hill, supra*, 7 Cal.4th at p. 40.) Were that still necessary, of course, the plurality opinion might have to focus immediately on whether and why minors have expectation of privacy in circumstances that have been subject to parental and state control since California joined the union, and how the procedures established by Assembly Bill No. 2274 constitute *any* "breach of the social norms underlying [a child's] privacy right." (*Hill, supra*, 7 Cal.4th at p. 37.) Having not so subtly revised *Hill*, the plurality opinion is able to postpone discussion of this otherwise dispositive question until it is subsumed in its examination of "compelling state interest."

As with beauty, what may "significantly affect" a privacy interest lies in the eye of the judicial beholder. What is clear to this majority may be cloudy in the eyes of another court. The plurality opinion reformulates the crucial *Hill* threshold elements and the concurring opinion misapplies them leaving both the bench and bar asea in an ocean of uncertainty over the reach of the privacy provision of article I, section 1. Presumably a judge will know a violation when he or she sees one.

**BROWN, J.,** Dissenting.—

## I. INTRODUCTION

Today, the court invalidates the Legislature's effort to increase the involvement of parents in the abortion decisions of their unemancipated minor daughters, concluding the enactment cannot survive the exacting scrutiny of a compelling state interest test. To reach this result, the plurality must ignore the historic limits of the federal Constitution, rewrite the privacy provision of the state Constitution, and abrogate the constitutional interests of parents in an opinion that cannot survive *any* level of scrutiny, much less strict scrutiny.

In 1987, our Legislature enacted Assembly Bill No. 2274, 1987-1988 Regular Session (hereafter Assembly Bill 2274), which prohibits a physician from performing an abortion on an unemancipated minor without either the written consent of one of her parents or judicial authorization. Assembly Bill 2274 embodies a legislative effort to accommodate the competing interests

involved in an unemancipated minor's abortion decision—the minor's interests, the interests of her parents, and the state's interest in her health and welfare. As this court and the United States Supreme Court have repeatedly cautioned, when dealing with the sensitive subject of abortion, "[o]ur obligation is to define the liberty of all, not to mandate our own moral code." (*Planned Parenthood of Southeastern Pa.* v. *Casey* (1992) 505 U.S. 833, 850 [112 S.Ct. 2791, 2806, 120 L.Ed.2d 674] (hereafter *Casey*).)[1]

In our assessment of liberty interests, we would do well to heed the advice of Justice Holmes: "[T]he word 'liberty' . . . is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law." (*Lochner* v. *New York* (1905) 198 U.S. 45, 76 [25 S.Ct. 539, 547, 49 L.Ed. 937] (dis. opn. of Holmes, J.).) "The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. . . . No formula could serve as a substitute, in this area, for judgment and restraint." (*Poe* v. *Ullman* (1961) 367 U.S. 497, 542 [81 S.Ct. 1752, 1776, 6 L.Ed.2d 989] (dis. opn. of Harlan, J.).)

This is such a case. Its resolution demands delicate balance and exquisite restraint. We are faced with one of the most troubling paradoxes of human endeavor. Although liberty may find "no refuge in a jurisprudence of doubt" (*Casey, supra,* 505 U.S. at p. 844 [112 S.Ct. at p. 2803]), "[t]he spirit of liberty is the spirit which is not too sure that it is right" (Hand, *The Spirit of Liberty,* in The Spirit of Liberty (Dilliard edit. 1974) p. 190), for too much certainty is the surest way to extinguish liberty altogether. (Cf. *Washington* v. *Glucksberg* (1997) __ U.S. __, __ [117 S.Ct. 2258, 2275, 138 L.Ed.2d 772] ["Throughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide. Our holding permits this debate to continue, as it should in a democratic society."].)

Courts must speak with clarity and precision when the available tools are adequate to the task at hand, but when the claim at issue involves fundamentally moral and philosophical questions as to which there is no clear answer,

---

[1]Unless otherwise indicated, all further undesignated citations to *Casey* are to portions of the plurality opinion reflecting the views of a majority of the United States Supreme Court. (See *Casey, supra,* 505 U.S. at p. 922 [112 S.Ct. at pp. 2843-2844] (conc. and dis. opn. of Stevens, J.) [joining portions of the plurality opinion]; *ibid.* (conc. and dis. opn. of Blackmun, J.) [same].)

courts must remain tentative, recognizing the primacy of legislative prerogatives. The temptation always exists for judges to "wrap up their veto" of a legislative policy in a "protective veil of adjectives such as . . . 'reasonable,' 'inherent,' [or] 'fundamental,' . . . whose office usually, though quite innocently, is to disguise what they are doing and impute to it a derivation far more impressive than their personal preferences, which are all that in fact lie behind the decision." (Hand, The Bill of Rights (Harv.U. Press 1958) p. 70.) Whether judges act innocently or deliberately, the harm to the body politic is the same. The very real danger we face when "courts foreclose ordinary politics in one area after another" is that the "democratic elements in our republican experiment will wither away, while new forms of tyranny by the powerful few arise." (Scalia, Comment by Glendon in A Matter of Interpretation (Princeton U. Press 1997) p. 113.) "Whom should we fear more: an aroused populace, or the vanguard who know better than the people what the people should want?" (*Ibid.*)

The danger is most acute when the language to be interpreted is amorphous, vague, or general enough to provide broad scope for judicial policymaking and the court insists on creating its own standard, untethered to either the language, as used by its authors or, in the case of a constitution, the apparent intent of those who ratified it. The word "privacy" as used in the California Constitution, for example, has a meaning which can easily be derived from its history, context, and text. The controlling opinion reads this history backwards to infuse "privacy" with a meaning it did not clearly possess at the time of its enactment. As Jefferson warned us, "Laws are made for men of ordinary understanding, and should, therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything[] mean everything or nothing, at pleasure." (15 The Writings of Thomas Jefferson (Lipscomb edit. 1903) p. 450.)

The plurality goes to extraordinary lengths to declare Assembly Bill 2274 unconstitutional. The fundamental flaw running throughout its analysis is the utter lack of deference to the ordinary constraints of judicial decisionmaking—deference to state precedent, to federal precedent, to the collective judgment of our Legislature, and, ultimately, to the people we serve. The plurality begins by reinventing the legal standards governing facial constitutional challenges and proceeds to misapply its own new standards. Then, without any analytical foundation, it invokes the doctrine of independent state grounds, thereby disposing of two decades of highly pertinent United States Supreme Court precedent. Next, the plurality all but eliminates the threshold elements of a state privacy cause of action and misanalyzes what little remains of the elements. Finally, it subjects Assembly Bill 2274 to an

inherently insurmountable level of scrutiny, expressly disavowing any requirement of deference to the Legislature along the way.

A justice "is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness." (Cardozo, *The Nature of the Judicial Process*, in Selected Writings of Benjamin Nathan Cardozo (Hall edit. 1947) p. 164.) It is impossible to know the motives of any other judge. I do not purport to do so here. It is fair, however, to criticize the reasoning and justifications presented in a judicial opinion. In this case, the court's reliance on highly questionable premises to invalidate so eminently reasonable a statute invites cynicism.

I dissent.

## II. FACIAL CONSTITUTIONALITY OF ASSEMBLY BILL 2274

Not until two-thirds of the way through its opinion does the plurality address a dispositive procedural fact—namely, that this case involves a *facial* challenge to Assembly Bill 2274. "To support a determination of facial unconstitutionality, voiding the statute as a whole, [plaintiffs] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, [plaintiffs] must demonstrate that the act's provisions inevitably pose a present *total and fatal* conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215], second italics added; see also *Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45, 60-61 [51 Cal.Rptr.2d 837, 913 P.2d 1046]; *Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; *Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438].) In order to succeed on a facial challenge, plaintiffs must show that a statute or ordinance is unconstitutional "*under any and all circumstances.*" (*Superior Court* v. *County of Mendocino, supra*, 13 Cal.4th at p. 60, original italics; see also *Tobe* v. *City of Santa Ana, supra*, 9 Cal.4th at p. 1111 (conc. opn. of Werdegar, J.) ["in *all its possible applications.*"].) Plaintiffs have failed to make the requisite showing in this case.

There can be no question that Assembly Bill 2274 is constitutional as to minors who lack the capacity to give informed consent. As the plurality acknowledges (see plur. opn., *ante*, at pp. 355, 357), under our decision in *Ballard* v. *Anderson* (1971) 4 Cal.3d 873 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392], "there is an additional limitation implicit in each of the medical emancipation statutes: the minor must be of sufficient maturity to

give an *informed consent* to any treatment procedure. [Citation.] A minor of any age who is unable to convince competent medical authorities that she has the requisite understanding and maturity to give an informed consent for any medical treatment, including a therapeutic abortion, will be denied such treatment without the consent of either *a parent or legal guardian.*" (*Id.* at p. 883, second italics added & fn. omitted.) Subsequent to our decision in *Ballard,* the United States Supreme Court held that a minor's federal constitutional right to an abortion includes a right to nontherapeutic abortions and requires that, *in lieu of parental consent,* "the State must provide an alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests." (*Akron* v. *Akron Center for Reproductive Health* (1983) 462 U.S. 416, 439-440 [103 S.Ct. 2481, 2497-2498, 76 L.Ed.2d 687].) Thus, as the plurality must ultimately concede, the bypass procedure established by Assembly Bill 2274 is not only constitutional but constitutionally *mandated* for minors who are not capable of giving informed consent. (See plur. opn., *ante,* at p. 359, fn. 34.) The state *must* provide such a minor with a bypass option in addition to parental consent. (See *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548 [119 Cal.Rptr. 315, 531 P.2d 1099 [state court's interpretation of state law cannot "restrict the liberties guaranteed the entire citizenry under the federal charter"].)[2] Because Assembly Bill 2274 is not unconstitutional in all its possible applications, it clearly survives a facial constitutional challenge.

Since Assembly Bill 2274 does not inevitably pose a present total and fatal conflict with applicable constitutional prohibitions, the plurality must resort to an overbreadth analysis. According to the plurality, such an analysis is required when "a statute, as written, broadly impinges upon fundamental constitutional privacy rights in its general, normal, and intended application." (Plur. opn., *ante,* at p. 343; see also *ibid.* [direct and substantial impingement]; *id.* at p. 348 [broad and direct impingement].) Whatever the merits of this assertion in the abstract, there is no basis for resorting to the doctrine of overbreadth in this case. At the very most, the evidence at trial established what Assembly Bill 2274 was "likely" to do, "in some instances," "at least to some extent." (Plur. opn., *ante,* at pp. 355, 359; see also *post,*

---

[2]At oral argument, plaintiffs' counsel suggested that when a minor is not capable of giving informed consent and does not want to seek parental consent, her physician should initiate a child protective services investigation. This suggestion is both grossly overintrusive and legally insufficient to comply with the governing federal constitutional mandate. The plurality's suggestion that a common law judicial bypass procedure could be invoked for such immature minors (plur. opn., *ante,* at p. 359, fn. 34) is equally unworkable. How a minor who is too immature to give informed consent can possibly be expected to navigate the perils of an uncodified judicial bypass procedure escapes me. Assembly Bill 2274, by contrast, assists such a minor by authorizing the appointment of a guardian ad litem and by guaranteeing the right to court-appointed counsel. (See former Health & Saf. Code, § 25958, subd. (b), now § 123450, subd. (b).)

at p. 439.) The statute does not impose a broad, direct, and substantial impingement in its general, normal, and intended application.[3] (See *post*, at pp. 429-439.)

Moreover, as one of the plurality's principal authorities explains, before a court declares a statute to be unconstitutional on overbreadth grounds, it must be "convinced that the [legislative] purpose can be achieved by regulations drawn more narrowly and precisely than is attempted by the statute [at issue]." (*City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 270 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) Although the plurality suggests "there may be a small subclass of persons covered by [Assembly Bill 2274] as to whom a similar but much more narrowly drawn statute constitutionally could be applied" (plur. opn., *ante*, at p. 343), in fact, the line drawn by the statute—age 18—is the only sensible one to draw. Plaintiffs themselves concede that the capacity to give informed consent varies in the case of each individual unemancipated minor. Thus, in response to our inquiry whether a 17-year-old girl is capable of giving informed consent, counsel answered, "Maybe, maybe not." (See *Bellotti* v. *Baird* (1979) 443 U.S. 622, 643-644, fn. 23 [99 S.Ct. 3035, 3048, 61 L.Ed.2d 797] (plur. opn. of Powell, J.) (hereafter *Bellotti II*) ["[T]he peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors."]; see also *Akron* v. *Akron Center for Reproductive Health*, *supra*, 462 U.S. at pp. 441-442 [103 S.Ct. at pp. 2498-2499] [same]; *Stanford* v. *Kentucky* (1989) 492 U.S. 361, 396 [109 S.Ct. 2969, 2989, 106 L.Ed.2d 306] (dis. opn. of Brennan, J.) [". . . 18 is the dividing line that society has generally drawn, the point at which it is thought reasonable to assume that persons have an ability to make, and a duty to bear responsibility for[,] their[] judgments. . . . [A]ge 18 is a necessarily arbitrary social choice as a point at which to acknowledge a person's maturity and responsibility[.] [G]iven the different developmental rates of individuals, it is in fact 'a conservative estimate of the dividing line between adolescence and adulthood. Many of the psychological and emotional changes that an adolescent experiences in maturing do not actually occur until the early 20s.' "].)

---

[3]Nor does federal law support the use of an overbreadth analysis. Although the plurality asserts that *Casey*, *supra*, 505 U.S. 833, extended the overbreadth doctrine to the abortion context (see plur. opn., *ante*, at pp. 345-346), in reality this is an open question. (See *Washington* v. *Glucksberg*, *supra*, __ U.S. at p. __ [117 S.Ct. at p. 2275] (conc. opn. of Stevens, J.) [the issue is "the subject of debate" within the high court].) In any event, even if the passage the plurality quotes from *Casey* could somehow be deemed to have extended the doctrine, the *very next paragraph* of *Casey*, which the plurality fails to quote, explicitly limits the extension to adult women: "This conclusion is in no way inconsistent with our decisions upholding parental notification or consent requirements. [Citations.] Those enactments, and our judgment that they are constitutional, are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart. We cannot adopt a parallel assumption about adult women." (*Casey*, *supra*, 505 U.S. at p. 895 [112 S.Ct. at p. 2830].)

Assembly Bill 2274 does not inevitably pose a present total and fatal conflict with applicable constitutional prohibitions, and there is no basis for applying an overbreadth analysis in this case. Plaintiffs' facial challenge to the statute should be rejected on this basis alone.

### III. INDEPENDENT STATE GROUNDS

The plurality candidly acknowledges that the Legislature drafted Assembly Bill 2274 to comply with well-established United States Supreme Court precedent. (See plur. opn., *ante*, at pp. 324-325.) Nevertheless, the plurality, without any analysis or discussion, relegates *nine* United States Supreme Court decisions addressing the validity of parental involvement statutes to a single footnote (see *id.* at p. 324, fn. 11), resurrecting their language out of context only when necessary to reach its ultimate destination. (See, e.g., *id.* at pp. 333, 336, 337-338, fn. 22, 344, 350, fn. 26, 354, 359, fn. 34.) The plurality's wholesale departure from more than 20 years of high court precedent is itself wholly unprecedented.

In an attempt to justify the departure, the plurality relies on the fact that under the California Constitution the right to privacy is *explicit* whereas under the United States Constitution the right is *implicit*. (See plur. opn., *ante*, at p. 326.) Granted. The express phrase "and privacy" was added to article I, section 1 of the California Constitution by an initiative adopted by the voters on November 7, 1972 (hereafter the Privacy Initiative). But it does not follow that we should *ignore* United States Supreme Court precedent in defining the state right. To the contrary, one of the principal sources we look to in order to discern the meaning of "privacy" as used in the Privacy Initiative is the "federal constitutional right, derived from various provisions of the Bill of Rights, that took distinct shape in United States Supreme Court decisions in the 1960's safeguarding the rights of individuals and private entities from government invasion." (*Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 23 [26 Cal.Rptr.2d 834, 865 P.2d 633] (hereafter *Hill*).) "The ballot arguments refer to the right to privacy as 'an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, and Ninth Amendments to the U.S. Constitution,' thereby invoking the federal constitutional right to privacy as recognized in decisions of the United States Supreme Court. [Citation.] [¶] The Privacy Initiative was placed before the voters following a two-thirds vote of each house of the Legislature. (Cal. Const., art. XVIII, § 1.) Testimony before the Assembly Constitution Committee, together with staff reports and analyses prepared for that committee and the Senate Constitution Committee, makes explicit reference to the federal constitutional right to privacy, particularly as it developed beginning with *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]." (*Hill, supra,* 7 Cal.4th at p. 28.)

Where, as here, a state constitutional protection was modeled on a federal constitutional right, we should be extremely reticent to disregard United States Supreme Court precedent delineating the scope and contours of that right. As this court unanimously recognized in *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077], relied on by the plurality, "[a]s early as 1938, we stated that 'cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.' [Citations.] [¶] [Our cases] acknowledge and support a general principle or policy of deference to United States Supreme Court decisions, a policy applicable in the absence of good cause for departure or deviation therefrom." (*Id.* at p. 353, italics omitted; see also *id.* at p. 356 (conc. and dis. opn. of Mosk, J.) [joining the majority opinion on this issue].)

In the context of an unemancipated minor's abortion decision, it is particularly appropriate to seek guidance from the high court and to follow this general policy of deference. The nine decisions addressing the constitutionality of parental involvement statutes reflect the collective wisdom of sixteen Supreme Court justices gleaned over the course of more than two decades. In *Casey*, the most recent parental *consent* decision, eight of the court's nine justices concluded that parental consent statutes such as California's were constitutional. (See *Casey*, *supra*, 505 U.S. at pp. 899-900 [112 S.Ct. at p. 2832] (plur. opn. of O'Connor, Kennedy, and Souter, JJ.); *id.* at p. 922, fn. 8 [112 S.Ct. at pp. 2843-2844] (conc. and dis. opn. of Stevens, J.); *id.* at pp. 970-971 [112 S.Ct. at pp. 2868-2869] (conc. and dis. opn. of Rehnquist, C. J.).) As I explain in greater detail below (see *post*, at pp. 429-439), the Supreme Court's decisions in this area reflect a delicate balancing of a number of competing interests.

The only "cogent reason" the plurality articulates for departing from federal precedent is that the plurality opinion in *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779] (hereafter *Myers*), "clearly demonstrates that the state Constitution has been interpreted to provide *greater* protection of a woman's right of choice than that provided by the federal Constitution as interpreted by the United States Supreme Court." (Plur. opn., *ante*, at p. 327, italics added.) *Myers* does not support this proposition. The *Myers* opinion concluded only that "the protection afforded the woman's right of procreative choice as an aspect of the right of privacy under the explicit provisions of our Constitution is *at least as broad* as that described in *Roe* v. *Wade* [(1973) 410 U.S. 113 (93 S.Ct. 705, 35 L.Ed.2d 147)]." (*Myers*, *supra*, 29 Cal.3d at p. 281, italics added (plur. opn. of Tobriner, J.); see also *Conservatorship of Valerie*

*N.* (1985) 40 Cal.3d 143, 163 [219 Cal.Rptr. 387, 707 P.2d 760] [state and federal Constitutions afford "similar protection" to procreative choice].) Only by broadly misreading *Myers* can the plurality here avoid the analytical force of federal authority.

Assuming arguendo the state Constitution does afford greater protection to procreative choice, United States Supreme Court precedent surely remains relevant.[4] More importantly, in the context of this case, the fact that the state right to privacy may afford greater protection does not alter the fundamental nature of the interests to be balanced. Rather, to the extent the state right to privacy affords greater protection to an unemancipated minor's procreative choice, it affords at least commensurate protection to her *family's* right to privacy. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27 ["The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects *our homes, our families*, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose." (Italics added.)].)

This explicit reference to "our homes" and "our families" demonstrates that the voters did not intend the Privacy Initiative to erect a barrier between an unemancipated minor and her own parents. To the contrary, the voters intended to incorporate well-established state and federal precedent affording a sphere of constitutional protection to our homes and families, a sphere that encompasses the right of parents to direct the moral and spiritual upbringing of their own children. (See, e.g., *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 503-504 & fn. 12 [97 S.Ct. 1932, 1937-1938, 52 L.Ed.2d 531] (plur. opn. of Powell, J.); *Ginsberg* v. *New York* (1968) 390 U.S. 629, 639 [88 S.Ct. 1274, 1280, 20 L.Ed.2d 195]; see generally *post*, at pp. 429-432.) In other words, the same Constitution that protects an unemancipated minor's privacy also protects "the private realm of family life which the state

---

[4]An examination of the plurality's selective quotation from the case law is telling. The plurality quotes *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128 [277 Cal.Rptr. 354] for the proposition that " 'the state right of privacy has been held to be broader than the federal right.' " (Plur. opn., *ante*, at p. 327.) The complete passage from the case states that "[a]lthough the state right of privacy has been held to be broader than the federal right [citation], *California courts construing article I, section 1, have looked for guidance to federal precedents.*" (*Urbaniak* v. *Newton, supra*, 226 Cal.App.3d at p. 1136, italics added.) Likewise, the plurality quotes *American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831 [263 Cal.Rptr. 46] for the proposition that " 'the California Constitution . . . expressly recognizes a right to privacy . . . which is broader than the federal right to privacy.' " (Plur. opn., *ante*, at pp. 327-328.) The very next paragraph of the case explains that the state right "is to be construed by our courts ' "*informed but untrammeled* by the United States Supreme Court's reading of parallel federal provisions. [Citations.]" ' " (*American Academy of Pediatrics* v. *Van de Kamp, supra*, 214 Cal.App.3d at p. 839, italics added.)

cannot enter." (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645].)

## IV. ELEMENTS OF A STATE LAW PRIVACY CAUSE OF ACTION

Having dramatically expanded the scope of the plurality holding in *Myers*, *supra*, 29 Cal.3d 252, the plurality here turns to our recent decision in *Hill*, *supra*, 7 Cal.4th 1. In *Hill*, following an extended discussion of the state constitutional right to privacy, this court held that "a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id.* at pp. 39-40; see also *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 42-43 [32 Cal.Rptr.2d 200, 876 P.2d 999] [same].)

Today, in a sentence whose length is exceeded only by its circuity, the plurality offers the following gloss on our holding in *Hill*: " 'The three "elements" set forth in *Hill*—a legally protected privacy interest, reasonable expectation of privacy, and serious invasion of privacy—should not be interpreted as establishing significant *new* requirements or hurdles that a plaintiff must meet in order to demonstrate a violation of the right to privacy under the state Constitution—hurdles that would modify substantially the traditional application of the state constitutional privacy provision (and diminish the protection provided by that provision), by authorizing, in a wide variety of circumstances, the rejection of constitutional challenges to conduct or policies that intrude upon privacy interests protected by the state constitutional privacy clause, without any consideration of the legitimacy or importance of a defendant's reasons for engaging in the allegedly intrusive conduct and without balancing the interests supporting the challenged practice against the severity of the intrusion imposed by the practice.' " (Plur. opn., *ante*, at pp. 330-331, original italics, quoting *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 891 [59 Cal.Rptr.2d 696, 927 P.2d 1200] (lead opn. of George, C.J.) (hereafter *Loder*).) Amazingly, according to the plurality, the 58-page opinion in *Hill*, *supra*, 7 Cal.4th 1, did not establish any "significant new requirements."

Again quoting from *Loder*, *supra*, 14 Cal.4th at page 893, the plurality tells us that the three elements established in *Hill* " 'do not eliminate the necessity for weighing and balancing the justification for the conduct in question against the intrusion on privacy resulting from the conduct in any case that raises *a genuine, nontrivial invasion of a protected privacy interest.*' " (Plur. opn., *ante*, at p. 331, italics added.) Instead, we are told, the

elements were designed simply to " 'permit courts to weed out claims that involve *so insignificant or de minimis an intrusion on a constitutionally protected privacy interest* as not even to require an explanation or justification by the defendant.' " (*Ibid.*, italics added, quoting *Loder, supra,* 14 Cal.4th at p. 893 (lead opn. of George, C. J.).)

This strained interpretation of *Hill* has never been endorsed by a majority of this court. And with good reason. It is inconceivable that when the court in *Hill* required and in *Heller* reiterated that "[a]ctionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right" (*Hill, supra,* 7 Cal.4th at p. 37; *Heller* v. *Norcal Mutual Ins. Co., supra,* 8 Cal.4th at p. 44), it really meant the invasions need only be "nontrivial"—that is, not "insignificant" or "de minimis." (See *Hill, supra,* 7 Cal.4th at pp. 67-68 & fn. 1 (conc. and dis. opn. of George, J.).) Only Lewis Carroll could countenance this sleight of hand.[5]

"There is enough confusion in the law. We should say what we mean and mean what we say." (*Hill, supra,* 7 Cal.4th at p. 57.) Courts should guard against the appearance of "limitless manipulation" lest they "endanger the very legitimacy that has been the great accomplishment of American constitutionalism." (Casper, *Constitutionalism,* in 2 Encyclopedia of the American Const. (Levy et al. edits. 1986) p. 480.)

## V. PRESENCE OF REQUISITE ELEMENTS IN THIS CASE

The plurality purports to find that plaintiffs meet the *Hill* criteria. It does so only by a determinedly superficial application of its elements.

### A. *Legally Protected Privacy Interest*

"The first essential element of a state constitutional cause of action for invasion of privacy is the identification of a specific, legally protected privacy interest. Whatever their common denominator, privacy interests are best assessed separately and in context. Just as the right to privacy is not absolute, privacy interests do not encompass all conceivable assertions of individual rights." (*Hill, supra,* 7 Cal.4th at p. 35.) "Whether established

---

[5] " 'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'

" 'The question is,' said Alice, 'whether you *can* make words mean so many different things.'

" 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' " (Carroll, The Annotated Alice: Alice's Adventures in Wonderland & Through the Looking Glass (Gardner edit. 1960) p. 269, original italics.)

social norms safeguard a particular type of information or protect a specific personal decision from public or private intervention is to be determined from the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative." (*Id.* at p. 36.)

### 1. *The Unique Status of Unemancipated Minors*

The plurality correctly concludes "there can be no question but that minors, as well as adults, possess a constitutional right of privacy under the California Constitution." (Plur. opn., *ante*, at p. 334.) This conclusion, however, marks only the beginning, not the end, of the analysis. The fact that minors enjoy a state constitutional right to privacy does not mean that their privacy interests are coextensive with those of adults. (Cf. *In re Roger S.* (1977) 19 Cal.3d 921, 927-928 [141 Cal.Rptr. 298, 569 P.2d 1286] [" 'Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.' [Citation.] [¶] It is equally well established, however, that the liberty interest of a minor is not coextensive with that of an adult."].)

The law has long recognized the unique status of minors. "As Mr. Justice Frankfurter aptly put it: 'Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children.' *May* v. *Anderson*, 345 U.S. 528, 536 [73 S.Ct. 840, 844-845, 97 L.Ed. 1221] (1953) (concurring opinion). The unique role in our society of the family, the institution by which 'we inculcate and pass down many of our most cherished values, moral and cultural,' *Moore* v. *East Cleveland*, 431 U.S. 494, 503-504 [97 S.Ct. 1932, 1937-1938, 52 L.Ed.2d 531] (1977) (plurality opinion), requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. . . . [T]hree reasons justify[] the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." (*Bellotti II, supra*, 443 U.S. at pp. 633-634 [99 S.Ct. at p. 3043] (plur. opn. of Powell, J.).)

"[I]t has been of profound importance in all legal inquiries involving children that minors are presumed by all phases of the law (and by the culture reflected by our law) not to have the same basic capacities as adults." (Hafen, *Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their "Rights"* (1976) BYU L.Rev. 605,

646-647.) The courts have generally recognized the prevailing understanding in our society that the typical child is not possessed of full capacity for individual choice. " '[M]inors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience, that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life.' " (*Hodgson* v. *Minnesota* (1990) 497 U.S. 417, 459 [110 S.Ct. 2926, 2949, 111 L.Ed.2d 344] (conc. opn. of O'Connor, J., quoting *Stanford* v. *Kentucky, supra,* 492 U.S. at p. 395 [109 S.Ct. at pp. 2988-2989] (dis. opn. of Brennan, J.).) The fact there may be exceptions only serves to validate this truism.

The privacy interests of an unemancipated minor are particularly limited vis-à-vis her own parents. "Parents, of course, have powers greater than that of the state to curtail a child's exercise of the constitutional rights he may otherwise enjoy, for a parent's own constitutionally protected 'liberty' includes the right to 'bring up children' [citation], and to 'direct the upbringing and education of children.' " (*In re Roger S., supra,* 19 Cal.3d at p. 928.) Thus, in the closely related context of liberty, we have observed, "[t]he liberty interest of a minor is qualitatively different than that of an adult, being subject both to reasonable regulation by the state to an extent not permissible with adults [citations], and to an even greater extent to the control of the minor's parents unless 'it appears that the parental decisions will jeopardize the health or safety of the child or have a potential for significant social burdens.' " (*Id.* at p. 934.)

A parent's interest in directing his child's upbringing is firmly rooted in both the state and federal Constitutions. It is "a compelling one, ranked among the most basic of civil rights." (*In re B.G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244]; see also *In re Roger S., supra,* 19 Cal.3d at p. 934.) As Justice Powell explained in *Bellotti II, supra,* 443 U.S. 622:

"[T]he guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors. The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors. But an additional and more important justification for state deference to parental control over children is that '[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' *Pierce* v. *Society of Sisters,* 268 U.S. 510, 535 [45 S.Ct. 571, 573-574, 69 L.Ed. 1070, 39 A.L.R. 468] (1925). 'The duty to prepare the child for "additional obligations" . . . must be read to include the

inculcation of moral standards, religious beliefs, and elements of good citizenship.' *Wisconsin* v. *Yoder*, 406 U.S. 205, 233 [92 S.Ct. 1526, 1544, 32 L.Ed.2d 15] (1972). This affirmative process of teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens.

"We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State *not* to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, '[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include *preparation for obligations the state can neither supply nor hinder.*' *Prince* v. *Massachusetts*, *supra*, [321 U.S.] at [p.] 166 [64 S.Ct. at p. 442] (emphasis added).

"Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children. Indeed, 'constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.' *Ginsberg* v. *New York*, [390 U.S.] at [p.] 639 [88 S.Ct. at p. 1280].

"Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding. Under the Constitution, the State can 'properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility.' *Ginsberg* v. *New York*, 390 U.S., at 639 [88 S.Ct. at p. 1280]." (*Bellotti II, supra*, 443 U.S. at pp. 637-639 [99 S.Ct. at pp. 3045-3046], fns. omitted (plur. opn. of Powell, J.).)

Because it fails to consult "the usual sources of positive law governing the right to privacy" (*Hill, supra*, 7 Cal.4th at p. 36), the plurality does not acknowledge, much less justify, its decision to infringe on a liberty interest

historically more sacrosanct than a minor's right to privacy. There is no solace in the knowledge that the plurality's decision does not *prohibit* minors from confiding in their parents. It does prohibit this legislative attempt to *encourage* minors to confide, and this prohibition cannot be altered without a constitutional amendment. We ought to think long and hard before constructing a virtually impregnable citadel. "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' [citation] lest the liberty protected . . . be subtly transformed into the policy preferences of the members of this Court." (*Washington* v. *Glucksberg*, *supra*, __ U.S. at p. __ [117 S.Ct. at pp. 2267-2268].) Scholar Raoul Berger asks the rhetorical question: "How long can public respect for the Court, on which its power ultimately depends, survive if the people become aware that the tribunal which condemns the acts of others as unconstitutional is itself acting unconstitutionally? Respect for the limits on power are the essence of a democratic society; without it the entire democratic structure is undermined." (Berger, Government by Judiciary (2d ed. 1997) pp. 459-460.)

### 2. *The Unique Context of Abortion*

The plurality does not seriously dispute any of these fundamental principles. Indeed, it acknowledges that "[a]s a general matter, parents during a child's minority have the legal right (and obligation) to act on behalf of their child to protect their child's rights and interests, and in most instances this general rule would apply to interests of the minor that are protected by the state constitutional right of privacy as well as to other rights and interests of the minor." (Plur. opn., *ante*, at pp. 335-336.) According to the plurality, however, "that is not the case with respect to the particular privacy right that is here at issue, namely the right to decide whether a pregnant minor will continue or terminate her pregnancy." (*Id.* at p. 336.)

The plurality's conclusion that in the abortion context—and possibly *only* in the abortion context—an unemancipated minor's privacy interests are coextensive with those of an adult (plur. opn., *ante*, at p. 337 & fn. 21) is indefensible. Ironically, in attempting to justify its decision to treat abortion differently, the plurality quotes extensively from Justice Powell's plurality opinion in *Bellotti II*, *supra*, 443 U.S. 622, observing, among other things, that " '[t]he abortion decision differs in important ways from other decisions that may be made during minority' " and that " 'there are few situations in which *denying* a minor the right to make an important decision will have consequences so grave and indelible.' " (Plur. opn., *ante*, at p. 336, italics

added, quoting *Bellotti II, supra,* 443 U.S. at p. 642 [99 S.Ct. at p. 3047] (plur. opn. of Powell, J.).)

What the plurality fails to appreciate is that, unlike the Massachusetts statute at issue in *Bellotti II,* Assembly Bill 2274 does not deny a mature unemancipated minor the right to make her own abortion decision. Rather, our Legislature has established precisely the procedure approved in *Bellotti II* and in several subsequent decisions of the United States Supreme Court. Specifically, although Assembly Bill 2274 requires an unemancipated minor to obtain the written consent of one of her parents, it also "provide[s] an alternative procedure whereby authorization for the abortion can be obtained. [¶] A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made . . . assure[s] that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure . . . ensure[s] that the provision requiring parental consent does not in fact amount to the 'absolute, and possibly arbitrary, veto' that was found impermissible in *[Planned Parenthood of Missouri* v.] *Danforth* [(1976) 428 U.S. 52 (96 S.Ct. 2831, 49 L.Ed.2d 788)]." (*Bellotti II, supra,* 443 U.S. at pp. 643-644 [99 S.Ct. at p. 3048], fns. omitted (plur. opn. of Powell, J.); see also *Akron* v. *Akron Center for Reproductive Health, supra,* 462 U.S. at pp. 439-440 [103 S.Ct. at pp. 2497-2498].)

The plurality's statement that Assembly Bill 2274 "restricts a pregnant individual's ability to decide on her own whether to continue or to terminate her pregnancy" (plur. opn., *ante,* at p. 334) fails to account for the differences between unemancipated minors who are capable of giving informed consent and those who are not. Under Assembly Bill 2274, only unemancipated minors who *lack* the capacity to give informed consent are restricted in their ability to decide on their own whether to continue or terminate their pregnancies. (See former Health & Saf. Code, § 25958, subd. (c)(2), now § 123450, subd. (c)(2) ["If the court finds that the minor is not sufficiently mature and sufficiently informed to make the decision on her own regarding an abortion, *the court* shall then consider whether performance of the abortion would be in the best interest of the minor. In the event that *the court* finds that the performance of the abortion would be in the minor's best interest, the court shall grant the petition ordering the performance of the abortion without consent of, or notice to, the parents or guardian. In the

event that *the court* finds that the performance of the abortion is not in the best interest of the minor, the court shall deny the petition." (Italics added.)].) As to such immature unemancipated minors, Assembly Bill 2274 establishes the constitutionally mandated bypass procedure. (See *ante*, at pp. 421-423.) Unemancipated minors who *are* capable of giving informed consent, by contrast, are *not* restricted in their ability to decide on their own whether to continue or terminate their pregnancies. (See former Health & Saf. Code, § 25958, subd. (c)(1), now § 123450, subd. (c)(1) ["If the court finds that the minor is sufficiently mature and sufficiently informed to make the decision *on her own* regarding an abortion, and that the minor has, on that basis, consented thereto, the court *shall* grant the petition." (Italics added.)].)

The plurality significantly downplays the difficulties with its approach when it acknowledges, "[t]he question whether a statute or rule intrudes upon a minor's state constitutional right of privacy *admittedly becomes more complex* when the only effect of the statute or rule is to condition the minor's exercise of his or her constitutional privacy right upon parental consent." (Plur. opn., *ante*, at p. 335, italics added.) Since Assembly Bill 2274 contains a judicial bypass procedure, under which an unemancipated minor need never consult her parents at all, it is a gross mischaracterization of the statute to say that it "condition[s] the minor's exercise of his or her constitutional privacy right upon parental consent." (*Ibid.*) As noted above, our cases establish that an implicit limitation in *any* medical emancipation statute is that "[a] minor of any age" must "convince competent medical authorities that she has the requisite understanding and maturity to give an informed consent for any medical treatment, including a[n] . . . abortion." (*Ballard* v. *Anderson, supra*, 4 Cal.3d at p. 883; see also plur. opn., *ante*, at p. 355.) In other words, *someone* must determine whether an individual unemancipated minor, regardless of her age, has the capacity to give informed consent.

Properly viewed, Assembly Bill 2274 simply shifts the determination of whether an individual unemancipated minor has the capacity to give informed consent from a physician to a disinterested judicial officer. In the alternative, the statute gives an unemancipated minor the *option* of seeking the consent of one of her parents. If requiring an unemancipated minor to convince a physician that she has the requisite understanding and maturity to give informed consent to an abortion does not offend the Constitution, I cannot fathom how it can be unconstitutional to require her to convince a disinterested judicial officer of the same fact or, alternatively, to seek parental consent.

The plurality mistakenly responds that there is no indication *in the record that the Legislature was concerned with the potential for physician bias*

when it enacted Assembly Bill 2274. (Plur. opn., *ante*, at pp. 357-358.) But that is beside the point. There is also no proof the Legislature concluded these concerns were irrelevant. In fact, the potential for physician bias was brought to the attention of the Senate Committee on Health and Human Services by outside proponents of the bill, who were dissatisfied with the bill analysis prepared by committee staff. They submitted an alternative legislative analysis to the committee, which specifically observed that "[m]any of the opponents of AB 2274 are engaged in the business of offering abortion services and giving 'counsel' to pregnant women, including teenagers. Obviously, they have a direct conflict-of-interest (profit) when it comes to giving counsel to frightened teenagers who have unplanned pregnancies." (See Legis. Analysis Supporting Assem. Bill No. 2274, Sen. Com. on Health & Human Services, Aug. 19, 1987, p. 28.) Moreover, as the plurality recognizes, one of the primary reasons for requiring "parental or other legally authorized consent" as a precondition to medical treatment for unemancipated minors is to "safeguard[] them from the potential overreaching of third parties." (Plur. opn., *ante*, at p. 315; see also *Bellotti II, supra,* 443 U.S. at p. 641, fn. 21 [99 S.Ct. at p. 3047] (plur. opn. of Powell, J.) [Minors "are less likely than adults to know or be able to recognize ethical, qualified physicians."].) Finally, as the plurality freely admits, the Legislature drafted Assembly Bill 2274 with United States Supreme Court precedent in mind. (Plur. opn., *ante*, at pp. 324-325.) The high court's decisions question the advisability of relying on physicians to counsel minors on their abortion decisions. (See, e.g., *H. L.* v. *Matheson* (1981) 450 U.S. 398, 409-410 [101 S.Ct. 1164, 1171, 67 L.Ed.2d 388] [" ' "There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." ' "]; *Bellotti II, supra,* 443 U.S. at pp. 640-641 [99 S.Ct. at pp. 3046-3047] (plur. opn. of Powell, J.) [same]; *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52, 91 [96 S.Ct. 2831, 2851, 49 L.Ed.2d 788] (conc. opn. of Stewart, J.) [same].)

Nor is it dispositive that "in numerous analogous contexts the Legislature has authorized minors to obtain medical care without parental consent or judicial authorization, thus recognizing the general competence of health care professionals to determine whether a minor is capable of giving informed consent. (See, e.g., Fam. Code, §§ 6925 [prenatal care], 6926 [care for communicable disease], 6927 [care for rape], 6928 [care for sexual

assault], 6929 [care for drug or alcohol related problem].)" (Plur. opn., *ante*, at p. 358.) Unlike prenatal care, unlike care for communicable disease, unlike care for rape, unlike care for sexual assault, and unlike care for drug or alcohol related problems, abortion " 'is a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles.' " (*Id.* at p. 313, quoting *Myers, supra,* 29 Cal.3d at p. 284 (plur. opn. of Tobriner, J.).) Since " '[t]he abortion decision differs in important ways from other decisions that may be made during minority' " (plur. opn., *ante*, at p. 336), it was certainly not unreasonable for the Legislature to conclude that, in the unique context of abortion, it wanted a disinterested judicial officer, rather than a physician in the business of performing abortions, to make the informed consent determination.

### 3. *The Relevance of Social Norms*

Finally, the plurality maintains that "the circumstances that the statute involves minors rather than adults, and is concerned with furthering the parent-child relationship" are relevant only when "we consider potential justifications for a challenged statute at a subsequent stage of the analysis, and not in determining the threshold question whether the statute implicates a protected privacy interest." (Plur. opn., *ante*, at p. 337; see also *id.* at pp. 334, 341-342.) My disagreement with this conclusion could not be more profound. The one factor common to *each* of the three threshold elements of a cause of action for violation of the state constitutional right to privacy is the incorporation of social norms. (See *Hill, supra,* 7 Cal.4th at pp. 35-36 [existence of a "legally protected privacy interest" turns on "established social norms"]; *id.* at pp. 36-37 [existence of a "reasonable expectation of privacy" turns on "broadly based and widely accepted community norms"]; *id.* at p. 37, italics omitted [existence of a "[s]erious invasion of [a] privacy interest" turns on "an egregious breach of the social norms underlying the privacy right"].) To say that the social norms underlying the incapacity of unemancipated minors in general and the parent-child relationship in partic-ular are not relevant until "a subsequent stage of the analysis" (plur. opn., *ante*, at p. 337) is revisionist legal history at its best and judicial activism at its worst. By deferring consideration of these factors, the plurality condemns to second-class status the protections expressly afforded to "our homes" and "our families" by the Privacy Initiative. (See *ante*, at p. 426.)

### B. *Reasonable Expectation of Privacy*

"The second essential element of a state constitutional cause of action for invasion of privacy is a reasonable expectation of privacy on plaintiff's part." (*Hill, supra,* 7 Cal.4th at p. 36.)

The plurality summarily addresses this element as follows: "Although it has been suggested that, in light of the general statutory rule requiring a minor to obtain parental consent for medical care, and the existence of numerous abortion/parental consent statutes in other states, a minor has no reasonable expectation of privacy in this context, it plainly would defeat the voters' fundamental purpose in establishing a *constitutional* right of privacy if a defendant could defeat a constitutional claim simply by maintaining that statutory provisions or past practices that are inconsistent with the constitutionally protected right eliminate any 'reasonable expectation of privacy' with regard to the constitutionally protected right." (Plur. opn., *ante*, at pp. 338-339, original italics.)

The plurality's analysis is circular, referencing a "reasonable expectation of privacy" without explaining what that term means legally. As we explained in *Hill, supra*, 7 Cal.4th at page 37, "[a] 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. (See, e.g., Rest.2d Torts, [] § 652D, com. c ['The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.'].)" (See also *Heller* v. *Norcal Mutual Ins. Co., supra*, 8 Cal.4th at pp. 43-44 [same]; cf. *Washington* v. *Glucksberg, supra*, __ U.S. at p. __ [117 S.Ct. at p. 2268] ["Our Nation's history, legal traditions, and practices . . . provide the crucial 'guideposts for responsible decisionmaking.' "].) Under *Hill* and its progeny, the social norms reflected in both case law and statutory law—the nine decisions of the United States Supreme Court (plur. opn., *ante*, at pp. 324-325, fn. 11), the "numerous abortion/parental consent statutes in other states" (*id.* at p. 339), and "the general statutory rule requiring a minor to obtain parental consent for medical care" (*id.* at p. 338)—clearly demonstrate that Assembly Bill 2274 does not implicate any "reasonable expectation of privacy."

Indeed, it was a concept of privacy consonant with community norms that the drafters invoked when they authored the Privacy Initiative, and we must conclude this commonly understood meaning is what the electorate ratified. As Justice Story recognized, "[c]onstitutions are not designed for metaphysical or logical subtleties." (3 Story, Commentaries on the Constitution of the United States (Rotunda et al. edits. 1987) § 210, p. 157.) Constitutions are "instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them; the people adopt them; the people must be supposed to read them, with the help of common sense; and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss." (*Id.* at pp. 157-158.)

The plurality's assertion that plaintiffs have demonstrated a "reasonable expectation of privacy" because "the challenged statutory requirements apply to *all* pregnant minors and, unlike the drug testing program in *Hill*, are not confined to a specific setting or limited context" (plur. opn., *ante*, at p. 338, original italics) is disingenuous. The fact that Assembly Bill 2274 applies *only* to unemancipated minors and *not* to emancipated minors or adults *is* a specific setting and a limited context. Like the parental involvement statutes of most other states and in line with the requirements set out in nine high court decisions, Assembly Bill 2274 encourages but does not mandate that an unemancipated minor consult her parents prior to obtaining an abortion. (See, e.g., *H. L.* v. *Matheson, supra*, 450 U.S. at pp. 409-410 [101 S.Ct. at pp. 1171-1172]; *Bellotti II, supra*, 443 U.S. at pp. 640-641, 648 [99 S.Ct. at pp. 3046-3047, 3050-3051] (plur. opn. of Powell, J.).) The bypass procedure established by Assembly Bill 2274 reflects a delicate, time-honored balancing of the privacy interests of the unemancipated minor, the liberty interests of her parents, and the state's compelling interest in her health and welfare, both physical and emotional. For these reasons, it does not implicate any "reasonable expectation of privacy."

## C. *Serious Invasion of a Privacy Interest*

The third essential element of a state constitutional cause of action for invasion of privacy is a "[s]erious invasion of [a] privacy interest[.]" (*Hill, supra*, 7 Cal.4th at p. 37, italics omitted.) "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Ibid.*; see also *Heller* v. *Norcal Mutual Ins. Co., supra*, 8 Cal.4th at p. 44 [same].)

The plurality begins its analysis of this element by reiterating " 'that this element is intended simply to screen out intrusions on privacy that are de minimis or insignificant.' " (Plur. opn., *ante*, at p. 339, quoting *Loder, supra*, 14 Cal.4th at p. 895, fn. 22 (lead opn. of George, C. J.).) As noted earlier, this reincarnation of *Hill* eviscerates the requirement that an actionable invasion of privacy constitute an "egregious breach of . . . social norms." (See *ante*, at pp. 427-428.) The plurality's analysis of this element is faulty in a number of other respects as well.

For instance, the plurality asserts that Assembly Bill 2274 "significantly intrudes upon autonomy privacy" by "den[ying] a pregnant minor, who believes it is in her best interest to terminate her pregnancy rather than have a child at such a young age, control over her own destiny." (Plur. opn., *ante*,

at p. 339.) As explained above, however, the statute merely shifts the determination of whether an individual unemancipated minor has the capacity to give informed consent from a physician to a disinterested judicial officer. Far from denying a mature unemancipated minor "control over her own destiny" (*ibid.*), the statute actually *guarantees* her the right to make her own abortion decision. (See *ante*, at pp. 433-434.) As such, Assembly Bill 2274 surely does not effect a serious invasion of a privacy interest. (See *Washington* v. *Glucksberg, supra,* __ U.S. at p. __ [117 S.Ct. at p. 2271] ["That many of the [constitutionally protected] rights and liberties . . . sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected."].)

The plurality also maintains that "the statutory requirement that the minor obtain parental consent or judicial authorization will delay the minor's access to a medically safe abortion in many instances, and thereby will increase, at least to some extent, the health risks posed by an abortion." (Plur. opn., *ante*, at p. 339.) Once again, the plurality fails to appreciate the nature of a facial challenge to a statute. The fact that "in many instances" the statute may increase "at least to some extent" the health risks associated with an abortion (*ibid.*) is insufficient to establish the facial unconstitutionality of the statute. (See *ante*, at pp. 421-424.) In fact, the United States Supreme Court has considered and rejected this very line of argument. In *Ohio* v. *Akron Center for Reproductive Health* (1990) 497 U.S. 502 [110 S.Ct. 2972, 111 L.Ed.2d 405], the plaintiffs argued that a judicial bypass procedure was inadequate because, under certain circumstances, it could result in a three-week delay, which "could increase by a substantial measure both the costs and the medical risks of an abortion." (*Id.* at p. 513 [110 S.Ct. at p. 2980].) The high court rejected this argument, reasoning as follows: "[B]ecause [plaintiffs] are making a facial challenge to a statute, they must show that 'no set of circumstances exists under which the Act would be valid.' [Citation.] The Court of Appeals should not have invalidated the Ohio statute on a facial challenge based upon a worst-case analysis that may never occur. [Citation.] Moreover, under our precedents, the mere possibility that the procedure may require up to 22 days in a rare case is plainly insufficient to invalidate the statute on its face." (*Id.* at p. 514 [110 S.Ct. at pp. 2980-2981].)

## VI. APPROPRIATE LEVEL OF SCRUTINY

In my view, plaintiffs have failed to establish each of the three requisite elements of a state constitutional cause of action for invasion of privacy, and, for that reason alone, defendants should prevail. (See *Hill, supra,* 7 Cal.4th at p. 40.) Because the plurality concludes otherwise, it is necessary

to examine the state's affirmative defense. (*Ibid.*) Thus, I turn to the appropriate level of scrutiny to which Assembly Bill 2274 should be subjected.

The plurality concludes that the statute must be subjected to strict scrutiny. The significance of the plurality's decision to apply a "compelling interest" test cannot be overstated. Whether an interest is protected, what level of scrutiny is appropriately applied to any infringement, and who has the burden of proof depend on how the interest is characterized in the first instance. As we recognized in *Hill*, "strict scrutiny generally functions as a judicial 'trump card,' invalidating any attempt at state regulation." (*Hill*, *supra*, 7 Cal.4th at p. 30; see also *id.* at p. 37.) It also shifts the burden of proof. Instead of deferring to legislative findings of fact, the analysis begins by assuming the interest in question is constitutionally protected and requires the state to *prove* normative presuppositions that are incapable of objective proof. (Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests* (1983) 81 Mich. L.Rev. 463, 548-550; see also *Dunn v. Blumstein* (1972) 405 U.S. 330, 363-364 [92 S.Ct. 995, 1013, 31 L.Ed.2d 274] (dis. opn. of Burger, C. J.) ["Some lines must be drawn. To challenge such lines by the 'compelling state interest' standard is to condemn them all. So far as I am aware, no state law has ever satisfied this seemingly insurmountable standard, and I doubt one ever will, for it demands nothing less than perfection."].) The plurality's decision to apply a "compelling interest" test is thus tantamount to declaring Assembly Bill 2274 unconstitutional. (See Kurland, *The Supreme Court, Compulsory Education, and the First Amendment's Religion Clauses* (1973) 75 W.Va. L.Rev. 213, 232 [The "compelling interest" test imposes such a severe burden of justification on the state as to be "a statement of a conclusion rather than a measure of constitutionality."].)

The plurality justifies its decision to apply a "compelling interest" test, the highest level of constitutional scrutiny, by quoting the following passage from *Hill*: " '[[T]]he particular context, i.e., the specific kind of privacy interest involved and the nature and the seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. *Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a "compelling interest" must be present to overcome the vital privacy interest.* If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed.' " (Plur. opn., *ante*, at p. 340, adding italics, quoting *Hill*, *supra*, 7 Cal.4th at p. 34; see also plur. opn., *ante*, at pp. 329-330.)

Based on the italicized portion of the quotation, the plurality concludes that a "compelling interest" test is required whenever an interest fundamental to personal autonomy is at stake. The full passage from *Hill* does not

support this proposition. Rather, it requires that "the nature and seriousness of the invasion and any countervailing interests" also be taken into account in determining the appropriate level of scrutiny. (*Hill, supra,* 7 Cal.4th at p. 34.) Significantly for the present purposes, where the privacy interest at stake is "in bona fide dispute," a general balancing test is employed. (*Ibid.*)

As discussed above, Assembly Bill 2274 burdens an unemancipated minor's privacy interest only by requiring her to convince a disinterested judicial officer, rather than a physician, that she has the capacity to give informed consent. The statute guarantees a mature unemancipated minor the right to make her own abortion decision. (See *ante,* at pp. 433-434.) Under these circumstances, "the nature and seriousness of the invasion" do not warrant the application of a "compelling interest" test. (*Hill, supra,* 7 Cal.4th at p. 34; see also *id.* at p. 79 (dis. opn. of Mosk, J.) ["[C]onduct adversely affecting, but not abridging, an established right of privacy may be allowed if reasonable."]; *id.* at pp. 85, 107.) Nor does the fact that Assembly Bill 2274 *encourages* an unemancipated minor to consult with her parents warrant the application of a "compelling interest" test. Rather, in this regard, the statute effects a reasonable accommodation of "countervailing interests." (*Hill, supra,* 7 Cal.4th at p. 34.) To put it another way, at most the privacy interest at stake in this case is "in bona fide dispute," and, hence, a general balancing test ought to apply. (*Ibid.*)

The fundamental problem with the plurality's approach to constitutional jurisprudence is that it allows the courts to topple every cultural icon, to dismiss all societal values, and to become the final arbiters of traditional morality in a context in which their view of wisdom cannot be challenged. "[T]he judiciary can change the most fundamental patterns of our social character with no real proof that the change will be for the better—or, in the long run, even tolerable." (Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests, supra,* 81 Mich. L.Rev. at p. 550.) That is why legislatures must be accorded broad deference on issues as to which reasonable minds can differ and why courts must exercise reasoned judgment and self-restraint.

Balance is the Holy Grail for courts in a constitutional system: to strike a balance between the will of majorities, the rights of minorities, and the insatiable appetite of political institutions for power. To preserve a healthy equilibrium in a world hell-bent for absolutes, that is the judiciary's crucial and difficult role. Today, the plurality abandons this historic and irreplaceable legacy with a shrug and without a backward glance.

## VII. REVIEW OF ASSEMBLY BILL 2274 UNDER THE APPROPRIATE LEVEL OF SCRUTINY

### A. *Deference to the Legislative Process*

If there were any doubt that a "compelling interest" test functions as a judicial trump card, the plurality promptly dispels it by expressly disavowing any requirement of deference to the legislative process. Thus, the plurality explains, " '[[t]]he ordinary deference a court owes to any legislative action *vanishes* when constitutionally protected rights are threatened.' " (Plur. opn., *ante*, at p. 349, italics added, quoting *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119].) "Vanishing" acts may be appropriate to the lexicon of a magician whose task is to make things disappear. It cannot seriously be used to describe the work of a judiciary cognizant of the inherent limits of our constitutional scheme. Smoke and mirrors should be no part of our repertoire.

Even if this sweeping principle of "vanishing" deference were correct in the First Amendment context, no rationale justifies extending the principle beyond that limited realm. (See *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543, 577-578 [63 Cal.Rptr.2d 467, 936 P.2d 473] (dis. opn. of Baxter, J.); see also *id.* at p. 605 (dis. opn. of Ardaiz, J.).) As we recently observed in *Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112], " '[i]n considering the constitutionality of a legislative act we *presume* its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is *clear and unquestionable*, we must uphold the Act. [Citations.]' " (Italics added; see also *People* v. *Sanders* (1990) 51 Cal.3d 471, 495 [273 Cal.Rptr. 537, 797 P.2d 561]; *County of Sonoma* v. *State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368 [220 Cal.Rptr. 114, 708 P.2d 693]; *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 544-545 [63 Cal.Rptr. 21, 432 P.2d 717].) " ' "All presumptions and intendments favor the validity of a statute and *mere doubt* does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality *clearly, positively and unmistakeably appears.* [Citations.]" ' " (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204], italics added.) Likewise, courts "presume that the legislature acted with integrity, and with an honest purpose to keep within the restrictions and limitations laid down by the constitution. The legislature is a coordinate department of the government, invested with high and responsible duties, and it must be presumed that it has considered and discussed the

constitutionality of all measures passed by it." (*Beach* v. *Von Detten* (1903) 139 Cal. 462, 465 [73 P. 187].)[6]

Deference is especially warranted in this case. First, the Legislature drafted Assembly Bill 2274 to comply with the guidelines set out in several United States Supreme Court decisions and heeded that court's advice to act with "particular sensitivity" in this arena. (*Bellotti II, supra,* 443 U.S. at p. 642 [99 S.Ct. at pp. 3047-3048] (plur. opn. of Powell, J.).) "[O]ur past cases establish that the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. (See, e.g., *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].) In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 176-180 [2 L.Ed. 60, 73-74]), a focused legislative judgment on the question enjoys significant weight and deference by the courts." (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 180.)

Second, before enacting Assembly Bill 2274, the Legislature considered and evaluated much of the same conflicting empirical evidence the trial court later purported to resolve. The Senate Committee on Health and Human Services, for example, considered competing legislative analyses. One lambasted the failure of parental involvement statutes in states such as Massachusetts and Minnesota; the other praised their success. (Compare Legis. Analysis Supporting Assem. Bill No. 2274, Sen. Com. on Health & Human Services, Aug. 19, 1987, pp. 5-7, with Staff Analysis of Assem. Bill No. 2274, Sen. Com. on Health & Human Services, July 15, 1987, pp. 4-5.) Because much of the evidence related to normative presuppositions not subject to objective proof, resolution of any conflicts lay within the province of the Legislature, a collective and accountable body.

---

[6]The plurality mischaracterizes *Gregg* v. *Georgia* (1976) 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] as an example of the deference courts owe legislatures in *nonconstitutional* cases (plur. opn., *ante,* at p. 349, fn. 25), suggesting such deference does not extend to *constitutional* cases. *Gregg* actually addressed an *Eighth Amendment* claim that capital punishment amounted to cruel and unusual punishment because it did not deter crime. The court acknowledged that "there is no convincing empirical evidence either supporting or refuting this view" (*Gregg* v. *Georgia, supra,* 428 U.S. at p. 185 [96 S.Ct. at p. 2930] (plur. opn. of Stewart, Powell, and Stevens, JJ.)), but nonetheless rejected the claim. "The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. [Citation.] . . . . [¶] In sum, we cannot say that the judgment of the Georgia Legislature that capital punishment may be necessary in some cases is *clearly wrong*." (*Id.* at p. 186 [96 S.Ct. at p. 2931], italics added.)

"It is not for us to resolve empirical uncertainties underlying state legislation, save in the *exceptional* case where that legislation *plainly impinges* upon rights protected by the Constitution itself." (*Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49, 60 [93 S.Ct. 2628, 2936-2937, 37 L.Ed.2d 446], italics added & fn. omitted; see also *Hill, supra,* 7 Cal.4th at p. 47 ["Plaintiffs cite no authority imposing a 'scientific' burden of proof on a defendant in an invasion of privacy case; we have located none."].) Unless such an impingement plainly appears, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." (*FCC* v. *Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [113 S.Ct. 2096, 2102, 124 L.Ed.2d 211].) "[T]he proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and . . . Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain." (*Tyson & Brother* v. *Banton* (1927) 273 U.S. 418, 446 [47 S.Ct. 426, 433-434, 71 L.Ed. 718, 58 A.L.R. 1236] (dis. opn. of Holmes, J.).)

Finally, in addition to the state's compelling interest in the health and welfare of an unemancipated minor, this case implicates other, competing constitutional interests—specifically, the minor's privacy interest and the liberty interests of her parents. "[H]ow are competing interests to be assessed? Since they are not subject to quantitative ascertainment, the issue necessarily resolves itself into asking, who is to make the adjustment?—who is to balance the relevant factors and ascertain which interest is in the circumstances to prevail? Full responsibility for the choice cannot be given to the courts. Courts are not representative bodies. . . . History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures. [¶] Primary responsibility for adjusting the interests which compete in the situation before us of necessity belongs to the [legislature]." (*Dennis* v. *United States* (1951) 341 U.S. 494, 525 [71 S.Ct. 857, 875, 95 L.Ed. 1137] (conc. opn. of Frankfurter, J.).)

"Our right to pass on the validity of legislation is now too much part of our constitutional system to be brought into question. But the implications of that right and the conditions for its exercise must constantly be kept in mind and vigorously observed. Because the Court is without power to shape measures for dealing with the problems of society but has merely the power of negation over measures shaped by others, the indispensable judicial requisite is intellectual humility, and such humility presupposes complete

disinterestedness." (*A. F. of L.* v. *American Sash Co.* (1949) 335 U.S. 538, 556-557 [69 S.Ct. 258, 267, 93 L.Ed. 222, 6 A.L.R.2d 481] (conc. opn. of Frankfurter, J.).) "Courts can fulfill their responsibility in a democratic society only to the extent that they succeed in shaping their judgments by rational standards, and rational standards are both impersonal and communicable. Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feeling; it is also an exercise in prophecy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people. Its functions can be assumed by this Court only in disregard of the historic limits of the Constitution." (*Id.* at p. 557.)

## B. *The Court as a Super-Legislature*

The plurality presumes to disregard the limits of its constitutional role because numerous "analogous" statutes authorize a minor to obtain medical care or make other fundamental decisions for herself and her child without parental consent. Based on these statutes, the plurality concludes Assembly Bill 2274 is not necessary either to protect the health of a pregnant minor or to protect the minor's relationship with her parents. (See plur. opn., *ante*, at pp. 353-354.) I cannot agree with this mode of analysis.

The plurality itself acknowledges abortion is fundamentally different in that it includes a unique moral and philosophical dimension: "[T]he decision whether to continue or terminate [a] pregnancy has . . . a substantial effect on a pregnant minor's control over her personal bodily integrity, has . . . serious long-term consequences in determining her life choices, [and] is . . . central to the preservation of her ability to define and adhere to her ultimate values regarding the meaning of human existence and life." (Plur. opn., *ante*, at p. 337; see also *id.* at pp. 313-314, 332-334; *ante*, at pp. 433-436.) "Though [a mature unemancipated minor] has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. . . . It follows that States are free to enact laws to provide a reasonable framework for [her] to make a decision that has such profound and lasting meaning." (*Casey, supra,* 505 U.S. at pp. 872-873 [112 S.Ct. at p. 2818] (plur. opn. of O'Connor, Kennedy, and Souter, JJ.).) "What is at stake is the [mature unemancipated minor's] right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express [their views] are permitted, if they are

not a substantial obstacle to [her] exercise of the right to choose." (*Id.* at p. 877 [112 S.Ct. at p. 2821].)

Even the decisions to bear a child or to put a child up for adoption—decisions that implicate similar concerns—are not truly analogous, for a state has an independent and compelling interest in the health and welfare of the unemancipated minor's child. In order to further this interest, our Legislature could reasonably conclude that it was necessary to ensure an unemancipated minor unrestricted access to prenatal care and the ability to give her child up for adoption if, for whatever reason, she deems herself unable or unwilling to care for it. In fact, plaintiffs' own expert testified that "entry into early prenatal care is absolutely critical for a healthy outcome of [a] pregnancy."

This case is an excellent example of the folly of courts in the role of philosopher kings. Here, the trial court "found" there is no difference in the decisionmaking capacities of minors and adults. Under the usual rules, this conclusion would be insulated from appellate review if the record provides any support for the finding. There is only one problem. The "finding" is contrary to what every adult in the country knows from experience. The greatest distance between two points is time. Information is not the same thing as knowledge. Knowledge is not wisdom. And wisdom we gain only with time. We have a vastly richer perspective from which to judge our actions at 45 than at 15.

A trial judge may "find" that ages 15 and 45 are indistinguishable, but that will never make it true.

This is not to say that such truths are capable of proof. Does the death penalty deter? Does pornography deform? Does a terminally ill patient have a right to die? Our laws reflect, as they must, working assumptions on which there is a general consensus. These broadly conceived principles, captured under the rubric of culture and tradition, are not empirically determined. They represent value judgments growing out of the collective conscience of the people, taking authority from custom itself. The proponents of these traditional understandings—including the general incapacity of minors—cannot prove their truth. But neither can their opponents prove their falsity; they can only impose the tyranny of the anecdote.

Certainly, in matters of normative judgment, no court should be in the position to supplant a society's collective understanding, distilled through experience and expressed in legislative enactments, on the basis of the evidence presented in a single case. "Experience is the oracle of truth; and where its responses are unequivocal, they ought to be conclusive and

sacred." (Madison et al., The Federalist No. 20 (Rossiter edit. 1961) p. 138.) But, as this case demonstrates, truth is not the same thing as proof. Apparently, the court believes profound questions about the way we live our lives together should be resolved not on the basis of collective experience but on the basis of expert testimony.

When fundamentally moral and philosophical issues are involved and the questions are fairly debatable, the judgment call belongs to the Legislature. The reasons are both pragmatic and political. Legislatures are in the business of accommodating interests and building consensus. They represent the will of the people. Courts are in the business of articulating inviolable rights that cannot be accommodated and are shielded from the will of the majority.

The government may not extinguish constitutional rights. But, when the Legislature accommodates competing constitutional claims in a way that is appropriate to the historical and cultural context, congruent with long-standing tradition and respectful of all interests, courts have nothing more to say.

VIII. CONCLUSION

"A free and enlightened society may decide that each of its members should attain a clearer, more tolerant understanding of the profound philosophic choices confronted by a woman who is considering whether to seek an abortion. Her decision will embrace her own destiny and personal dignity, and the origins of the other human life that lie within the embryo. The State is entitled to assume that, for most of its people, the beginnings of that understanding will be within the family, society's most intimate association. It is both rational and fair for the State to conclude that, in most instances, the family will strive to give a lonely or even terrified minor advice that is both compassionate and mature. The statute in issue here is a rational way to further those ends. It would deny all dignity to the family to say that the State cannot take this reasonable step in regulating its health professions to ensure that, in most cases, a young woman will receive guidance and understanding from a parent." (*Ohio* v. *Akron Center for Reproductive Health*, *supra*, 497 U.S. at p. 520 [110 S.Ct. at pp. 2983-2984] (plur. opn. of Kennedy, J.).)

I dissent.